## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

———————————————————————— )
UNITED STATES SECURITIES )
AND EXCHANGE COMMISSION, )
)
      Plaintiff, )     Case No. 15-CV-00758
)
      v. )
)
ITT EDUCATIONAL SERVICES, INC., )     Jury Trial Demanded
KEVIN M. MODANY, and )
DANIEL M. FITZPATRICK, )
)
      Defendants. )
———————————————————————— )

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Commission"), alleges as follows:

### NATURE OF THE ACTION

1.     Beginning no later than the second quarter of 2012, ITT Educational Services, Inc. ("ITT"), an operator of for-profit colleges, its chief executive officer Kevin M. Modany, and its chief financial officer Daniel M. Fitzpatrick (collectively, the "Defendants"), engaged in a fraudulent scheme and course of business and made various false and misleading statements and omissions to defraud ITT's investors by concealing the extraordinary failure of two off-balance sheet student loan programs, and the looming effect of that failure on ITT's financial condition.

2.     The "PEAKS" student loan program, formed in 2010 was structured as a trust that sold securities to investors and used the funds to make over $300 million in loans to ITT students.  The "CUSO" student loan program, formed in 2009, was funded by a group of credit

unions organized by ITT and made approximately $141 million in loans to ITT students.  To induce the program participants to finance these risky loans, ITT provided guarantees that limited any risk of loss from the student loan pools. Default rates on the student loans had a key impact on these guarantees: if enough students defaulted, the guarantees were triggered and ITT would be responsible for payments to the loan program participants.

3.     By 2012, the loans made through these programs had performed so abysmally, with extremely high default rates, that ITT's guarantee obligations began to balloon. The Defendants knew ITT faced looming, massive payments on these guarantees. However, rather than disclosing the significant impact of these guarantee obligations to ITT's investors, the Defendants engaged in a series of deceptive acts to hide the poor performance of the student loan programs and their financial impact on ITT.  The Defendants also made numerous misstatements and omissions – in ITT's public filings and in conference calls with financial analysts – that similarly concealed the condition of the student loan programs and ITT's guarantee obligations.

4.     ITT, Modany, and Fitzpatrick hid the poor performance of the programs and their impact on the company in numerous ways. For example, in October 2012, after ITT received its first demand for a multi-million dollar guarantee payment on the PEAKS program, Modany and Fitzpatrick devised a plan whereby ITT actually made payments on behalf of student borrowers who had failed to make timely payments, which had the effect of temporarily delaying further defaults. This practice – which ITT later innocuously titled "Payments on Behalf of Borrowers," or "POBOB" – had the effect of delaying tens of millions of dollars of looming PEAKS guarantee payments ITT would otherwise have had to make. The Defendants concealed this practice from ITT's investors (among others) and instead made statements in public filings that

led investors to believe the PEAKS program and its composite student loans were performing relatively well.

5.      ITT, Modany, and Fitzpatrick further misled investors about the condition of the PEAKS program by consistently "netting" the near-term PEAKS guarantee payments ITT projected making against speculative recoveries that were not projected to be realized until many years later. As a result, the net amount disclosed was tens of millions of dollars lower than the more than $100 million in near-term payments ITT projected making. The Defendants made numerous misstatements and omissions regarding this "netting" practice, including falsely claiming that this net amount represented the total amount of ITT's future guarantee payments.

6.      In addition, the Defendants made only the minimum payments required on ITT's CUSO guarantee – a practice akin to making minimum payments on a high interest credit card – but failed to disclose that this payment choice would have the effect of significantly increasing the amounts ITT would ultimately owe. The Defendants also failed to consolidate the PEAKS program into ITT's financial statements, which would have shown the declining value of PEAKS loans, despite having the sort of control over the program that should require consolidation.

7.      Finally, Modany and Fitzpatrick routinely misled ITT's external auditor regarding important information affecting the PEAKS and CUSO programs, including internal projections about future PEAKS and CUSO guarantee payments, a dispute with PEAKS program participants over the permissibility of POBOB, an unfavorable legal opinion regarding the permissibility of POBOB, and information about ITT's ability to remove the PEAKS loan servicer. The Defendants' actions to mislead ITT's auditor also helped to further the Defendants' fraudulent scheme.

3

8.      In early 2014, the Defendants' scheme began to unravel. ITT's auditor began to learn previously undisclosed information regarding the PEAKS program, including the dispute with PEAKS program participants over the permissibility of POBOB. ITT ultimately restated its financial statements to consolidate PEAKS for periods beginning in the first quarter of 2013 and to reclassify and disclose the timing for CUSO liabilities. In March 2014, ITT paid $40 million to settle claims by PEAKS program participants that ITT circumvented its guarantee obligations through POBOB. In its preliminary first quarter 2014 results, ITT disclosed that it was projecting $144 million of additional PEAKS payments, $116 million of which it expected to pay in 2014. ITT's stock price dropped approximately 20% from already depressed prices.  ITT has since paid millions of dollars in additional PEAKS guarantee payments, based on the poor performance of the program.

9.      As a result of the conduct described herein, ITT, Modany, and Fitzpatrick violated numerous provisions of the federal securities laws and unless restrained and enjoined will continue to do so.

## JURISDICTION AND VENUE

10.     The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 77u(d)]. The Court has jurisdiction pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)-(e) and 78aa]. The Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

4

11.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because the Defendants reside in this District and the acts, practices and courses of business constituting the violations alleged in this Complaint occurred within this District and elsewhere.

## DEFENDANTS

## I.     ITT

12.     ITT Educational Services, Inc. is a Delaware corporation with headquarters in Carmel, Indiana. ITT is a for-profit higher education company with more than 50,000 students at its campuses in 39 states and online. ITT's stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, and is quoted on the New York Stock Exchange.

13.     ITT filed registration statements on Forms S-8 in May 2006 and May 2013 to register shares of common stock under its equity compensation plan. ITT's Form S-8 registration statements incorporated certain prior filings and all subsequently filed periodic reports.  ITT's offerings pursuant to these registration statements were ongoing during the time periods impacted by the Defendants' misstatements and scheme, detailed below.

14.     ITT issued equity-based compensation based on these registration statements to its executives, board of directors, and other non-executive officer employees during the relevant period. ITT obtained the benefit of the services of these executives, directors, and employees by in part compensating them with equity-based compensation subject to these registration statements.

## II.     Modany

15.     Kevin M. Modany, age 48, is a resident of Carmel, Indiana. During the relevant period, Modany was ITT's chief executive officer ("CEO") and chairman of its board of

directors, positions he had held since 2007 and 2008, respectively. Prior to that time, Modany was ITT's president and chief operating officer from approximately 2005 to 2007 and was ITT's chief financial officer ("CFO") from approximately 2003 to 2005. Modany is also a certified public accountant ("CPA") and was an auditor with a national accounting firm from 1990 to 1995.

16.     Modany was significantly involved in the structure and operation of the loan programs at issue in this case, as well as in ITT's public filings and disclosures. Modany signed ITT's 2012 Form 10-K and certified each periodic filing during the time period relevant to this Complaint. Modany (along with Fitzpatrick) had extensive input into these periodic filings: he edited and commented upon early drafts of the filings, reviewed the drafts after others had commented, and gave final approval before the filings were issued. As detailed below, those periodic filings contained numerous false and misleading statements and omissions regarding the PEAKS and CUSO programs.

17.     Modany also signed management representation letters to ITT's auditor for each filing period relevant to this Complaint. Those management representation letters also contained false and misleading statements and omissions.

18.     During the time period relevant to this Complaint, Modany received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation.

**III.    Fitzpatrick**

19.     Daniel M. Fitzpatrick, age 55, is a resident of Carmel, Indiana. During the relevant period, Fitzpatrick was ITT's CFO, executive vice president, and principal accounting officer. Before joining ITT, Fitzpatrick was a senior vice president and controller for another for-

profit education company, as well as an auditor with a national accounting firm. Like Modany, Fitzpatrick is a CPA.

20.     Fitzpatrick was also significantly involved in the structure and operation of the loan programs at issue in this case, as well as in ITT's public filings and disclosures. Fitzpatrick signed and certified each of ITT's periodic reports during the time period relevant to this Complaint. Fitzpatrick (along with Modany) had extensive input into these periodic filings: he edited and commented upon early drafts of the filings, reviewed the drafts after others had commented, and gave final approval before the filings were issued.

21.     Fitzpatrick also signed management representation letters to ITT's auditor for each filing period relevant to this Complaint. Those management representation letters also contained false and misleading statements and omissions.

22.     During the time period relevant to this Complaint, Fitzpatrick received substantial compensation from ITT in the form of salary, bonuses, and incentive and/or equity-based compensation.

## FACTS

### I.     ITT's Dependence on Private Student Loans

23.     ITT is a for-profit education company. Nearly all of ITT's revenues come from tuition, which students pay using principally federal and state student loans. Like most for-profit education companies, ITT receives a significant amount of its revenue from federal student loan programs under Title IV of the Higher Education Act of 1965 ("Title IV"). For example, in 2013, approximately 82% of ITT's revenue came from Title IV funding. Federal regulations require that ITT, like other schools that receive Title IV funds, derive at least 10% of its revenue from non-Title IV sources.

24.     Historically, ITT's students relied on traditional private education loans to pay for tuition and other costs not covered by Title IV grants, loans, and other sources, and ITT relied on the students' private loans to provide cash flow and critical non-Title IV revenue. However, in early 2008, traditional private lenders generally ceased extending loans to students of for-profit colleges, given those students' high default rates.

25.     In 2008 and 2009, ITT tried but failed to secure a new source of private loans for its students. As a result, ITT extended "temporary credit" to students who were unable to pay the full cost of tuition from other sources. Temporary credit was a short-term loan payable in a single payment at the end of the academic year for which it was offered. Temporary credit had the effect of decreasing ITT's reported income and other financial metrics, and further affecting ITT's cash flow. In addition, the revenue associated with temporary credit was not considered part of the 10% of revenue ITT was required to derive from non-Title IV sources.

