## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Case No. 1:15-cv-00758-JMS-MJD** |
| ITT EDUCATIONAL SERVICES, INC., KEVIN M. MODANY, and DANIEL M. FITZPATRICK | ) ) ) ) | |
| Defendants. | ) ) | |

### PLAINITFF'S RESPONSE TO DEFENDANT ITT'S SECOND SET OF INTERROGATORIES AND FIRST SET OF REQUESTS FOR ADMISSION TO THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Plaintiff, United States Securities and Exchange Commission ("Plaintiff" or "Commission"), pursuant to Rule 26, 33, and 36 of the Federal Rules of Civil Procedure, hereby objects and responds to Defendant ITT's Second Set of Interrogatories and First Set of Requests for Admission, propounded on January 11, 2016, as follows:

### GENERAL OBJECTIONS

The Commission objects to the proffered instructions, definitions, and discovery requests to the extent they require the Commission to do anything other than that required by the Federal Rules of Civil Procedure, the Local Rules of this Court, and Orders entered in this matter. The Commission further objects to the proffered definitions to the extent they purport to define any word or phrase as having other than its ordinary meaning. Further, these General Objections and the Commission's responses are based upon information now available to the Commission. Discovery is ongoing and the Commission continues to learn additional facts to support its claims, and the Commission reserves the right to supplement, amend, correct, and/or clarify its

responses and objections to these discovery requests. The Commission incorporates these General Objections into each response, below.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

**Interrogatory No. 3:** Identify each accounting error that you contend that any Defendant made in connection with ITT's financial statements or public disclosures. For each error, identify:

a. The alleged GAAP violation or error, and the start and end dates of each such alleged GAAP violation or error;

b. The Defendant(s) or other individual(s) who you allege are responsible for the GAAP violation or error;

c. All acts, statements, omissions, or other facts that constitutes the alleged GAAP violation or error;

d. All documents that reflect or demonstrate the basis for the alleged GAAP violation or error;

e. All documents, acts, statements, omissions, or other facts that support your assertion that a Defendant or Defendants knew of the alleged accounting error and the GAAP relevant to the alleged error.

**RESPONSE:** In addition to the General Objections stated above, the Commission objects to this contention interrogatory as premature. Discovery is ongoing and the Commission continues to learn additional facts to support its claims. The Commission reserves the right to amend or supplement its responses if further information comes to light, and to present additional facts or evidence in support of the contention at trial.

Further, the Commission objects to the request that it identify "each accounting error" as overly broad and unduly burdensome. For example, the Defendants' failure to consolidate the PEAKS Trust in accordance with GAAP caused all of ITT's financial statements filed in connection with its original first, second and third quarter 2013 Forms 10-Q and innumerable associated accounting entries to be misstated errors. Additionally, ITT identified five additional categories of accounting errors that it made during these periods, including accounting errors related to the CUSO program. Each of these five additional categories of accounting errors are comprised of countless individual accounting errors and misstatements.

In addition, the Commission objects to the term "responsible" as used in this interrogatory as overly broad, unduly burdensome, vague and ambiguous. Because the Defendants' failure to consolidate the PEAKS Trust in accordance with GAAP caused all of ITT's financial statements and innumerable accounting entries to be misstated and contain or constitute accounting errors, virtually every ITT employee who had any involvement in ITT's accounting during the periods at issue might bear some responsibility for the error.

Finally, the Commission objects to the request that it identify "all acts," "all documents," "all facts," etc. on the grounds that it is overly broad and unduly burdensome.

Without waiving these objections, or the General Objections, the Commission will identify the principal accounting errors at issue in this case, the individuals the Commission contends are liable under the federal securities laws for these accounting errors, and the principal acts, documents, and facts supporting the Commission's contentions.

The principal accounting errors and GAAP violations at issue in this case are the errors in ITT's periodic filings from the first quarter of 2013 through the third quarter of 2013, which did not conform with GAAP because of the Defendants' failure to consolidate the PEAKS Trust.

*See, e.g.*, ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended March 31, 2013; ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended June 30, 2013; ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended September 30, 2013.