26.     Beginning in 2009, ITT formed the two private student loan programs at issue in this case – PEAKS and CUSO. Once those loan programs were in place, ITT used funds from the programs to pay off millions of dollars in temporary credit balances its students already owed to ITT, and to make new loans to ITT students.

## II.     Defendants Devise the PEAKS and CUSO Private Student Loan Programs.

27.     The PEAKS and CUSO private student loan programs were complex structures that involved numerous parties outside of ITT providing money to fund student loans. ITT made a number of guarantees that mitigated these external parties' risk of loss if the programs performed poorly. A critical element of both student loan programs was the rate of student defaults: if a large number of students defaulted on their loans, ITT could be obligated to make

significant guarantee payments that would flow to the outside parties involved in the loan programs.

28. Modany and Fitzpatrick were extensively involved in the organization of both the PEAKS and CUSO programs and the negotiation of the relevant agreements.

**A. PEAKS**

29. In January 2010, ITT created the PEAKS (an acronym for "Program for Education Access and Knowledge") private student loan program. Under the terms of the PEAKS program, a bank issued loans to ITT students based on a commitment from a newly-formed trust (the "PEAKS Trust") to purchase these loans. To finance the purchase of these loans, the PEAKS Trust raised approximately $300 million by issuing senior debt to various institutional investors (the "PEAKS Noteholders"). The PEAKS Trust received the cash flows from the payments on the student loans and used those funds to pay the principal and interest of the senior debt, and other fees and expenses of the program. A student loan servicer was responsible for collecting the payments on the student loans.

30. ITT guaranteed all of the principal and interest payments on the PEAKS senior debt, as well as all other financial obligations of the PEAKS Trust. The PEAKS Trust was required to pay off all of the senior debt by the beginning of 2020, either through student loan cash flows or ITT's guarantee payments.

31. ITT also guaranteed that it would maintain a "parity ratio" between the PEAKS Trust's assets (which essentially consisted of the value of the loans made to ITT's students) and liabilities (which essentially consisted of the senior debt owed to the PEAKS Noteholders). ITT guaranteed that the value of the assets would at all times equal or exceed 105% of the liabilities. In practice, this meant that if the value of the Trust's assets declined below the required parity

ratio, ITT was required to pay down the liabilities, *i.e.*, the senior debt, until the ratio was back in balance.

32.     Student loan defaults had a significant impact on the parity ratio. When PEAKS loans became 180 days delinquent, they were required to be written off for the purpose of the parity ratio calculation, thereby reducing the PEAKS Trust's assets and decreasing the parity ratio.

33.     If ITT did not make required guarantee payments, such as payments to preserve the parity ratio, when those payments were due, the PEAKS Noteholders could force ITT to immediately pay the entire amount of principal and interest remaining on the senior debt rather than waiting for the 2020 maturity date.

**B.     CUSO**

34.     Prior to PEAKS, in 2009, ITT launched the CUSO private student loan program. ITT organized a group of credit unions that, acting through a Credit Union Service Organization ("CUSO"), made a total of approximately $141 million in private loans to ITT's students over several years.  Loans made in each year of the program were aggregated into one of three annual loan pools.

35.     ITT entered into a "risk sharing agreement" with the CUSO that was triggered if more than 35% of the loans in any of the three annual pools defaulted. Under the risk sharing agreement, ITT guaranteed payment of the principal, interest, and fees on any loans that defaulted over this 35% threshold (the "risk share threshold").

36.     Under the CUSO risk sharing agreement, once ITT's guarantee obligation was triggered for one of the CUSO loan pools, ITT could choose to pay an amount equal to the monthly payments due on defaulted loans over the threshold (a minimum payment), or it could

discharge its total future obligation on those defaulted loans by immediately paying an amount equal to their outstanding principal plus some additional interest. In practice, the first option (making minimum monthly payments) cost ITT less in the short term than the second option (immediate discharge), but cost ITT more over the long term because of the accruing interest associated with the monthly payments.

### C.  PEAKS and CUSO Underwriting Criteria

37.     ITT wrote the loan underwriting criteria for the PEAKS and CUSO programs. The underwriting standards were extremely lenient. In addition, ITT was able to override the standards if ITT had previously extended temporary credit to the borrower.

38.     The vast majority of PEAKS and CUSO borrowers had very poor credit profiles. Further, ITT students who accepted PEAKS and CUSO loans were required to pay very high capitalized fees and adjustable interest rates. These interest rates ranged up to the U.S. prime interest rate ("prime") plus 10.5% for CUSO and prime plus 11.5% for PEAKS.

## III.     <u>PEAKS and CUSO are Initially Kept off ITT's Balance Sheet.</u>

39.     As Modany and Fitzpatrick knew, the PEAKS and CUSO programs were designed to enable ITT to avoid reporting their assets, liabilities, and financial performance in ITT's balance sheet and other financial statements.

40.     Both the PEAKS and CUSO programs are so-called variable interest entities, or "VIEs". Under Generally Accepted Accounting Principles ("GAAP"), a company is required to consolidate the assets, liabilities, and financial results of a VIE into its financial statements if, among other things, the company directs the activities that most significantly impact the VIE's economic performance.

41.     ITT identified the establishing of loan underwriting criteria and the servicing of

the loans as the activities that most significantly impacted the economic performance of the

PEAKS and CUSO programs. However, ITT did not initially consolidate the PEAKS or CUSO

programs into its financial statements.

42.     Because ITT did not consolidate the PEAKS or CUSO programs into its financial

statements, ITT's investors did not have direct information about the performance of the

programs or the component student loans.

## IV.     Second and Third Quarters of 2012: ITT's Student Loan Programs Begin to Deteriorate.

43.     From at least the end of 2011 through the end of the third quarter of 2012,

PEAKS and CUSO loans were defaulting at extremely high rates. During this same time period,

ITT's financial performance and stock price were deteriorating due to declining enrollment and

other issues affecting the for-profit college industry. In this environment, ITT's management,

investors, and stock analysts were particularly focused on ITT's cash generation, cash

obligations, and liquidity.

44.     During the second and third quarters of 2012, ITT used an internal model to

estimate its liability for the PEAKS program by estimating the cash flows of the PEAKS Trust

and ITT's resulting guarantee payments.  However, as the performance of the PEAKS Trust

deteriorated, the parity ratio the model calculated diverged significantly from the actual parity

ratio that was reported to and tracked by Fitzpatrick and others.

45.     By at least the second quarter of 2012, ITT was tracking the declining

performance of the PEAKS loans. In June 2012, an institutional investor who was a PEAKS

Noteholder asked Fitzpatrick about the decline of the PEAKS parity ratio. In response,

Fitzpatrick was told by ITT's controller that the ratio had declined dramatically, from 119% to 112% in the course of only three months.

46.     However, at the end of the second quarter of 2012, ITT's internal model reflected a parity ratio of 121%, far higher than the 112% ratio Fitzpatrick knew about in June 2012.

47.     ITT continued to track the declining parity ratio in the third quarter of 2012. In August 2012, ITT's controller emailed Modany and Fitzpatrick a spreadsheet that showed further decline of the PEAKS parity ratio, which by June 2012 had fallen to below 110%.

48.     Later in August 2012, ITT's controller informed Fitzpatrick that the parity ratio had fallen to 107%, and reiterated that 105% was the trigger point at which ITT would be required to make guarantee payments to the PEAKS Trust. Fitzpatrick simultaneously received a PEAKS monthly statement which showed that over $67 million in PEAKS loans were thirty or more days delinquent.

49.     In September 2012, Fitzpatrick received additional information indicating that the PEAKS parity ratio was about to be breached and that tens of millions of dollars of additional loans were projected to default over the next few months.  For example, on September 14, 2012, ITT's controller told Fitzpatrick that if the PEAKS student loan assets declined by about $6 million, the parity ratio would fall below 105%. Less than two weeks later, on September 27, 2012, ITT's controller forwarded Fitzpatrick an analysis of monthly PEAKS student loan defaults from ITT's independent loan consultants that projected approximately $17 million in student loan defaults in September, and more than $50 million in student loan defaults by the end of the year.

50.     In October 2012, before ITT filed its Form 10-Q for the third quarter of 2012, ITT received a demand for a PEAKS guarantee payment of more than $8 million as a result of the breach of the parity ratio. ITT made a payment to the PEAKS Trust in that amount.

51.     When ITT received this demand, Modany and Fitzpatrick almost immediately began to analyze the PEAKS delinquent loans that would trigger additional payment demands upon default. Based on these analyses, Modany and Fitzpatrick knew that severely delinquent PEAKS loans would have required additional projected PEAKS guarantee payments of approximately $30 million in the fourth quarter of 2012 alone.

52.     The Defendants misled ITT's auditor by failing to disclose the growing disparity between ITT's internal model and the actual PEAKS parity ratio. Fitzpatrick and ITT employees under his direction provided various information, including the results of ITT's internal model estimating the PEAKS liability, to ITT's auditor in connection with the auditor's review work in the second and third quarters of 2012. As discussed above, that internal model reflected a far higher parity ratio than the actual parity ratio that Fitzpatrick was monitoring. Even so, Fitzpatrick did not alert ITT's auditor to the discrepancy between the actual parity ratio and the parity ratio calculated by ITT's model.

53.     The fact that the parity ratio produced by the model did not agree with the actual parity ratio would have been significant to ITT's auditor, as it bore upon the accuracy, reasonableness and reliability of the model ITT was using to project its PEAKS liability.