Modany and Fitzpatrick are "responsible" for the errors and GAAP violations contained in these periodic filings and associated financial statements filed with Forms 8-K. The principal facts supporting this contention include the fact that Modany and Fitzpatrick reviewed, approved, and/or signed the aforementioned periodic reports. Modany and Fitzpatrick are also "responsible" for the misstatements in ITT's periodic filings and underlying accounting errors because they are control persons of ITT as defined by Section 20(a) of the Securities Exchange Act of 1934.

The principal facts supporting the Commission's contention that ITT's periodic filings from the first quarter of 2013 through the third quarter of 2013 did not conform with GAAP because of the Defendants' failure to consolidate the PEAKS Trust are set forth in ITT's restated Forms 10-Q for these periods. In these filings, the Defendants admit that:

> We determined that the activities of the PEAKS Trust that most significantly impact its economic performance involve the servicing of the PEAKS Trust Student Loans. We determined that February 28, 2013 was the first date that we could have exercised our right to terminate the servicing agreement that governs the servicing activities of the PEAKS Trust Student Loans (the "PEAKS Servicing Agreement"), due to the failure of the entity that performs those servicing activities for the PEAKS Trust Student Loans on behalf of the PEAKS Trust to meet certain performance criteria specified in the PEAKS Servicing Agreement. As a result of this analysis, we concluded that we became the primary beneficiary of the PEAKS Trust on February 28, 2013, which was the first date that we had the power to direct the activities of the PEAKS Trust that most significantly impact the economic performance of the PEAKS Trust. As a result of our determination that we should have consolidated the PEAKS Trust

in our consolidated financial statements beginning on February 28, 2013, we concluded that we needed to restate the unaudited condensed consolidated financial statements in our Quarterly Reports on Form 10-Q for each of the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, and that those previously-issued financial statements should no longer be relied upon.

…

Under ASC 810, an entity that holds a variable interest in a VIE and meets certain requirements would be considered to be the primary beneficiary of the VIE and required to consolidate the VIE in its consolidated financial statements.
…

We determined that the activities of the PEAKS Trust and the 2009 Entity that most significantly impact the economic performance of the PEAKS Trust and the 2009 Entity involve the servicing (which includes the collection) of the PEAKS Trust Student Loans and loans owned by the 2009 Entity.
…

Based on our analysis, we concluded that we became the primary beneficiary of the PEAKS Trust on February 28, 2013. This was the first date that we had the power to direct the activities of the PEAKS Trust that most significantly impact the economic performance of the PEAKS Trust, because we could have exercised our right to terminate the PEAKS Servicing Agreement, due to the failure of the entity that performs those servicing activities for the PEAKS Trust Student Loans on behalf of the PEAKS Trust to meet certain performance criteria specified in the PEAKS Servicing Agreement.

The principal documents that "reflect or demonstrate the basis" for the "GAAP violations" resulting from the Defendants' failure to consolidate the PEAKS Trust include ITT's restatements of its Forms 10-Q for 2013, ITT's Forms 8-K that contained the related incorrect financial statements, and audit workpapers related to the restatements. *See* ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended March 31, 2013; ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended June 30, 2013; ITT Educational

Services, Inc., Form 10-Q/A, for the quarterly period ended September 30, 2013; ITT

Educational Services, Inc., Form 8-K filed April 25, 2013; ITT Educational Services, Inc., Form

8-K filed July 25, 2013; ITT Educational Services, Inc., Form 8-K filed October 24, 2013, ITT

Educational Services, Inc., Form 8-K filed January 30, 2014,  PWC Workpapers related to ITT's

Restatements of its Forms 10-Q for 2013.