**V.      Fourth Quarter of 2012 through Second Quarter of 2013: Defendants Engage in Fraudulent Conduct Surrounding the Poor Performance of PEAKS and CUSO, Including Concealing that Poor Performance from Investors.**

  **A.      Defendants' Make Payments on Behalf of Borrowers and Mislead ITT's Investors and Others about this Practice.**

   **i.      Defendants Devise a Plan to Temporarily Avoid PEAKS Guarantee Payments.**

54.      After receiving the PEAKS guarantee payment demand in October 2012, Modany and Fitzpatrick devised a scheme for ITT to make relatively small payments on delinquent student loans in order to delay making much larger PEAKS parity ratio guarantee payments that defaults on those loans would trigger.

55.      ITT determined which students were about to default on their loans and made the minimum payment necessary to avoid default on their behalf, without advising the defaulting student that these payments were being made.  Modany and Fitzpatrick implemented this scheme – which ITT later dubbed "Payments on Behalf of Borrowers," or "POBOB" – with the goal to prevent any PEAKS loans from defaulting and thereby avoid all parity ratio guarantee payments that would otherwise have been required based on actual student loan performance.  Modany and Fitzpatrick directed and approved the POBOB payments, monitored the amounts of payments, and were aware of the magnitude of the PEAKS loan balances impacted by the payments.

56.      At the end of October 2012, ITT made approximately $2.4 million of POBOB payments, which prevented the subject loans from defaulting. As Modany and Fitzpatrick were aware, the effect of these POBOB payments was to avoid approximately $30 million in guarantee payments to the PEAKS Trust that ITT would have been required to make to maintain the parity ratio.

15

57.    ITT continued making POBOB payments almost every month through the first quarter of 2014.  These POBOB payments were significant: they comprised approximately 44% of the cash the PEAKS Trust received from the student loan pool over the period from the fourth quarter of 2012 through the second quarter of 2013.  Indeed, by the second quarter of 2013, ITT was not making any parity ratio guarantee payments, but was instead only making POBOB.

58.    As Modany and Fitzpatrick knew, the practice of making POBOB payments rather than PEAKS guarantee payments resulted in lower monthly payment obligations, but increased ITT's overall PEAKS guarantee obligations. Unlike guarantee payments, which would pay down the PEAKS Noteholders' principal, POBOB payments did not reduce ITT's total PEAKS liability. The POBOB payments instead increased ITT's overall PEAKS liability because ITT essentially took over these student loans and their additional interest costs that ITT was not otherwise obligated to pay.  These effects compounded each period that ITT continued the practice.

59.    By the end of 2013, ITT had delayed tens of millions of dollars of guarantee payments that would otherwise have been required.

### ii.    Defendants Mislead ITT Investors about POBOB.

60.    From the fourth quarter of 2012 through the second quarter of 2013, ITT, Modany, and Fitzpatrick misled investors about the existence and impact of ITT's POBOB payments. As detailed below, the Defendants failed to disclose POBOB to investors, which rendered various statements the Defendants did make misleading. Relatedly, the Defendants had an obligation to disclose POBOB, particularly in the Management Discussion and Analysis ("MD&A") portion of ITT's public filings, but failed to do so. Finally, the Defendants made

several affirmative statements concerning PEAKS and the PEAKS Trust that were false and misleading in light of POBOB.

61.     ITT, Modany, and Fitzpatrick misled investors through various statements in ITT's Forms 10-K, 10-Q, and 8-K during this period that were rendered false and misleading by the Defendants' failure to disclose information relating to ITT's POBOB payments.  Each of these filings contained various statements describing the PEAKS guarantee and disclosing the amounts of guarantee payments ITT made in the each relevant period. By making these statements without disclosing POBOB, the Defendants gave ITT's investors the false appearance that the PEAKS program and its composite student loan pools were performing relatively well, even though the Defendants knew that PEAKS student loans were defaulting at significant rates and ITT was merely delaying tens of millions of dollars in guarantee payments by making POBOB.

62.     For example, ITT's 2012 Form 10-K disclosed that ITT "guarantee[d] payment of the principal, interest and … certain call premiums owed on the PEAKS Senior Debt, and administrative fees and expenses of the PEAKS Trust and the required ratio of assets of the PEAKS Trust to outstanding PEAKS Senior Debt (the 'PEAKS Guarantee')." The Form 10-K went on to disclose that "[i]n 2012, we made guarantee and other payments net of recoveries, of approximately $16.9 million under the [CUSO] and PEAKS Programs." ITT's other filings during this period contained similar statements.

63.     These statements about the nature of the PEAKS guarantee and ITT's performance under it were misleading as a result of ITT's undisclosed POBOB payments. The statements indicated to investors that the amounts ITT paid during these periods reflected the amount that ITT was required to pay under its guarantee agreements. In fact, the Defendants

started making POBOB payments in the fourth quarter of 2012 in an attempt to avoid making any guarantee payments. By the second quarter of 2013, ITT was not making any parity ratio guarantee payments but was instead only making POBOB payments. The amounts of the guarantee payments ITT delayed were many times larger than the POBOB payments it made.

64.     In addition, the disclosed amounts of guarantee payments made from period to period misled investors into thinking that ITT's obligations did not increase after the fourth quarter of 2012. As noted above, in ITT's 2012 Form 10-K, the Defendants disclosed that ITT had made "guarantee and other payments" to PEAKS and CUSO of $16.9 million in 2012. In ITT's Form 10-Q for the first quarter of 2013, ITT disclosed that it made "guarantee and other payments" to the PEAKS Trust of just over $3 million in the first quarter of 2013. And in ITT's Form 10-Q for the second quarter of 2013, ITT disclosed that it made "guarantee and other payments" to the PEAKS Trust of approximately $3.3 million in the second quarter of 2013. These disclosures indicated that the PEAKS program and its composite student loans were not significantly deteriorating. In fact, however, based on the poor performance of the loan pool, PEAKS guarantee payments would have risen significantly but for POBOB. Together, these misstatements concealed ITT's enormous and imminent PEAKS guarantee obligations.

65.     In addition to the fact that the failure to disclose the existence and effect of POBOB rendered numerous statements in ITT's periodic filings misleading, the Defendants also had an affirmative obligation to disclose POBOB, including in the MD&A portion of ITT's periodic filings. Management is required to disclose information in MD&A beyond what they are required to disclose in the financial statements, including information about "off balance sheet arrangements" (such as the PEAKS program). Specifically, companies must disclose information about the nature and amounts of obligations related to such arrangements, as well as information

about "contractual obligations" (such as ITT's loan program guarantee obligations) and known trends, demands or uncertainties bearing upon the company's liquidity. Despite this, the Defendants failed to disclose the existence or effect of POBOB in MD&A in any of the periodic filings from the fourth quarter of 2012 through the second quarter of 2013.

66.     Additionally, the Defendants made several affirmative misstatements in ITT's periodic filings. For example, in each of these periodic filings, the Defendants stated that ITT "did not explicitly or implicitly provide any financial or other support to the PEAKS Trust … that we were not contractually required to provide, and we do not intend to provide any such support to the PEAKS Trust in the foreseeable future, other than what we are contractually required to provide." This statement was false. As the Defendants knew or were reckless in not knowing, the PEAKS contracts did not require ITT to make POBOB payments. The Defendants nonetheless made this statement in ITT's 2012 Form 10-K and Forms 10-Q for the first three quarters of 2013.

67.     In addition, the Defendants stated that ITT would be entitled to eventual repayment of any payments made under the PEAKS guarantee, to the extent PEAKS funds were available. For example, in ITT's 2012 Form 10-K, the Defendants stated: "[o]ur guarantee and purchase obligations under the PEAKS Program remain in effect until the PEAKS Senior Debt and the PEAKS Trust's fees and expenses are paid in full. At such time, we will be entitled to repayment of the amount of any payments made under our guarantee and payment of the Subordinated Note, in each case only to the extent of available funds remaining in the PEAKS Trust." However, unlike parity ratio guarantee payments, POBOB was not recoverable.

68.     Modany and Fitzpatrick were responsible for ITT's periodic filings, discussed above, that contained misstatements and omissions. Modany and Fitzpatrick were involved in the

drafting and preparation of ITT's 2012 Form 10-K and Forms 10-Q for the first and second quarters of 2013. In addition, Modany signed and certified ITT's 2012 Form 10-K, and he certified ITT's Forms 10-Q for the first and second quarters of 2013. Fitzpatrick signed and certified ITT's 2012 Form 10-K and Forms 10-Q for the first and second quarters of 2013.

69.     Modany and Fitzpatrick also made various statements in earnings calls regarding the performance of the PEAKS loans and ITT's guarantee obligations that were rendered false and misleading by their failure to disclose that they were manipulating the current performance of the loans through POBOB.  For example, Modany and Fitzpatrick held an earnings call on October 25, 2012 in which they discussed the performance of the PEAKS program.  That same day, ITT had made its first POBOB payment. Even so, Modany and Fitzpatrick did not disclose anything about the existence or impact of POBOB on this earnings call. Modany and Fitzpatrick made numerous additional statements in other earnings calls for the fourth quarter of 2012 and the first and second quarters of 2013 regarding the performance of the PEAKS loans and ITT's PEAKS guarantee obligation that were similarly misleading as a result of their failure to disclose POBOB.

70.     The Defendants knew or were reckless in not knowing that the above misstatements and omissions regarding POBOB were false and misleading. Among other things, ITT, Modany, and Fitzpatrick knew of the POBOB practice, and further knew that ITT was not disclosing that practice to investors despite numerous statements about the performance of the PEAKS program.

71.     The Defendants' misstatements and omissions were material. During the relevant time period, including from the fourth quarter of 2012 through the second quarter of 2013, investors were focused on the performance of the PEAKS loans, ITT's cash obligations under

the PEAKS guarantee, and the potential impact on ITT's liquidity. These issues were the focus

of stock analyst reports received by the Defendants as well as stock analyst questions during

earnings calls. Investors would have wanted to know of the existence and impact of POBOB.