Principal facts that support that Defendants knowledge or recklessness with respect to the

alleged GAAP violations or accounting errors related to the Defendants failure to consolidate the

PEAKS Trust, include the fact that Modany and Fitzpatrick are CPAs, have backgrounds as

CFOs of public companies, and have extensive backgrounds in GAAP accounting and financial

reporting for public companies. Moreover, Modany, Fitzpatrick and ITT were familiar with the

specific GAAP provisions related to the consolidation of the PEAKS Trust.  For example,

Modany and Fitzpatrick signed, certified, and/or approved ITT's periodic filings, including ITT's

Forms 10-Q for the first, second, and third quarters of 2013, which contained extensive

discussion of their application of GAAP to the issue of consolidating the PEAKS Trust and

ITT's other loan programs.  Additionally, in connection with these and other filings, Modany and

Fitzpatrick signed Management Representation Letters in which they specifically represented

that ITT's accounting and disclosures related to PEAKS and CUSO complied with ASC 810, the

specific GAAP guidance that the Defendants failed to follow when they did not consolidate the

PEAKS Trust.  Fitzpatrick was also involved in email correspondence with ITT's auditor

regarding the significance of ITT's right to kick out the servicer to the issue of whether ITT

needed to consolidate the PEAKS Trust.  *See*, *e.g.*, Test. Ex. 112.

The Defendants also knew about the significance of their ability to remove the servicer of

the PEAKS loans to the accounting treatment of the PEAKS Trust under GAAP based on their

correspondence with the Commission's Division of Corporation Finance ("Corp Fin"). Corp Fin questioned the Defendants' off-balance sheet accounting for the PEAKS program and specifically asked ITT to describe its ability to remove the servicer of the PEAKS loans in July and August 2010. *See* Letters from Fitzpatrick to the Division of Corporation Finance dated July 19, 2010, August 18, 2010. Those letters directly addressed the issue of whether their right to "terminate" the servicer required ITT to consolidate the PEAKS Trust pursuant to ASC-810. In these letters, the Defendants assured the Commission that its right to terminate the servicer was triggered only in "certain limited, non-discretionary circumstances" and was "merely a protective right." In the August letter, the Defendants state that "the Company believes that it is unlikely that the Company would need to exercise its protective right" to terminate the servicer.

In at least February 2013, Defendants ITT and Fitzpatrick knew that this right was not merely protective and ITT had the unfettered right to terminate the servicer, giving ITT control over the servicing of the loans, which required ITT to consolidate the PEAKS Trust pursuant to GAAP. *See*, *e.g.*, ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended March 31, 2013; ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended June 30, 2013; ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended September 30, 2013. On November 2, 2012, Fitzpatrick notified the PEAKS loan servicer that, by ITT's calculation, the level of PEAKS loan defaults required the servicer to provide a remediation plan to avoid termination. *See* Test. Ex. 91. On November 20, 2012, Fitzpatrick notified the PEAKS loan servicer that PEAKS loan defaults had "reached the point at which the agreements could be terminated with 30 days notice." *See* Test. Ex. 92. The Defendants filed ITT's Forms 10-Q for the first, second, and third quarters of 2013, without consolidating the

PEAKS Trust on ITT's financial statements, despite ITT's control over the servicing of the loans.


       **Interrogatory No. 4:** Do you contend that when ITT began to make MPP in October 2012, any Defendant had any reason to believe ITT was not permitted to make MPP under the PEAKS loan documents? For each Defendant, if your answer is anything other than an unqualified "no," identify all documents and facts supporting your allegation that such Defendant did not believe in October 2012 that ITT was permitted to make MPP.

       **RESPONSE:** In addition to the General Objections set forth above, the Commission objects to this contention interrogatory because the term "PEAKS loan documents" is vague and ambiguous. The term "PEAKS Student Loan Program Agreements" is defined in Defendant ITT's Second Set of Interrogatories and First Set of Requests for Admission as referring to "the documents that control the formation and operation of the PEAKS student loan program and ITT's guarantee obligations in the PEAKS student loan program." Because Defendant ITT used the term "PEAKS loan documents" instead of the term "PEAKS Student Loan Program Agreements" in this interrogatory, the Commission infers that ITT is referring to documents other than "the documents that control the formation and operation of the PEAKS student loan program and ITT's guarantee obligations in the PEAKS student loan program." Further, even the term "PEAKS Student Loan Program Agreements," as defined, is vague and ambiguous. The term is defined to refer to "the documents that control the formation and operation of the PEAKS student loan program and ITT's guarantee obligations in the PEAKS student loan program." The Commission does not know to which documents ITT is referring. For example, during the investigation, ITT produced to the Commission