### iii.    Defendants Mislead the PEAKS Noteholders and Others.

72.    In addition to concealing information from investors, the Defendants furthered

their scheme by initially concealing ITT's practice of making POBOB from other participants in

the PEAKS program. The Defendants did not inform the PEAKS Noteholders, the trust

administrator, or the trustee that ITT had started to make POBOB payments. Instead, they caused

the PEAKS Trust to issue monthly PEAKS Noteholder reports that misrepresented the true

performance of the PEAKS collateral because loans that received POBOB payments were treated

as though borrowers had actually made the payments.  The Defendants received these reports

and knew, or were reckless in not knowing, that the reports received by PEAKS Noteholders and

other participants in the PEAKS program contained this false and misleading information.

73.    Further, in early December 2012, Fitzpatrick received an inquiry from one of the

PEAKS Noteholders regarding the "strong improvement" in payment results. Fitzpatrick

forwarded the query to Modany. Modany and Fitzpatrick initially avoided disclosing the POBOB

payments to this (or any other) PEAKS Noteholder.

74.    Only after additional questions about the turnaround in the performance of student

loan repayments did Modany and Fitzpatrick eventually disclose the POBOB practice to at least

one of the PEAKS Noteholders, in February 2013. In response, this noteholder wrote to Modany

and Fitzpatrick noting its "serious questions" about whether the practice was permitted and

demanding additional information.

75.     As other PEAKS Noteholders began to learn about ITT's practice of making POBOB payments, they too objected to the practice and demanded additional information. For example, on June 14, 2013, another PEAKS Noteholder sent an email to Modany noting "many of us [PEAKS Noteholders] are concerned that the company's practice of paying for borrowers as a means to keep them current has denied the lenders certain bargained for rights."

### iv.     Defendants Mislead ITT's Auditor.

76.     The Defendants also misled ITT's auditor regarding key facts related to the POBOB practice.  For example, the Defendants deceived ITT's auditor about ITT's authority to make POBOB.  When ITT first began the POBOB practice, the Defendants told the auditor that the PEAKS contracts permitted POBOB, and that the participants in the PEAKS program and others agreed with ITT's interpretation.  In fact, the Defendants had not even told the PEAKS Noteholders, the trust administrator, or the trustee (the parties most affected by the practice) about POBOB, much less obtained their assent to the practice.

77.     Moreover, neither Modany nor Fitzpatrick corrected their statements to ITT's auditor upon learning that the PEAKS Noteholders did, in fact, object to the POBOB practice. As noted above, ITT received the first formal objection from a PEAKS Noteholder in February 2013. Modany and Fitzpatrick did not tell ITT's auditor about this or later claims of PEAKS Noteholders that the POBOB practice violated the PEAKS contracts. It was not until early 2014 that ITT's auditor learned that PEAKS Noteholders had been objecting to the POBOB practice.

78.     The objections of PEAKS Noteholders directly contradicted the Defendants' representations to the auditor, would have been significant to the auditor's audit and review work, and should have been provided to the auditor.

**B.      Defendants Mislead Investors about the Size of ITT's Massive Near-Term PEAKS Payments.**

79.      The Defendants' scheme and misconduct did not stop with the undisclosed

POBOB payments. Following ITT's approximately $8 million PEAKS guarantee payment in

October 2012, ITT adopted a new model to calculate projected PEAKS guarantee payments

going forward. Using this new model, ITT determined it would be required to make

approximately $128 million of PEAKS guarantee payments through 2019, with the majority to

be paid before the end of 2015. ITT projected it would eventually recover most of these

guarantee payments from the performance of the student loan pool, but not until 2020 or later.

80.      ITT calculated its PEAKS liability by taking its anticipated, near-term guarantee

payments and subtracting the value of these longer term projected recoveries ("netting" the

projected payments and recoveries).  Based on this approach, ITT recorded only a $47.5 million

liability for its PEAKS guarantee in the fourth quarter of 2012. Modany and Fitzpatrick knew

ITT's liability was based on a "net" number.

81.      Rather than disclosing ITT's "netting" approach, or the near-term cash impact of

ITT's projected PEAKS guarantee obligations, the Defendants instead deceived investors by

making various statements that indicated that the PEAKS liability amount represented ITT's total

projected payment obligations.

**i.      Defendants Make False and Misleading Statements on a Key Analyst Call.**

82.      ITT filed a Form 8-K on January 24, 2013 that included an announcement of its

2012 financial results, and held an earnings call that same day.  For the first time, ITT disclosed

in the Form 8-K that it had a liability associated with the PEAKS guarantee and included the

$47.5 million liability in its financial results.

83.     On the subsequent earnings call, ITT's new contingent liability for the PEAKS program was a primary focus of management's comments and analyst questions.  During this call, Modany and Fitzpatrick falsely represented that the recorded liability represented projected total cash outlays, when the figures they gave were actually "netted" against future recoveries.

84.     For example, statements in the call (emphasis added) included:

Modany:     "We are currently projecting approximately $80 million of <u>future RSA guarantee payments</u>."[1]

Fitzpatrick:     "[W]e believe that this estimate is the best projection of our <u>total future guarantee obligations</u> related to the [CUSO] and PEAKS Program."

Analyst:     "…on the future payments, I think you said 7 to 10 years of <u>potential future payments</u> on the RSAs. Is that - so are we talking about $10 million to $15 million essentially of <u>potential cash payments</u> for those RSAs?"

Modany Response:

"The 2013 obligation, we're projecting around $15 million to $20 million. The very, very early estimate on 2014 is probably somewhere in the $30 million range. And that appears to be the high water mark, then it goes down from there. <u>And then you wouldn't be materially off if you kind of straight lined the remaining portion from there out over somewhere between 7 and 10 years</u>. So, that'll give you probably the best color we can at this point on the <u>cash obligations relative to that estimated liability</u>."

85.     Following the earnings call, Fitzpatrick and Modany received analyst reports showing that investors were in fact deceived by these statements, and demonstrating that this information was highly material. For example, one analyst noted that ITT's shares "traded down as much as 18% on 4Q earnings results before closing up 18%. The positive swing occurred as ITT provided additional clarity around its outstanding third-party loans." That analyst went on to write that the net liability amounts discussed on the earnings call "represents ITT's expectation

---

[1] The $80 million figure was comprised of the $47.5 million net liability for PEAKS, plus additional amounts for CUSO and a prior student loan program, all collectively referred to as "risk-sharing agreements" or "RSA" guarantee payments.

of future payments…. This provided reassurance that ITT should have liquidity required to meet regulatory and debt requirements."

86.     Similarly, another analyst noted that Modany and Fitzpatrick's comments "eased some liquidity concerns," and further wrote that the net liability amounts discussed on the earnings call represented the expected "cash payments from here."

        **ii.     Defendants Continue to Mislead Investors in ITT's Filings.**

87.     The Defendants continued to mislead investors about the actual PEAKS cash obligations in ITT's periodic filings. The Defendants did not disclose anything in ITT's 2012 Form 10-K, or in its subsequently filed first, second, or third quarter 2013 Forms 10-Q, about the amount, timing, or circumstances of the payments and recoveries the Defendants were projecting for the PEAKS guarantee. Rather, the Defendants continued to disclose only the "net" liability figure. These periodic filings both omitted to disclose information about ITT's projected PEAKS guarantee payments in violation of an affirmative duty to disclose, and made false and misleading statements regarding ITT's PEAKS cash payment obligations.

88.     For example, as noted above, companies are required to disclose information in MD&A beyond what they are required to disclose in their financial statements, including specifically the nature and amounts of obligations related to off-balance sheet arrangements (such as the PEAKS program), information about "contractual obligations" (such as ITT's loan program guarantee obligations), and known trends, demands or uncertainties bearing upon the issuer's liquidity.

89.     The Defendants did not disclose ITT's projected PEAKS guarantee payments, which were significantly greater than ITT's reported PEAKS liability, despite the above-referenced MD&A disclosure requirements.

90.     Instead, the Defendants made false and misleading statements indicating that ITT's much smaller reported liability was reflective of its projected cash payments.  For example, the Defendants stated in a section of ITT's MD&A disclosure in its 2012 Form 10-K titled "Off Balance Sheet Arrangements": "We believe the $57.2 million included in Other liabilities…will be paid over the next seven to ten years for our estimated guarantee obligations [related to PEAKS and CUSO]."  This was not the amount the Defendants projected to be "paid over the next seven to ten years." Rather, ITT projected making over $128 million of guarantee payments for PEAKS alone over this time period.

91.     Modany and Fitzpatrick were responsible for ITT's periodic filings, discussed above, that contained misstatements and omissions. Modany and Fitzpatrick were involved in the drafting and preparation of ITT's 2012 Form 10-K and Forms 10-Q for the first and second quarters of 2013. In addition, Modany signed and certified ITT's 2012 Form 10-K, and he certified ITT's Forms 10-Q for the first and second quarters of 2013. Fitzpatrick signed and certified ITT's 2012 Form 10-K and Forms 10-Q for the first and second quarters of 2013.

92.     The Defendants knew or were reckless in not knowing that the above misstatements and omissions regarding ITT's undisclosed total PEAKS cash obligation were false and misleading. Among other things, ITT, Modany, and Fitzpatrick were aware of ITT's total projected PEAKS cash obligation, and were aware that ITT had not disclosed that total obligation even though analysts were raising specific questions regarding ITT's liquidity and total projected payments on the loan programs.

93.     The Defendants' misstatements and omissions were material. During the relevant time period, including the fourth quarter 2012 through the second quarter 2013, ITT's liquidity and cash flow was important to investors. ITT and the entire for-profit college sector were in a

significant downturn and generating less cash. Information that ITT faced more than $100 million in near-term cash payments related to the PEAKS program would have been important to investors.