"PEAKS program closing documentation and subsequent amendments." *See* Ltr. from J. Partridge to Z. Carlyle, dated March 1, 2013. This production alone, which may or may not contain some or all of the documents that ITT considers to be the documents that control the formation and operation of the PEAKS student loan program and ITT's guarantee obligations in the PEAKS student loan program," contains over 2,000 pages. *See id.* For all of these reasons, the Commission does not know which documents ITT is referring to and therefore cannot answer this interrogatory.[1]

**Interrogatory No. 5:** Identify all facts and documents that support your assertion in paragraph 76 of the Complaint that ITT "deceived ITT's auditor about ITT's authority to make [MPP]," including but not limited to all facts and documents that support your assertion that ITT told its auditor that "the participants in the PEAKS program and others agreed with ITT's interpretation" regarding its authority to make MPP.

**RESPONSE**: The Commission objects to this contention interrogatory as overbroad, unduly burdensome, and premature in seeking that the Commission identify "all facts and documents" supporting the fact that ITT deceived ITT's auditor about ITT's authority to make payments on behalf of borrowers. Discovery is ongoing and the Commission continues to learn additional facts to support its claims. Further, it is unduly burdensome to require a complete recital of all facts that constitute the Defendants' improper acts. Without waiving these objections, or the General Objections, the Commission's response will identify the principal facts

---

[1] In the event ITT clarifies to which documents it refers, the Commission reserves the right to assert additional objections to this contention interrogatory, including that such a request is overbroad, unduly burdensome, disproportionate to ITT's needs in this case, or that the request is premature.

and documents supporting its contention. The Commission reserves the right to amend or supplement its responses if further information comes to light, and to present additional facts or evidence in support of the contention at trial.

PWC was led to believe that there were provisions in the PEAKS documents that discussed ITT making POBOB and that would permit POBOB. In addition, on or about February 12, 2013, ITT represented to PWC that "per legal counsel" POBOB "are in accordance with the provisions of the PEAKS agreements, which do not preclude payments of past due amount for delinquent borrowers." Further, it was PWC's understanding from ITT and Fitzpatrick that POBOB was discussed, agreed to, and understood by the parties involved in the PEAKS agreements. PWC also understood that there was discussion and clarification with the trust to ensure that POBOB were permitted payments.

In addition, between December 2012 and February 2013, Modany and Fitzpatrick participated in telephone conversations with PEAKS noteholders in which the noteholders asserted that POBOB was not permitted under the PEAKS agreements. On February 21, 2013, ITT received a letter from Wells Fargo contesting the propriety of POBOB and asserting that POBOB circumvented contractual requirements. ITT's dispute with PEAKS noteholders continued over the next several months. On February 22, 2013, Modany and Fitzpatick signed a management representation letter on behalf of ITT representing, among other things, that ITT was in compliance with contractual agreements and that ITT had considered all data available in evaluating ITT's guarantees under the PEAKS arrangement. ITT did not disclose the February 21, 2013, letter, the information contained therein, or its ongoing dispute with the noteholders, to PWC. PWC learned that information from the Commission on January 15, 2014.

In connection with ITT's dispute with PEAKS noteholders, in May 2013, ITT contacted legal counsel for advice regarding PEAKS. On August 6, 2013, ITT, Modany, and Fitzpatrick were informed by legal counsel that it was likely that POBOB was not permitted under the PEAKS agreements. ITT did not inform PWC of that information, which was contrary to the information ITT provided PWC in February 2013 that "per legal counsel" POBOB "are in accordance with the provisions of the PEAKS agreements, which do not preclude payments of past due amount for delinquent borrowers" and inconsistent with management representation letters signed by Modany and Fitzpatrick. PWC learned of ITT's counsel's position after January 15, 2014. Additional management representation letters were provided to PWC on April 26, 2013, July 26, 2013, and October 29, 2013.