### C.    Defendants Fail to Consolidate PEAKS.

94.    As set forth above, the PEAKS Trust was initially kept off ITT's balance sheet and financial statements. This treatment was based largely upon the conclusion that the servicing of the loans was the activity that most significantly impacted the Trust's economic performance, and that ITT did not control the servicer.  However, ITT consistently had the unilateral right to remove, or "kick out," the PEAKS servicer if certain criteria were not met. Even so, ITT failed to consolidate the PEAKS Trust, even after its kick-out right was triggered.

95.    In an August 4, 2010 letter regarding ITT's initial treatment of the PEAKS Trust as an off-balance sheet entity, the SEC's Division of Corporation Finance asked ITT to explain why its right to terminate the servicer was not indicative of power over servicing activities. In a response sent on August 18, 2010, ITT claimed that, "[w]hile the Company may have the right to terminate the Servicer in certain limited, non-discretionary circumstances, this is merely a protective right" and suggested that there was only a remote possibility that this right would ever become operative.  Fitzpatrick participated in drafting and signed the letters to the SEC's Division of Corporation Finance.

96.    In November 2012, however, Fitzpatrick determined that this kick-out right had been triggered based on the poor performance of the PEAKS loan pool. Fitzpatrick told the PEAKS servicer that ITT could terminate the servicing agreement based on the loan performance to date. Despite this, ITT and Fitzpatrick did not reassess consolidation of PEAKS.

97.     In addition, the Defendants failed to inform ITT's auditor that ITT's servicer kick-out right had been triggered. Further, Modany and Fitzpatrick signed management representation letters to ITT's auditor in connection with the 2012 audit and 2013 quarterly reviews claiming that ITT management had "considered all reconsideration events and complied with the financial statement disclosure requirements" for VIEs, specifically including PEAKS. ITT improperly continued to treat PEAKS as an unconsolidated VIE throughout this period.

98.     ITT also consistently disclosed in its Forms 10-Q and 10-K that it did not consolidate PEAKS because it did not exercise control over PEAKS loan servicing or underwriting.  This statement was false: ITT always had control over PEAKS underwriting, and in later periods gained control over PEAKS servicing.

99.     Had ITT properly consolidated PEAKS, ITT's investors would have learned, among other things, of the reduced value of the Trust's student loan assets.

**D.      Defendants Mislead ITT's Investors and Auditors about the Scope of ITT's CUSO Obligations.**

100.     As set forth above, ITT also had guarantee obligations related to the CUSO student loan program. Specifically, ITT guaranteed payment of the principal (including fees and interest) on any loans that defaulted over a 35% risk share threshold.

101.     ITT calculated the liability for these CUSO guarantee payments – which was disclosed to investors – by estimating the principal amount of loans that were projected to default past the risk share threshold.  This approach effectively assumed that ITT was immediately discharging its obligation on the defaulted loans. In fact, with very rare exception, ITT made only the minimum monthly CUSO guarantee payments, which were equal to the monthly principal and interest amount due on those loans. ITT's choice to pay just the monthly minimum amount had the effect of increasing the amount that ITT would ultimately pay on the CUSO

guarantee far beyond the amount of the disclosed liability. Beginning by at least the second and third quarters of 2012, the Defendants misled investors by failing to disclose the inconsistency between the method ITT used to calculate liability (which assumed ITT would immediately discharge its obligation) and the method ITT actually used to pay its CUSO guarantee (which was to make minimum payments equal to the monthly amounts due on these high-interest loans).

> **i.** **Defendants Monitor ITT's Growing CUSO Obligations and Project CUSO Guarantee Payments that are Materially Higher than ITT Disclosed.**

102.    As a result of significant student loan defaults, ITT was required to make its first CUSO guarantee payment in late 2011. Thereafter, ITT received monthly statements from the CUSO from which it could calculate the growing total of outstanding principal and interest for which ITT was responsible. These statements were forwarded to Fitzpatrick. By the end of the fourth quarter of 2012, the statements showed that ITT was liable for repayment of approximately $18.2 million of defaulted principal and accrued interest, if it discharged its obligation on the defaulted loans immediately. ITT's obligation grew as the CUSO loans continued to default and, by the end of the second quarter of 2013, ITT was liable for repayment of approximately $23.7 million of defaulted principal and interest. Even so, ITT continued to make only the minimum monthly payments required to satisfy its CUSO obligations.

103.    In late 2012, Modany asked Fitzpatrick to analyze the cash impact of the minimum monthly payment approach ITT was using to satisfy its CUSO obligations. Beginning in January 2013, ITT's Director of Student Financing prepared such an analysis and circulated it to both Fitzpatrick and Modany. This January 2013 analysis projected that, using the minimum payment approach, ITT would make $104 million in CUSO payments. Modany and Fitzpatrick closely monitored the updated projections sent to them each month. Those projections

consistently showed that ITT would need to make massive payments on the CUSO guarantee if it continued performing by making minimum monthly payments.

### ii.    Defendants Mislead ITT's Investors About ITT's CUSO Obligations.

104.    ITT's disclosures related to the CUSO program and the payments it projected making on the CUSO guarantee were misleading without disclosure of the fact that ITT was choosing to perform in a manner that would ultimately increase the amounts ITT would pay on the CUSO guarantee and that, if the practice continued, ITT would ultimately pay many millions more than it recorded as its guarantee liability for the program.

105.    At no time before ITT's restatement of its first, second and third quarter 2013 Forms 10-Q did the Defendants disclose the minimum monthly payment approach ITT was using, or that ITT would pay far more on the guarantee than it disclosed if it continued to use that approach. For the CUSO liability amount that was disclosed to investors to be roughly accurate, ITT would have had to make tens of millions of dollars in guarantee payments over the short term to discharge its CUSO obligations. However, ITT did not record any of its CUSO liability as current or otherwise disclose that it anticipated imminent material CUSO payments.

106.    The Defendants' MD&A disclosures also failed to disclose the payments ITT would need to make on the CUSO program, either in the near term (if its total recorded CUSO liability was to be accurate) or in the long term (if ITT elected to continue making minimum monthly payments until the loans were amortized). The Defendants disclosed only the amount of CUSO guarantee payments they projected making over the next 12 months, purportedly because "we cannot reasonably predict the timing of possible payments that we believe we will make after 2013…"   However, as noted above, Modany and Fitzpatrick had projections of the CUSO payments on a monthly basis and could estimate their timing.

107.    Modany and Fitzpatrick were responsible for these periodic filings that contained misstatements and omissions. For example, Modany and Fitzpatrick were involved in the drafting and preparation of ITT's 2012 Form 10-K and Forms 10-Q for the first and second quarters of 2013. In addition, Modany signed and certified ITT's 2012 Form 10-K, and he certified ITT's Forms 10-Q for the first and second quarters of 2013. Fitzpatrick signed and certified ITT's 2012 Form 10-K and Forms 10-Q for the first and second quarters of 2013.

108.    In addition to misstatements and omissions in ITT's periodic filings, the Defendants made additional misstatements and omissions regarding ITT's CUSO liability. As discussed above, in the earnings call held on January 24, 2013, Modany and Fitzpatrick made several statements indicating that the liability amounts ITT had disclosed represented all of the payments ITT anticipated for its student loan programs combined.  In fact, the Defendants knew or were reckless in not knowing that ITT would likely make payments on the CUSO program alone that were tens of millions of dollars higher than the total disclosed liability for all student loan programs combined, if ITT continued to use the CUSO minimum payment approach it was using at the time.

109.    The Defendants' misstatements and omissions regarding CUSO were material. The fact that ITT faced substantial payments on the CUSO program if it continued using the minimum monthly payment approach would have been important to investors.

### iii.    Defendants Mislead ITT's Auditor about ITT's Projected CUSO Payments.

110.    As ITT made minimum payments on the CUSO guarantee throughout 2012 and into 2013, the Defendants (or staff under their direction) provided ITT's auditor with information showing that ITT was making small guarantee payments to the CUSO. However, the Defendants did not tell ITT's auditor that those payments were just monthly minimum amounts due on

defaulted loans or that the payments had the effect of increasing, rather than decreasing, the total amount that ITT could expect to pay on the CUSO guarantee.  As a consequence, the Defendants knew, but ITT's auditor did not, that ITT's CUSO guarantee payments might be dramatically higher in future periods than what ITT disclosed.

111.    In addition, throughout this period, the Defendants failed to disclose to ITT's auditor the projections demonstrating the cash impact of the minimum monthly payment approach ITT was actually using.  Instead, in January 2013, the Defendants (or staff under their direction) gave ITT's auditor an analysis estimating the range of its total CUSO exposure as $25.1 million to $33.4 million.  The Defendants gave ITT's auditor similar estimates to support its recorded liability in connection with its Forms 10-Q for the first and second quarters of 2013.

112.    Information that the Defendants were only making minimum guarantee payments, and that those payments would have the effect of significantly increasing ITT's eventual obligation for the CUSO program, would have been material to ITT's auditor.

## VI.    Third Quarter 2013:  Defendants Disclose Incomplete Information to Investors and Continue to Withhold Critical Information from Auditors.

### A.    PEAKS: The Defendants Continue to Make POBOB, Mislead the Auditors, and Conceal their Netting Approach to ITT'S PEAKS Liability.

113.    During the third quarter of 2013, ITT continued making POBOB instead of the much larger PEAKS guarantee payments that POBOB temporarily delayed.

114.    On October 29, 2013, ITT filed its third quarter 2013 Form 10-Q.  In that filing, the Defendants for the first time disclosed that ITT sometimes made POBOB payments.  The Defendants made only limited disclosure. Among other things, the Defendants stated that ITT made POBOB payments to "help" student borrowers from defaulting on their PEAKS loans, "which defaults would have triggered contractually required payments by us ...."