**Interrogatory No. 6**: With respect to the SEC's Eighth Claim for Relief, for each part of Rule 13b2-2 of the Exchange Act that you contend was violated, identify every act by Mr. Modany and/or Mr. Fitzpatrick that you allege constitutes a violation of that part, including (a) every false or misleading statement made, or caused to be made, by Mr. Modany and/or Mr. Fitzpatrick, (b) every fact omitted, or caused to be omitted, by Mr. Modany and/or Mr. Fitzpatrick; (c) if an allegedly false or misleading statement, the reasons that you contend the allegedly false or misleading statement was material; (d) if an allegedly false or misleading statement, the reason(s) that you contend the statement was untrue or misleading; (e) if an omitted fact, the reason(s) that you contend the omitted fact was necessary in order to make statements made, in light of the circumstances, not misleading; (f) if an omitted fact, the reason(s) that you contend the omitted fact was material; and (f) identify all documents or facts supporting your allegation.

**RESPONSE**:  The Commission objects to this contention interrogatory as overbroad, unduly burdensome, and premature in seeking that the Commission identify "every act" constituting a violation of Rule 13b2-2, "every … statement made," and "every fact omitted …". Discovery is ongoing and the Commission continues to learn additional facts to support its claims. Further, it is unduly burdensome to require a complete recital of every act or all facts that constitute the Defendants' improper acts.  The Commission also objects to this interrogatory to the extent it seeks a legal conclusion about the materiality of any statement or omission.  Without waiving these objections, or the General Objections, the Commission's response will identify the principal facts and documents supporting its claim.  The Commission reserves the right to amend or supplement its responses if further information comes to light, and to present additional facts or evidence in support of the contention at trial.  Furthermore, the Commission incorporates its response to Interrogatories 3 and 5 into this answer.

The contingent PEAKS guarantee liabilities recorded in ITT's financial statements were supported by PEAKS parity ratio models provided to PWC. *See*, *e.g*., Test. Exs 254, 255. Fitzpatrick knew those PEAKS parity ratio models did not accurately reflect the PEAKS parity ratio, the default rate of PEAKS student loan assets, or the likelihood that payments under the PEAKS guarantee agreements would be triggered.  Nonetheless, Fitzpatrick neither disclosed this information to PWC nor told PWC that ITT had internal parity ratio calculations that were different than those provided to PWC.  Fitzpatrick signed management representations letters inconsistent with his failure to provide this information.  This would have been important information to PWC because it bears upon the accuracy, reasonableness, and reliability of the PEAKS parity ratio model upon which PWC relied, it could have impacted the contingent PEAKS guarantee liabilities recorded in ITT's financial statements, and PWC would have

expected ITT to tell it if defaults were greater, the parity ratio was less, or the likelihood that ITT would be required to make guarantee payments under the PEAKS agreements was greater.

Fitzpatrick told PWC that the parties involved in the PEAKS agreements agreed to POBOB. *See* Answer to Interrogatory 5. Between December 2012 and February 2013, Fitzpatrick and Modany learned that Peaks noteholders contested the propriety of POBOB. Neither Fitzpatrick nor Modany disclosed to PWC that noteholders contested the propriety of POBOB. *See* Answer to Interrogatory 5. These omissions were inconsistent with management representation letters signed by Modany and Fitzpatrick. *See* Answer to Interrogatory 5. Fitzpatrick also represented to PWC that legal counsel had concluded that POBOB was in accordance with the PEAKS agreements. *See* Answer to Interrogatory 5. Modany and Fitzpatrick received legal advice on August 6, 2013 indicating that POBOB was likely not permitted under the PEAKS agreements but did not inform PWC of that fact. *See* Answer to Interrogatory 5. These omissions were inconsistent with management representation letters signed by Modany and Fitzpatrick and information previously provided to PWC. Information that PEAKS noteholders were contesting the propriety of POBOB and that POBOB likely violated the PEAKS agreements would have been important information to PWC because PWC needed the information to correctly assess ITT's potential and contingent liabilities, and PWC would expect ITT to disclose potential breaches of contracts creating potential and/or contingent liabilities. This information would also have been important to PWC because it was contradictory to the information PWC had been provided by ITT about the permisibility of POBOB.