115.    During the third quarter of 2013, the Defendants continued to withhold critical information regarding POBOB from ITT's auditor. As set forth above, when the Defendants initially determined to make POBOB, they told the auditor that PEAKS Noteholders agreed with ITT's contractual interpretation that POBOB was permitted. During the third quarter of 2013, Modany and Fitzpatrick had additional communications with PEAKS Noteholders regarding the disputed permissibility of the payments, possible settlement of claims, and Noteholders' demands for information regarding the impact of the POBOB practice. Modany and Fitzpatrick did not tell ITT's auditor about these communications.

116.    The Defendants also misled ITT's auditor about the legal permissibility of the POBOB practice. In or about July 2013, ITT asked an outside law firm for an opinion on the permissibility of the practice of making payments on behalf of borrowers. Shortly thereafter, in early August 2013, the law firm told ITT that the PEAKS Noteholders had the more defensible position in claiming the practice was not permitted under the PEAKS contracts. Modany and Fitzpatrick participated in the solicitation of this advice, and were aware of the opinion.

117.    Even so, Modany and Fitzpatrick did not inform ITT's auditor that they had received advice from counsel questioning the legality of POBOB. Indeed, neither Modany nor Fitzpatrick informed the auditor of the legal advice until early 2014, in connection with the auditor's consideration of whether PEAKS needed to be consolidated into ITT's financial statements, despite having specific conversations with the auditor regarding POBOB's legality.

118.    Information that PEAKS Noteholders were continuing to challenge ITT's POBOB practice, and that ITT had received legal advice that POBOB was likely not permitted, would have been material to the auditor.

119.     In addition, in the third quarter of 2013, the Defendants continued to disclose only the "net" amount of projected PEAKS liability. Specifically, in ITT's Form 10-Q for the third quarter of 2013, the Defendants continued to make similar statements to those in prior period filings, which indicated that ITT's reported liability was reflective of ITT's total projected cash payments. These statements continued to mislead investors about the significant near-term cash obligation ITT faced related to the PEAKS program.

120.     Modany and Fitzpatrick were responsible for ITT's Form 10-Q for the third quarter of 2013. As with other of ITT's periodic filings, they were significantly involved in the drafting and review. Modany certified the filing; Fitzpatrick signed and certified the filing.

121.     As discussed above, the Defendants knew or were reckless in not knowing that ITT was disclosing only the "net" amount of projected PEAKS liability.

122.     As discussed above, facts about the total near-term cash payments related to PEAKS would have been material to investors.

123.     Finally, ITT continued to fail to consolidate the PEAKS program into ITT's financial statements, instead keeping it off-balance sheet.

**B.     CUSO: The Defendants Continue to Monitor, But Not Disclose, Significant Projected Payment Obligations.**

124.     In advance of filing ITT's third quarter 2013 Form 10-Q, Fitzpatrick and Modany reviewed the latest monthly internal CUSO cash projection, which showed total projected payments of $117 million if ITT continued its minimum monthly payment approach.  ITT again did not share this information with its auditor.

125.     In its third quarter 2013 Form 10-Q, ITT reported a total CUSO liability of $34 million, classifying only $8 million of that as a "current" liability due over the next year.  ITT disclosed for the first time that it had payment options under the CUSO guarantee, such that it

could discharge its liability for loans and reduce future payments by paying amounts equal to the outstanding principal and interest of CUSO loans.  However, the Defendants did not tell investors that ITT hardly ever used that approach, opting instead to satisfy its guarantee obligation by paying minimum monthly payments.

126.   The Defendants also failed to disclose that ITT's recorded liability for the CUSO guarantee was based solely on the amount of principal it owed for guaranteed loans – an approach that essentially assumed that ITT would discharge CUSO loans as soon as possible – but that the range of its additional losses was more than three times that amount if ITT continued to make only the minimum monthly payments.  And, as in prior quarters, ITT's reported range of additional losses for all claims and contingencies – disclosed as $9 million less than to $41 million greater than the recorded liability – did not contemplate the tens of millions of dollars of additional obligations ITT would incur if it continued the CUSO minimum monthly payment approach.

127.   As discussed above, Modany and Fitzpatrick were responsible for ITT's Form 10-Q for the third quarter of 2013.

128.   The Defendants knew or were reckless in not knowing that they continued to fail to disclose the significant additional payments ITT would be responsible for making if it continued the CUSO minimum monthly payment approach.

129.   As discussed above, information about the CUSO minimum monthly approach and the resultant additional payments would have been material to investors.

## VII.   Defendants Finally Disclose Total PEAKS and CUSO Payment Obligations.

130.   Over the course of 2014, ITT's stock price declined significantly as ITT began to disclose the consequences of its practices and the magnitude of payments ITT projected on the PEAKS and CUSO guarantees.

131.   On January 30, 2014, ITT filed an 8-K with unaudited 2013 results.  The company reported over $60 million of additional charges related to PEAKS and CUSO. ITT did not consolidate PEAKS at that time, but indicated it might consolidate the PEAKS Trust before filing its Form 10-K.  ITT's stock price dropped approximately 20% in the first day of trading after release of this news.

132.   On March 21, 2014, ITT announced it had entered into a settlement with the PEAKS Trust and PEAKS Noteholders related to POBOB.  Under the terms of the settlement, ITT agreed: (1) that paying POBOB in lieu of guarantee payments breached the PEAKS agreements; (2) that it would not to make further POBOB; and (3) that it would pay $40 million to the PEAKS Trust.  ITT's stock price dropped approximately 7% on the first day of trading after release of this news.

133.   On May 22, 2014, ITT reported its first quarter 2014 results.  ITT increased its projected additional PEAKS payments to $144 million, $116 million of which it projected for 2014.  ITT projected total future payments under the CUSO program of $123 million, or $83.6 million assuming that it elected to fully discharge its obligations on defaulted loans in 2015 and 2016.  In addition, ITT stated it was withdrawing its previously disclosed internal guidance for 2014 due to uncertainty regarding accounting for the PEAKS Program. ITT's stock price dropped approximately 8% on the first day of trading after release of this news.

**VIII.  ITT Restates its Financial Results and Defendants Admit Material Weaknesses in ITT's Internal Control Over Financial Reporting.**

134.    On October 16, 2014, ITT filed restated Forms 10-Q for the first, second, and third quarters of 2013 and filed its 2013 Form 10-K, finally informing investors about the scope and impact of its exposure to the student loan programs.

135.    In those reports, ITT consolidated the PEAKS Trust as of the first quarter of 2013. This resulted in ITT recognizing an additional net loss of $73 million. The consolidation also caused ITT to breach certain PEAKS covenants, resulting in an increase to the required PEAKS parity ratio from 105% to 140%. In its amended first quarter 2013 Form 10-Q, ITT disclosed that this change would result in ITT paying $159 million to the PEAKS Trust in 2014.  That amount represented 77% of ITT's available cash.

136.    ITT also revised and reclassified the CUSO liability it previously reported in its 2012 Form 10-K and in each of the first three quarters of 2013.  ITT disclosed that its liability assumed it was immediately discharging its obligation, but that it had in fact been making only minimum payments.  ITT further disclosed that electing not to discharge might result in ITT ultimately paying more on the guarantee.

137.    In its 2013 Form 10-K, ITT increased the liability recorded for the CUSO liability from $43.5 million to $116.0 million based on the assumption that it would not have the financial ability to make discharge payments until 2018 and would continue making minimum monthly payments until that time.

138.    In the restated quarterly filings, ITT also admitted material weaknesses in the company's internal control over financial reporting related to both PEAKS and CUSO.

139.    According to ITT's restatements, ITT misstated its net income for the first three quarters of 2013 based on its failure to consolidate the PEAKS Trust. The amount of that misstatement is summarized in the table below:

| Reporting Period | Net Income as Previously Reported | Correction to Net Income (Loss) upon Consolidation of PEAKS trust | Net Income (Loss) as Restated (before other adjustments and reclassifications) | % of Misstatement |
|---|---|---|---|---|
| 1Q13 - (3 mos.) | $ 31,130 | $ (48,571) | $ (17,441) | 278% |
| 2Q13 - (3 mos.) | $ 20,859 | $ (1,036) | $ 19,823 | -5% |
| 2Q13 - (6 mos.) | $ 51,989 | $ (49,607) | $ 2,382 | -2083% |
| 3Q13 - (3 mos.) | $ 18,941 | $ (10,343) | $ 8,598 | -120% |
| 3Q13 - (9 mos.) | $ 70,930 | $ (59,950) | $ 10,980 | -546% |

## IX.    The Defendants Engaged in a Scheme to Defraud.

140.    As detailed above, the Defendants engaged in a scheme to defraud ITT's investors from learning about the true performance of the PEAKS and CUSO loan programs, and the effect of that performance on ITT's financial condition.

141.    As detailed above, Modany committed numerous acts in furtherance of this scheme. Among other things, Modany:

a.     Designed ITT's off-balance sheet student loan programs;

b.     Devised and implemented the POBOB payment practice, which had the effect of temporarily delaying significant and looming PEAKS guarantee payments;

c.     Failed to disclose the POBOB practice to investors;

d.     Initially concealed the POBOB practice from the PEAKS Noteholders;

e.     Misrepresented to ITT's auditor that the PEAKS Noteholders had consented to the POBOB practice when in fact they were not initially consulted about the practice and, when they did learn of the practice, objected to it;

      f.       Withheld from ITT's auditor that ITT had received a legal opinion that POBOB payments were likely not permitted under the terms of the PEAKS agreements;

      g.       Failed to disclose to ITT's auditor that ITT was projecting more than $100 million in CUSO payments if it continued using the minimum monthly payment method;

      h.       Failed to consolidate the PEAKS program into ITT's financial statements, even when he knew that ITT had the right to kick-out the PEAKS servicer;

      i.       Signed management representation letters to ITT's auditor that contained false or misleading statements and omissions;

      j.       Made false and misleading statements and omissions on earnings calls that, among other things, failed to disclose the POBOB practice and misled investors by claiming that ITT's net PEAKS liability was equal to the total amount of cash payments ITT would be required to make, when in fact ITT was projecting near-term cash payments that were tens of millions of dollars greater that the total net liability; and

      k.       Signed or certified numerous of ITT's period filings containing material misstatements and omissions regarding PEAKS and CUSO.