The CUSO liabilities recorded in ITT's financial statements were based on projections provided to PWC that assumed that ITT would discharge their entire guarantee obligation at the

time of the default.  In fact, ITT was making monthly payments equal to defaulting student loans rather than discharging its entire guarantee obligation at the time of the default.  Modany and Fitzpatrick each received internal ITT projections informing them of the total CUSO liabilities ITT would incur if ITT continued to make such monthly payments.  Fitzpatrick represented to PWC that no such internal ITT projections existed.  Neither Modany nor Fitzpatrick disclosed to PWC the information contained in the internal ITT projections until the information was disclosed to the public in a May 2014 press release.  Modany and Fitzpatrick each signed management representation letters inconsistent with their failure to disclose the internal CUSO payoff projections to PWC.  This information would have been important to PWC in correctly analyzing ITT's recorded and reported CUSO liabilities and PWC would have expected this information to be provided to it.

According to ITT, the servicing of the private education loan assets of the PEAKS trust most significantly impacts the performance of those assets and determines whether ITT was required to consolidate the PEAKS accounting with its own.  On November 20, 2012, Fitzpatrick informed the PEAKS servicer that ITT's right to terminate the servicer had been triggered.  Fitzpatrick did not inform PWC of that communication.  Fitzpatrick's omission was inconsistent with management representation letters he signed.  *See* Answer to Interrogatory No. 3.  Consolidation of the PEAKS accounting with ITT's was an issue ultimately requiring ITT to restate its financial statements for multiple periods.  It was an important issue to PWC and one concerning which PWC would have expected to have been informed.

Primary documents supporting these facts are Test. Exs. 10, 12, 92, 108 – 113, 115, 118 - 120, 125, 159, 163, 167,  194, 227, 232, 233, 235, 252 – 262, 265 – 267, 269 – 270, 273 – 279,

282 - 286, 302, 305, 310, 313, 330, 333, 336 – 344, 347 – 366, 369 – 372, the Schiff Hardin Email, the Cravath Letter, ITT's public filings, and management representation letters.

**Interrogatory No. 7:** With respect to the SEC's Twelfth Claim for Relief, for each part of Section 13(b)(2) of the Exchange Act that you contend was violated, identify (a) the specific book, record or account you contend is false; (b) the specific reason(s) you contend the book, record or account is false; and (c) identify all documents or facts supporting your allegation.

**RESPONSE:** The Commission objects to this contention interrogatory as premature. Discovery is ongoing and the Commission continues to learn additional facts to support its claims. The Commission reserves the right to amend or supplement its responses if further information comes to light, and to present additional facts or evidence in support of the contention at trial.

The Commission further objects to Interrogatory No. 7 because it misstates the language of Section 13(b)(2) of the Exchange Act. The Commission contends that ITT violated Section 13(b)(2) of the Exchange Act. The "parts" of Section 13(b)(2) the SEC contends were violated are Section 13(b)(2)(A) and 13(b)(2)(B).

Section 13(b)(2)(A) of the Exchange Act requires issuers like ITT to "make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." Section 13(b)(2)(A) does not contain the word "false." The Commission, therefore, will identify books, records, and accounts that are bases for the Commission's contention that ITT violated Section 13(b)(2)(A).

Section 13(b)(2)(B) of the Exchange Act requires issuers like ITT to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among

other things, transactions are recorded as necessary "to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements." *See* Section 13(b)(2)(B)(ii). The Commission does not need to allege or prove specific books, records or accounts that are "false" to state a claim for a violation of Section 13(b)(2)(B). Since Interrogatory No. 7 only asks for identification of books, records, or accounts that the Commission contends are "false," the Commission does not interpret this interrogatory as seeking information concerning the Commission's contention that Defendants violated Section 13(b)(2)(B). The Commission reserves the right to present additional contentions, facts, and evidence concerning the Defendants' violation of Section 13(b)(2)(B).