142.    As detailed above, Fitzpatrick committed numerous acts in furtherance of this scheme. Among other things, Fitzpatrick:

      a.       Designed ITT's off-balance sheet student loan programs;

      b.       Failed to disclose to ITT's auditor the growing disparity between the PEAKS parity ratio ITT's internal model (which was shared with the auditor) predicted, and the actual and deteriorating PEAKS parity ratio that Fitzpatrick and his staff were monitoring;

      c.       Devised and implemented the POBOB payment practice, which had the effect of temporarily delaying significant and looming PEAKS guarantee payments;

d.       Failed to disclose the POBOB practice to investors;

e.       Initially concealed the POBOB practice from the PEAKS Noteholders;

f.       Misrepresented to ITT's auditor that the PEAKS Noteholders had consented to the POBOB practice when in fact they were not initially consulted about the practice and, when they did learn of the practice, objected to it;

g.       Withheld from ITT's auditor that ITT had received a legal opinion that POBOB payments were likely not permitted under the terms of the PEAKS agreements;

h.       Failed to disclose to ITT's auditor that ITT was projecting more than $100 million in CUSO payments if it continued using the minimum monthly payment method;

i.       Failed to consolidate the PEAKS program into ITT's financial statements, even when he knew that ITT had the right to kick-out the PEAKS servicer;

j.       Signed management representation letters to ITT's auditor that contained false or misleading statements and omissions;

k.       Made false and misleading statements and omissions on earnings calls that, among other things, failed to disclose the POBOB practice and misled investors by claiming that ITT's net PEAKS liability was equal to the total amount of cash payments ITT would be required to make, when in fact ITT was projecting near-term cash payments that were tens of millions of dollars greater that the total net liability; and

l.       Signed and certified numerous of ITT's period filings containing material misstatements and omissions regarding PEAKS and CUSO.

**X.**     **Modany and Fitzpatrick Misled ITT's Auditor.**

143.    As detailed above, Modany and Fitzpatrick also misled ITT's auditor about important facts related to the PEAKS and CUSO programs in connection with the auditor's audit and review work during the time period relevant to this Complaint.

144.    Among other things, Modany:

a.    Misrepresented to ITT's auditor that the PEAKS Noteholders had consented to the POBOB practice when in fact they were not initially consulted about the practice and, when they did learn of the practice, objected to it;

b.    Withheld from ITT's auditor that ITT had received a legal opinion that POBOB payments were likely not permitted under the terms of the PEAKS agreements;

c.    Failed to disclose to ITT's auditor that ITT was projecting more than $100 million in CUSO payments if it continued using the minimum monthly payment method; and

d.    Failed to inform ITT's auditor when ITT's right to kick-out the PEAKS servicer was triggered.

145.    Similarly, among other things, Fitzpatrick:

a.    Failed to disclose to ITT's auditor the growing disparity between the PEAKS parity ratio ITT's internal model (which was shared with the auditor) predicted, and the actual and deteriorating PEAKS parity ratio that Fitzpatrick and his staff were monitoring;

b.    Misrepresented to ITT's auditor that the PEAKS Noteholders had consented to the POBOB practice when in fact they were not initially consulted about the practice and, when they did learn of the practice, objected to it;

c.    Withheld from ITT's auditor that ITT had received a legal opinion that POBOB payments were likely not permitted under the terms of the PEAKS agreements;

d.     Failed to disclose to ITT's auditor that ITT was projecting more than $100 million in CUSO payments if it continued using the minimum monthly payment method; and

e.     Failed to inform ITT's auditor when ITT's right to kick-out the PEAKS servicer was triggered.

146.   In addition, Modany and Fitzpatrick each signed management representation letters in each of the relevant periods that contained material misstatements and omissions. For example, those management representation letters claimed that Modany and Fitzpatrick had provided the auditor with all relevant financial data and records, and had properly considered all reconsideration events relevant to, among other things, the PEAKS program. These statements were false and misleading in light of the significant information withheld from ITT's auditor.

147.   As detailed above, Modany and Fitzpatrick's misstatements and omissions were material.

## XI.     Modany and Fitzpatrick Were Control Persons of ITT.

148.   As detailed above, Modany and Fitzpatrick had significant control over ITT during the time period relevant to this Complaint.

149.   Modany was ITT's CEO and chairman of its board of directors. He exercised control over ITT's general operations. Moreover, as detailed above, he exercised control over the specific, violative activity that is the subject of this Complaint, and had a substantial role in that conduct.

150.   Fitzpatrick was ITT's CFO and principal accounting officer. He exercised control over ITT's general operations. Moreover, as detailed above, he exercised control over the specific, violative activity that is the subject of this Complaint, and had a substantial role in that conduct.

**XII.    ITT Violated Various Reporting Provisions of the Federal Securities Laws, and Modany and Fitzpatrick Aided & Abetted those Violations.**

151.    Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 thereunder require issuers like ITT to file reports with the Commission containing such information as the Commission's rules prescribe. As detailed above, issuers and their management are required to disclose certain information in MD&A beyond what they are required to disclose in financial statements. Further, Rule 12b-20 requires that an issuer's statements or reports contain such further material information as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

152.    As detailed above, ITT violated these reporting provisions by filing false and misleading annual, current, and quarterly reports during the time period at issue in this Complaint.

153.    As also detailed above, Modany and Fitzpatrick aided and abetted these violations by knowingly or recklessly providing substantial assistance. Among other things, Modany and Fitzpatrick provided false and misleading information for ITT's reports, omitted material information from ITT's reports, and signed and certified ITT's reports.

**XIII.   ITT Violated Various Books and Records and Internal Control Provisions of the Federal Securities Laws, and Modany and Fitzpatrick Aided & Abetted those Violations.**

154.    Section 13(b)(2)(A) of the Exchange Act requires issuers like ITT to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the company's transactions and dispositions of assets. Section 13(b)(2)(B) of the Exchange Act requires issuers like ITT to devise and maintain a system of sufficient internal accounting controls. Section 13(b)(5) of the Exchange Act prohibits any person from knowingly circumventing or failing to implement a system of internal accounting controls or knowingly

falsifying books, records, or accounts.  Similarly, Rule 13b2-1 prohibits any person from directly or indirectly falsifying or causing to be falsified books, records, or accounts.

155.    As detailed above, ITT violated these provisions. Among other things, ITT failed to accurately track critical information regarding its power over the PEAKS servicer and, as a result, failed to consolidate the PEAKS Trust on its financial statements during at least the first three quarters of 2013. ITT also calculated and classified its CUSO liability in its books, records, and accounts, in a manner that was internally inconsistent since its reported liability was based on the assumption that ITT would make discharge payments on guaranteed loans, but ITT failed to classify this liability as "current," *i.e.*, due over the next year. ITT restated its financial results for the first three quarters of 2013 as a result of these errors.

156.    Modany and Fitzpatrick aided and abetted ITT's violations of these provisions by knowingly or recklessly providing substantial assistance. Among other things, Modany and Fitzpatrick were responsible for these books and records and directed the relevant conduct, yet failed to assure that ITT's accounts were accurate.

157.    Modany and Fitzpatrick also knowingly failed to implement an appropriate system of internal accounting controls. For example, ITT was required to periodically reassess its position as primary beneficiary of the PEAKS Trust. However, Modany and Fitzpatrick did not provide reasonable assurance of accurate reassessments, even when events including the triggering of the servicer kick-out right occurred. Modany and Fitzpatrick were responsible for ITT's internal control structure, and were aware of the issues underlying ITT's internal control failures and misstated accounts.

**XIV.  Modany and Fitzpatrick Made False Certifications in Connection with ITT's Periodic Reports.**

158.    Rule 13a-14 of the Exchange Act requires an issuer's principal executive and financial officers to sign certifications which are included as exhibits to each periodic report containing financial statements.  The certifications must state that the signing officer has reviewed the report and, based on the officer's knowledge: (1) the report does not contain any material misstatements or omissions; (2) the financial statements fairly present, in all material respects, the financial results of operations; and (3) the officer has designed or caused to be designed such internal controls to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.

159.    As detailed above, Modany and Fitzpatrick certified ITT's periodic reports despite knowingly or recklessly making false and misleading material misstatements and omissions, including false financial statements, in those reports.

**FIRST CLAIM FOR RELIEF**
**Fraud: Section 10(b) of the Exchange Act and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(All Defendants)**

160.    Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

161.    By engaging in the conduct described above Defendants directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts,

practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

162.    By reason of the foregoing, Defendants each violated, and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SECOND CLAIM FOR RELIEF
**Fraud: Control Person Liability Under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for ITT's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] (Modany and Fitzpatrick, Alternatively)**

163.    Paragraphs 1 through 159 are hereby realleged and incorporated by reference. ITT, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

164.    Modany, as ITT's CEO and chairman of the board, and Fitzpatrick, as ITT's CFO and principal accounting officer, exercised control over the management, general operations, and policies of ITT, as well as the specific activities upon which ITT's violations are based.