In addition, the Commission objects to the request that it identify the "specific" book, record, or account underlying the Commission's claim as overly broad and unduly burdensome. As with most large corporations, ITT's books and records are complex with many interrelated accounts and sub-accounts. It is unduly burdensome to require a complete recital of each specific book, record, or account that failed, in reasonable detail, to accurately and fairly reflect the transactions and dispositions of the assets of the issuer. The Commission will identify the principal books and records underlying its claims and incorporates all relevant accounts and sub-accounts in such responses.

The Commission also objects to the request that it identify "all documents or facts" supporting the Commission's claim on the grounds that it is overly broad and unduly burdensome. It is unduly burdensome to require a complete recital of all documents or facts that support the Commission's claims. Without waiving these objections, or the General Objections, the Commission will identify the principal books and records at issue in this case and the principal documents and facts supporting the Commission's contentions.

The Commission contends that ITT violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Section 13(b)(2)(A) of the Exchange Act requires issuers like ITT to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the company's transactions and dispositions of assets.

The principal books and records at issue in this case are ITT's financial statements for the first three quarters of 2013. ITT has admitted that it misstated numerous line items in its original financial statements for the first three quarters of 2013 as a result of its failure to consolidate the PEAKS Trust on its financial statements. *See*, *e.g.*, ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended March 31, 2013; ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended June 30, 2013; ITT Educational Services, Inc., Form 10-Q/A, for the quarterly period ended September 30, 2013. In those filings, ITT describes the specific line items that were misstated as a result if its failure to consolidate the PEAKS Trust in its amended Form 10-Q filings for the first three quarters of 2013 Accordingly, ITT's financial statements contained in its original periodic filings for the first three quarters of 2013, and ITT's books, records and accounts underlying each of those filings, were misstated in violation of Section 13(b)(2)(A) as a result of ITT's failure to consolidate the PEAKS Trust. *See also* PWC Workpapers related to ITT's Restatements of its Forms 10-Q for 2013.

ITT also violated Section 13(b)(2)(A) when it classified its CUSO liability in its books, records, and accounts, in a manner that was internally inconsistent since its reported liability was based on the assumption that ITT would make discharge payments on guaranteed loans, but ITT failed to classify this liability as "current," *i.e.*, due over the next year. ITT restated its financial results for the first three quarters of 2013 based on these errors. As a result, ITT's financial statements contained in its original periodic filings for the first three quarters of 2013, and ITT's

books, records and accounts underlying each of those filings, were misstated in violation of Section 13(b)(2)(A) as a result of ITT's internally inconsistent classification of its CUSO liability.

## REQUESTS FOR ADMISSION

**Request for Admission No. 1:**  Admit that, at least as of December 13, 2012, Deutsche Bank had been notified that ITT had made MPP.

**RESPONSE:**  The Commission objects to Request for Admission No. 1 on the ground that the phrase "had been notified that ITT had made MPP" is vague and ambiguous.

Without waiving this objection or the General Objections, the Commission admits that, on December 13, 2012, David Johnson from First Associates Loan Servicing, LLC sent an email to David J. Ryan at Deutsche Bank stating the amounts of "direct payments made by ITT to date on behalf of borrowers." This email (Bates-labeled DBSI059157) speaks for itself. The Commission lacks knowledge or information to make any additional response to this Request for Admission, and thus cannot admit or deny the remainder of this Request.

**Request for Admission No. 2:**  Admit that, at least as of December 18, 2012, Wells Fargo Bank NA had been notified that ITT had made MPP.

**RESPONSE:**  The Commission objects to Request for Admission No. 2 on the ground that the phrase "had been notified that ITT had made MPP" is vague and ambiguous.

Without waiving this objection or the General Objections, the Commission admits that, on December 18, 2012, Marcus N. Moore from Wells Fargo Bank NA sent an email to Barb Roth at ITT requesting "some of the underlying documentation and analysis in order to better

understand ITT's program of paying delinquent interest installments on underlying student loans before they become 180 days past due." This email (Bates-labeled ITT-SEC-0017853) speaks for itself. The Commission lacks knowledge or information to make any additional response to this Request for Admission, and thus cannot admit or deny the remainder of this Request.

**Request for Admission No. 3:** Admit that, at least as of December 5, 2012, Access Group had been notified that ITT had made MPP.