165.    By reason of the foregoing, Modany and Fitzpatrick are each liable as control persons under Section 20(a) of the Exchange Act for ITT's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### THIRD CLAIM FOR RELIEF
**Fraud: Aiding and Abetting ITT's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Modany and Fitzpatrick, Alternatively)**

166.    Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

167.    ITT, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

168.    By engaging in the conduct described above, Modany and Fitzpatrick each aided and abetted the violations of ITT, in that they knowingly or recklessly provided substantial assistance to ITT in committing these violations.

169.    By reason of the foregoing, Modany and Fitzpatrick, and each of them, have aided and abetted and, unless restrained and enjoined, will continue to aid and abet, ITT's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### FOURTH CLAIM FOR RELIEF
**Fraud in the Offer or Sale of Securities in Violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**
**(All Defendants)**

170.    Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

171.    By engaging in the conduct described above, ITT, Modany, and Fitzpatrick have, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a

device, scheme or artifice to defraud with scienter; obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

172.    By reason of the foregoing, ITT, Modany, and Fitzpatrick violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act.

**FIFTH CLAIM FOR RELIEF**
**Fraud: Aiding and Abetting ITT's Violations of Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**
**(Modany and Fitzpatrick, Alternatively)**

173.    Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

174.    ITT, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme or artifice to defraud with scienter; obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

175.    By engaging in the conduct described above, Modany and Fitzpatrick each aided and abetted the violations of ITT, in that they knowingly or recklessly provided substantial assistance to ITT in committing these violations.

176.    By reason of the foregoing, Modany and Fitzpatrick, and each of them, have aided and abetted, and unless restrained and enjoined, will continue to aid and abet, ITT's violations of Section 17(a) of the Securities Act.

## SIXTH CLAIM FOR RELIEF
### Falsified Books, Records, or Accounts – Section 13(b)(5) of the Exchange Act and Rule 13b2-1 [15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1 (Modany and Fitzpatrick)

177.    Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

178.    By engaging in the conduct described above, Modany and Fitzpatrick knowingly circumvented or knowingly failed to implement a system of internal accounting controls to assure that ITT's financial statements were prepared in conformity with GAAP, or knowingly falsified or caused to be falsified books, records or accounts of ITT.

179.    By reason of the foregoing, Modany and Fitzpatrick violated and unless restrained and enjoined will in the future violate Section 13(b)(5) of the Exchange Act and Rule 13b2-1.

## SEVENTH CLAIM FOR RELIEF
### False Certifications – Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14] (Modany and Fitzpatrick)

180.    Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

181.    Modany and Fitzpatrick each falsely certified in connection with ITT periodic filings that as signing officers they reviewed the report, and: (1) based on the officer's knowledge, the report does not contain any untrue statement of material fact; (2) based on the officer's knowledge, the financial statements fairly present, in all material respects, the financial results of operations; and (3) the signing officers are responsible for establishing and maintaining adequate internal controls over financial reporting, have designed and evaluated such controls, and have disclosed any changes or weaknesses to the registrant's auditor and audit committee.

182.    By reason of the foregoing, Modany and Fitzpatrick violated and unless restrained and enjoined will in the future violate Rule 13a-14 of the Exchange Act.

**EIGHTH CLAIM FOR RELIEF**
**Deceit of Auditors – Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2]**
**(Modany and Fitzpatrick)**

183.     Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

184.     By engaging in the conduct described above, Modany and Fitzpatrick each made or caused to be made materially false or misleading statements to an accountant in connection with audits, reviews or examinations of ITT's financial statements or in the preparation or filing of ITT's documents or reports required to be filed with the Commission; or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with audits, reviews or examinations of financial statements or in the preparation or filing of ITT's documents or reports required to be filed with the Commission.

185.     By reason of the foregoing, Modany and Fitzpatrick each violated and unless restrained and enjoined will in the future violate Rule 13b2-2 of the Exchange Act.

**NINTH CLAIM FOR RELIEF**
**False SEC Filings: Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 204.13a-11, and 240.13a-13]**
**(ITT)**

186.     Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

187.     ITT, which was an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false and misleading reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

188.     By reason of the foregoing, ITT violated and unless restrained and enjoined

will in the future violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

## TENTH CLAIM FOR RELIEF
### False SEC Filings – Aiding and Abetting ITT's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 204.13a-11, and 240.13a-13]
### (Modany and Fitzpatrick)

189.     Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

190.     ITT, which was an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false and misleading reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

191.     By engaging in the conduct described above, Modany and Fitzpatrick each aided and abetted the reporting violations of ITT, in that they knowingly or recklessly provided substantial assistance to ITT in committing reporting violations.

192.     By reason of the foregoing, Modany and Fitzpatrick each aided and abetted, and unless restrained and enjoined will in the future aid and abet, ITT's violations of Section 13(a) of the Exchange Act and the rules thereunder.

## ELEVENTH CLAIM FOR RELIEF
### False SEC Filings – Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for ITT's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 204.13a-11, and 240.13a-13]
### (Modany and Fitzpatrick, Alternatively)

193.     Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

194.     ITT, which was an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false and misleading reports with the SEC that made untrue

statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

195.     Modany, as ITT's CEO and chairman of the board, and Fitzpatrick, as ITT's CFO and principal accounting officer, exercised control over the management, general operations, and policies of ITT, as well as the specific activities upon which ITT's violations are based.

196.     By reason of the foregoing, Modany and Fitzpatrick are liable as control persons under Section 20(a) of the Exchange Act for ITT's violations of Section 13(a) of the Exchange Act and the rules thereunder.

### TWELFTH CLAIM FOR RELIEF
**False Books and Records: Violations of Section 13(b)(2) of the Exchange Act**
**[15 U.S.C. § 78m(b)(2)]**
**(ITT)**

197.     Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

198.     By engaging in the conduct described above, ITT, in violation of Section 13(b)(2) of the Exchange Act, failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and any other criteria applicable to such statements.

199.     By reason of the foregoing, ITT violated and unless restrained and enjoined will in the future violate Section 13(b)(2) of the Exchange Act.

## THIRTEENTH CLAIM FOR RELIEF
### False Books and Records – Aiding and Abetting ITT's Violations of Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)]
### (Modany and Fitzpatrick)

200.     Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

201.     By engaging in the conduct described above, ITT, in violation of Section 13(b)(2) of the Exchange Act, failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and any other criteria applicable to such statements.

202.     By engaging in the conduct described above, Modany and Fitzpatrick aided and abetted ITT, in that they knowingly or recklessly provided substantial assistance to ITT in committing these violations.

203.     By reason of the foregoing, Modany and Fitzpatrick aided and abetted, and unless restrained and enjoined will in the future aid and abet, ITT's violations of Section 13(b)(2).

## FOURTEENTH CLAIM FOR RELIEF
### False Books and Records -- Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for ITT's Violations of Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)]
### (Modany and Fitzpatrick, Alternatively)

204.     Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

205.     By engaging in the conduct described above, ITT, in violation of Section 13(b)(2) of the Exchange Act, failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets and failed to devise and maintain a system of internal accounting controls sufficient to provide

reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and any other criteria applicable to such statements.

206.    Modany, as ITT's CEO and chairman of the board, and Fitzpatrick, as ITT's CFO and principal accounting officer, exercised control over the management, general operations, and policies of ITT, as well as the specific activities upon which ITT's violations are based.

207.    By reason of the foregoing, Modany and Fitzpatrick are liable as control persons under Section 20(a) of the Exchange Act for ITT's violations of Section 13(b)(2) of the Exchange Act.

**FIFTEENTH CLAIM FOR RELIEF**
**Failure to Reimburse – Violation of Section 304(a) of the Sarbanes-Oxley Act of 2002**
**[15 U.S.C. § 7243(a)]**
**(Modany and Fitzpatrick)**

208.    Paragraphs 1 through 159 are hereby realleged and incorporated by reference.

209.    As a result of the misconduct described above, ITT filed reports that were in material non-compliance with its financial reporting requirements under the federal securities laws. ITT's material non-compliance with its financial reporting requirements resulting from the misconduct required the company to prepare accounting restatements.

210.    Modany and Fitzpatrick received or obtained, during the statutory time periods established by the Sarbanes-Oxley Act of 2002, bonuses, incentive and/or equity-based compensation or profits from their sale of ITT stock, that they have failed to reimburse ITT.

211.    The Commission has not exempted Modany or Fitzpatrick, pursuant to Section 304(b) of the Sarbanes-Oxley Act of 2002, from its application under Section 304(a).

212.    By engaging in the conduct described above, Modany and Fitzpatrick violated, and unless ordered to comply will continue to violate, Section 304(a) of the Sarbanes-Oxley Act of 2002.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Find that each of the Defendants committed the violations alleged in this Complaint;

### II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from violating, directly or indirectly, the laws and rules alleged in this Complaint;

### III.

Order that Modany and Fitzpatrick be permanently prohibited from acting as an officer or director of any public company;

### IV.

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre- and post-judgment interest, derived from the improper conduct set forth in this Complaint;

### V.

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court, plus post-judgment interest;

**VI.**

Order that Modany and Fitzpatrick reimburse ITT for all bonuses, incentive-based and

equity-based compensation, and/or profits realized from their sale of ITT stock pursuant to

Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)];

**VII.**

Grant such other relief as this Court may deem just or appropriate.

**<u>JURY DEMAND</u>**

The Commission demands a jury in this matter.

Dated: May 12, 2015

Respectfully submitted,

s/ Nicholas P. Heinke
Nicholas P. Heinke
Polly A. Atkinson
Zachary T. Carlyle
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Suite 1700
Denver, CO  80294-1961
Phone: (303) 844-1071 (Heinke)
　　　　(303) 844-1046 (Atkinson)
　　　　(303) 844-1084 (Carlyle)
Email: HeinkeN@sec.gov
　　　　AtkinsonP@sec.gov
　　　　CarlyleZ@sec.gov

*Attorneys for Plaintiff United States*
*Securities and Exchange Commission*

56