**RESPONSE:** The Commission objects to Request for Admission No. 3 on the ground that the phrase "had been notified that ITT had made MPP" is vague and ambiguous.

Without waiving this objection or the General Objections, the Commission admits that, on December 5, 2012, Mark Palmerton at First Associates Loan Servicing, LLC sent an email to Brian Wegrzyn at Access Group stating that "Funds were received by ITT to apply to specific PEAKS accounts." This email (Bates-labeled AGI-SEC-0031464) speaks for itself. The Commission lacks knowledge or information to make any additional response to this Request for Admission, and thus cannot admit or deny the remainder of this Request.

**Request for Admission No. 4:** Admit that, under the PEAKS Student Loan Program Agreements, ITT had no duty to inform the PEAKS student loan program senior note holders of payments made by ITT to the PEAKS student loan program servicer or PEAKS trust.

**RESPONSE:** In addition to the General Objections set forth above, the Commission objects to Request for Admission No. 4 on the ground that the term "PEAKS Student Loan Program Agreements," as defined, is vague and ambiguous. The term is defined to refer to "the documents that control the formation and operation of the PEAKS student loan program and

ITT's guarantee obligations in the PEAKS student loan program." The Commission does not know to which documents ITT is referring. For example, during the investigation, ITT produced to the Commission "PEAKS program closing documentation and subsequent amendments." *See* Ltr. from J. Partridge to Z. Carlyle, dated March 1, 2013. This production alone, which may or may not contain some or all of the documents that ITT considers to be the documents that control the formation and operation of the PEAKS student loan program and ITT's guarantee obligations in the PEAKS student loan program," contains over 2,000 pages. *See id.* Without knowing which specific documents are at issue in this request, the Commission cannot truthfully admit or deny Request for Admission No. 4.[2]

The Commission further objects to Request for Admission No. 4 on the ground that the phrase "duty to inform" is vague and ambiguous, as it is unclear to which legal duties, if any, it refers. For example, parties to contracts are subject to various duties, express and implied. *See, e.g.*, *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012) ("In addition to the express terms of a contract, New York law implies in every contract a covenant of good faith and fair dealing 'pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'") (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006)). Depending on which specific documents are at issue in this request, such express or implied duties may apply in addition to the specific provisions of the documents.

---

[2] In the event ITT clarifies to which documents it refers, the Commission reserves the right to assert additional objections, including that such a request is overbroad, unduly burdensome, disproportionate to ITT's needs in this case, or that the Commission lacks knowledge or information to admit or deny the request.

Dated: February 10, 2016

Respectfully submitted,

s/ Nicholas P. Heinke_____
Nicholas P. Heinke
Polly A. Atkinson
Zachary T. Carlyle
U.S. Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
Phone: (303) 844-1071 (Heinke)
(303) 844-1046 (Atkinson)
(303) 844-1084 (Carlyle)
Email:     HeinkeN@sec.gov
                AtkinsonP@sec.gov
                CarlyleZ@sec.gov

*Attorneys for Plaintiff United States
Securities and Exchange Commission*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 10, 2016, the foregoing has been served upon the

following counsel of record via email:

Steven M. Pyser
Christopher J. Mandernach
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901
Telephone:  (202) 434-5000
Fax:  (202) 434-5029
*spyser@wc.com*
*cmandernach@wc.com*

*Attorneys for Defendant ITT Educational Services, Inc.*

Eric W. Sitarchuk
David Miller
Ryan McCarthy
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103
Telephone:  (215) 963-5000
Fax:  (215) 963-5001
*esitarchuk@morganlewis.com*
*david.miller@morganlewis.com*
*rmccarthy@morganlewis.com*

*Attorneys for Defendant Kevin M. Modany*

Michael A. Ungar
James M. Commons
MCDERMOTT WILL & EMERY LLP
500 North Capitol St., N.W.
Washington, DC  20001
Telephone:  (202) 756-8000
Fax:  (202) 756-8087
*mungar@mwe.com*
*jcommons@mwe.com*

*Attorneys for Defendant Daniel M. Fitzpatrick*

/s/ Nicholas P. Heinke
Nicholas P. Heinke