IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:15-cv-00758-JMS-MJD |
| ITT EDUCATIONAL SERVICES, INC., KEVIN M. MODANY, and DANIEL M. FITZPATRICK, | ) ) ) | |
| Defendants. | ) ) | |

INDIVIDUAL DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO EXCLUDE
THE REPORT, TESTIMONY, AND OPINIONS OF HARVEY L. PITT

### TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 3

LEGAL STANDARDS .............................................................................................. 12

ARGUMENT .............................................................................................................. 15

   I.  PITT'S REPORT, TESTIMONY, AND OPINIONS SHOULD
      BE EXCLUDED BECAUSE THEY ARE IMPROPER,
      INADMISSIBLE, AND UNHELPFUL TO A JURY ..................................... 15

     A.  The Court Should Exclude Pitt's Testimony Because
         Pitt Offers Improper and Inadmissible Legal Opinions .......................... 15

     B.  This Court Should Exclude Pitt's Testimony
         Because Pitt Merely Recites the Commission's Allegations
         and Invades the Jury's Province ............................................................. 25

     C.  Any Value in Pitt's Testimony Is Far Outweighed
         By the Risk of Confusing the Jury ......................................................... 28

  II.  PITT'S REPORT, TESTIMONY, AND OPINIONS SHOULD
      BE EXCLUDED BECAUSE THEY ARE UNRELIABLE ........................... 29

     A.  Pitt's Report, Testimony, and Opinions Should Be Excluded
         Because They Rely on Factual Assertions That Omit Key Information
         or Are Contrary to the Established Record .............................................. 29

     B.  Pitt's Characterizations and Unduly Prejudicial Comments
         Demonstrate His Bias and Unreliability .................................................. 33

CONCLUSION ........................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                       **Page(s)**

*Autotech Tech. Ltd. P'ship v. Automationdirect.com*,
    471 F.3d 745 (7th Cir. 2006) ................................................13

*Barber v. United Airlines, Inc.*,
    17 F. App'x 433 (7th Cir. 2001) (unpublished) ........................................32

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................17

*Bone Care Int'l LLC v. Pentech Pharm., Inc.*,
    No. 08-CV-1083, 2010 WL 3928598 (N.D. Ill. Oct. 1, 2010) ...............................14

*Bourelle v. Crown Equip. Corp.*,
    220 F.3d 532 (7th Cir. 2000) ................................................14, 29

*Bull v. Bd. of Trustees of Ball State Univ.*,
    No. 10-cv-00878-JMS-TAB (S.D. Ind. May 2, 2012) (Magnus-Stinson, J.) .........................22

*In re Cogent, Inc. Shareholder Litigation*,
    7 A.3d 487 (Del. Ch. 2010)................................................21, 22

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................12, 14

*Ervin v. Johnson & Johnson, Inc.*,
    492 F.3d 901 (7th Cir. 2007) ................................................13

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
    744 F. Supp. 2d 870 (E.D. Wis. 2010)................................................32

*Feinberg v. Katz*,
    No. 01-Civ.-2739, 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) ...........................20

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
    No. 04-md-1628, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009) ...........................14

*Giuffre v. Jefferson*,
    No. 14 C 3692, 2017 WL 951239 (N.D. Ill. Mar. 10, 2017) ................................34

*Good Shepherd Manor Found., Inc. v. City of Momence*,
    323 F.3d 557 (7th Cir. 2003) ................................................13, 25

*Hershey v. Pac. Inv. Mgmt. Co. LLC*,
   697 F. Supp. 2d 945 (N.D. Ill. 2010) ...............................................................20, 29

*Kensinger v. Allstate*,
   No 10 C 1733, 2016 U.S. Dist. LEXIS 34416 (N.D. Ill. Mar. 17, 2016) .............24, 25, 26, 27

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999).........................................................................................12

*Landmark Builders, Inc. v. Cottages of Anderson, LP*,
   No 01-C-1592, 2003 WL 21508118 (S.D. Ind. May 20, 2003).........................................23, 24

*LeClercq v. The Lockformer Co.*,
   No. 00 C 7164, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005).........................................14

*Lewis v. CITGO Petroleum Corp.*,
   561 F.3d 698 (7th Cir. 2009) .........................................................................14

*Loeb v. Hammond*,
   407 F.2d 779 (7th Cir. 1969) .........................................................................22

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ...........................................................14

*Marting v. Crawford & Co.*,
   No. 00 C 7132, 2004 WL 305724 (N.D. Ill. Jan. 9, 2004) ...................................13, 20, 27, 28

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011).........................................................................................9, 17, 19

*Minasian v. Standard Chartered Bank, PLC*,
   109 F.3d 1212 (7th Cir. 1997) .......................................................................25, 26

*Navarro v. Fuji Heavy Indus., Ltd.*,
   117 F.3d 1027 (7th Cir.1997) .......................................................................18

*Norwest Bank, N.A. v. Kmart Corp.*,
   No. 3:94-CV-78RM, 1997 WL 33479072 (N.D. Ind. Jan. 29, 1997)......................................28

*O'Conner v. Commonwealth Edison Co.*,
   13 F.3d 1090 (7th Cir. 1994) .......................................................................14

*Panter v. Marshall Field & Co.*,
   646 F.2d 271 (7th Cir. 1981) .......................................................................18

*Phillips v. Wilkerson*,
   No. 1:15-cv-00151-JMS-MPB, 2016 WL 5394404 (S.D. Ind. Sept. 27, 2016)
   (Magnus-Stinson, J.)...............................................................................28, 29, 30

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................... 35

*SEC v. Goldstone*,
    No. CIV 12-0257, 2016 WL 3135651 (D.N.M. May 10, 2016) .............................. 21

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ............................................................................................... 17

*United States v. Sinclair*,
    74 F.3d 753 (7th Cir. 1996) ............................................................................. 13, 25

*Welch v. Eli Lilly & Co*,
    No. 1:06-cv-0641-RLY-JMS, 2009 WL 700199 (S.D. Ind. Mar. 16, 2009) ..... 34, 35

*Wintz ex rel. Wintz v. Northrop Corp.*,
    110 F.3d 508 (7th Cir. 1997) ................................................................................ 13

**Statutes and Rules**

FED. R. EVID. 702 .......................................................................................... 12, 13, 14

FED. R. EVID. 703 ...................................................................................................... 12

FED. R. EVID. 704 ...................................................................................................... 13

The individual defendants Kevin M. Modany and Daniel M. Fitzpatrick ("Defendants"), by undersigned counsel, submit this Motion to Exclude the Report, Testimony, and Opinions of Harvey L. Pitt (the "Motion"), pursuant to Federal Rules of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## INTRODUCTION

In support of its claims in this case, plaintiff Securities and Exchange Commission ("Commission") has designated as an expert Harvey L. Pitt, a former Chairman of the Commission.  Pitt has submitted a report, a rebuttal report, and has been deposed.  Based on his reports and deposition testimony, it is clear that Pitt intends to offer a raft of improper and inadmissible legal opinions including, but certainly not limited to: (i) specific facts concerning two private student loan programs would have been material to the investors of ITT Educational Services, Inc. ("ITT"); (ii) Defendants failed to meet investor expectations as to certain disclosures and thereby failed to meet disclosure obligations under the federal securities laws; and (iii) ITT's disclosures in its SEC filings and investor communications were insufficient, false, and materially misleading.  It is also clear that Pitt's reports and testimony are unreliable because they are built on a curated selection of facts that omits or ignores much of the key record evidence in this case.  Under well-established principles of law that protect the jury's role as the finder of fact—the process to which Defendants are constitutionally entitled—Pitt's testimony must be excluded in its entirety.

First, Pitt's testimony is not helpful to the trier of fact because Pitt impermissibly opines on ultimate *legal* issues in the case, including the critical question of materiality.  The Commission's Complaint alleges that Defendants orchestrated a fraudulent scheme by knowingly hiding from investors material information that concerned the performance of two private student loan programs.  Pitt's reports and testimony make near-identical allegations,

asserting in broad, conclusory strokes that ITT's investors would have expected certain disclosures concerning the student loan programs; that ITT and Defendants failed to make those disclosures; and that ITT's public filings and statements made by Defendants on earnings calls were materially false and misleading. Far from educating the jury, Pitt would simply dictate to them how the federal securities laws should be applied to the facts of this case, and suggest what legal conclusions they should reach concerning the materiality, accuracy, and sufficiency of the disclosures at issue. For these reasons alone, Pitt's reports and testimony would usurp the proper functions of both the judge and the jury and thus should be excluded in their entirety.

Second, Pitt's proposed testimony is unreliable. Pitt relies on factual assertions that omit key information or are contrary to the established record, cherry-picking facts to fit the Commission's allegations and ignoring large swaths of the factual record that do not align with his preferred theory. As Pitt's deposition revealed, when he wrote his reports he was evidently unaware of, or chose to disregard, key documents and testimony from, among others, ITT's inside and outside counsel. When presented with this evidence in his deposition, he consistently dismissed it as irrelevant or inconsequential. Additionally, Pitt's reports and testimony are brimming with characterizations and unduly prejudicial comments that demonstrate his bias and unreliability, including his characterization of inside counsel's advice as "irrelevant" and "worthless," his pejorative portrayals of ITT and Defendants as stating "pernicious" half-truths that purportedly "lull[ed]" investors into a false complacency, and his attempts to link Defendants with well-known and far different fraud scandals involving Enron and Sam Wyly.

Although the Commission presents Pitt as a disinterested expert, close analysis of his reports and testimony leads to one inescapable conclusion: at trial, Pitt would be a legal advocate—*de facto*, another Commission attorney, parroting the Commission's theories, cherry-

picking facts, offering "opinions" on the ultimate legal issues in the case—invading the jury's province, all with the imprimatur of "an expert."  In order to avoid the confusion and unfair prejudice that would result, Defendants respectfully submit that Pitt's reports and testimony should be excluded in their entirety.

## STATEMENT OF FACTS

Factual Background

Defendants served as officers of ITT Educational Services, Inc. ("ITT"), one of the nation's oldest providers of skills-based technical education.  This litigation arises from ITT's participation in two student loan programs designed to create more financing options for students at a time when other lending sources were scarce.  The Complaint addresses those two private student loan programs that were set up for the benefit of ITT students, the manner in which Defendants complied with ITT's obligations under those loan programs, the information Defendants provided to ITT investors about ITT's obligations under these loan programs, and the programs' impact on ITT's overall finances.  The loan programs, as to which ITT held certain financial obligations, were known as CUSO and PEAKS.[1]

The CUSO and PEAKS loan programs began in February 2009 and January 2010, respectively.  Under the terms of both agreements, ITT bore part of the financial risk in the event that the loans did not perform as expected.  Under the CUSO risk-sharing agreement, for instance, the CUSO entity, a credit union service organization, bore the so-called "first loss risk" for charged-off loans (loans in default for 180 days or more) amounting to 35% of a loan pool. ITT then guaranteed the principal and accrued interest for any charged-off loans in excess of the 35% first loss risk.  Under the terms of the PEAKS guarantee agreement, ITT guaranteed, among

---

[1] CUSO stands for "Credit Union Service Organization" and PEAKS stands for "Program for Education Access and Knowledge."

other things, to make payments to the PEAKS student loan trust in the event that the

asset/liability ratio of the trust fell below 105%.[2]

PEAKS and CUSO also involved several third parties.  The CUSO program was created

and marketed by the Rochdale Group, a consulting firm that works with credit unions.  The

PEAKS program was created by Deutsche Bank Securities, Inc., which structured and marketed

the program to investors based on similar programs that Deutsche Bank had set up for other

institutions.  A trio of Deutsche Bank entities served as owner trustee, lender trustee, and

indenture trustee and collateral agent for the PEAKS trust.  The loan programs' administrator

and initial servicer, Access Group, managed the loan portfolios and monitored and prepared loan

information, and an organization called First Associates took over as replacement servicer for

both PEAKS (in 2011) and CUSO (in 2012).

The current litigation arises from certain accounting treatment and public disclosures

regarding these loan programs from October 2012 through October 2013.  Following a multi-

year investigation, the Commission filed this lawsuit against ITT, former Chairman and Chief

Executive Officer Modany, and former Chief Financial Officer Fitzpatrick.  The Commission

claims that ITT should have consolidated the PEAKS loan program on its balance sheet in

February 2013, and that certain of the company's disclosures in late 2012 through late 2013

concerning the CUSO and PEAKS programs were insufficient.  [Filing No. 1 at 3 (SEC Compl.

¶¶ 5-6); Filing No. 197-1 (Ex. A, SEC Resp. to ITT's 2d Set of Interrogatories and First Set of

Requests for Admission (Feb. 10, 2016)) at 7.]  With regard to the PEAKS program, the

Commission contends that ITT, beginning in late October 2012, made payments on behalf of

PEAKS student borrowers (known as "POBOB") in order to minimize its short-term guarantee

---

[2] Because ITT's obligations under these programs were complex, the descriptions above are
intended to serve solely as an overview.

obligations, and that ITT should have disclosed the POBOB practice in its public filings and to the PEAKS noteholders.  [Filing No. 1 at 2-3, 16-21 (SEC Compl. ¶¶ 4, 60-71).]  With regard to the CUSO program, the Commission alleges that ITT failed to disclose to investors that it was making only minimum monthly payments under the risk-sharing agreement and failed to disclose ITT's "higher" CUSO liability if it continued to make minimum payments, thereby making material misstatements in its public filings and on a January 24, 2013 earnings call.[3]  [Filing No. 1 at 30-31 (SEC Compl. ¶¶ 104-109).]

The Commission also claims that Defendants withheld certain information from ITT's auditor, PricewaterhouseCoopers ("PwC").  *Id.* at 3 (¶ 7).  For example, the Commission contends Defendants should have informed PwC about questions raised by PEAKS noteholders concerning POBOB.  *Id.* at 22 (¶¶ 76-78).  The Commission also argues that PwC should have been informed of Fitzpatrick's purported conclusion in November 2012 (a "conclusion" that turned out to be erroneous) that ITT had the right to "kick out" the servicer of the PEAKS loans, which the Commission contends should have resulted in consolidation of the PEAKS trust on ITT's balance sheet in February 2013. *Id.* at 27 (¶¶ 94-99); *see* [Filing No. 197-1 (SEC Resp.) at 7].  With regard to CUSO, among other things, the Commission alleges that Defendants failed to disclose to PwC that it was making monthly minimum guarantee payments, and also purportedly failed to disclose certain internal cash flow models prepared by ITT's Director of Student Financing Mark Huber.  *Id.* at 31-32 (¶¶ 110-112).

As discovery proceeded, ITT made a determination to waive attorney-client privilege involving counsel's advice regarding the permissibility of POBOB and ITT's disclosures to the

---

[3] The Commission is not challenging the accuracy of ITT's contingent liability for the PEAKS and CUSO programs.  *See* [Filing No 197-2 (Ex. B, SEC Resp. to ITT's 5th Set of Interrogatories (July 5, 2016)) at 11-12.]

public and the PEAKS noteholders.  As a result, the record includes deposition testimony of numerous attorneys, both in-house at ITT and at sophisticated outside law firms, who provided advice on these subjects to the company and its executives, including advice as to the specific disclosures at issue in the case.  Defendants' position is that they reasonably relied on counsel's advice, as well as the input of PwC, with respect to the conduct alleged in the complaint.

Indeed, as the factual record in this case demonstrates, ITT employed a robust and best-in-class disclosure process that included extensive review and comment by inside counsel, outside counsel, and PwC.  ITT's quarterly Disclosure Committee meetings were attended not only by inside counsel but—unusual for a public company—by outside counsel and PwC as well.  Prior to Disclosure Committee meetings, ITT distributed draft SEC filings that then underwent a page-by-page review during the meetings, again with the participation of inside and outside counsel and PwC.  ITT followed an itemized checklist for draft filings that included multiple rounds of review by inside and outside counsel, PwC, the Disclosure Committee, and the Audit Committee.  Counsel reviewed and edited earnings releases and conference call scripts, and sat in on earnings calls to advise on any necessary clarifications.

ITT's practices concerning the CUSO and PEAKS loan programs were, accordingly, subject to thorough scrutiny by counsel, PwC, and outside experts.  Prior to making POBOB, for instance, ITT received and relied upon the advice of outside counsel that making POBOB was permissible under the terms of the PEAKS agreements, and inside and outside counsel testified that ITT's disclosure of "guarantee and other payments" in its filings was a sufficient disclosure of POBOB.  PwC was aware of POBOB from the outset and the related disclosures (drafted by counsel) included in ITT's filings.

6

With respect to ITT's decision to treat the PEAKS loan program as an off-balance sheet entity, and other accounting determinations concerning PEAKS, these highly complex determinations were known and vetted by PwC. PwC understood and concurred with ITT's practice of "netting" projected guarantee payments against future recoveries, and PwC ultimately determined that the PEAKS trust should have been consolidated onto ITT's balance sheet after PwC and ITT jointly consulted with the SEC's Office of the Chief Accountant in 2014. ITT also relied on outside financial experts such as Boston Portfolio Advisors and Saylor Consulting to analyze projected losses under the PEAKS program, and PwC independently determined the contingent liability using its own experts.

PwC was also aware of ITT's payment options under the CUSO program, including the minimum monthly payment option. PwC (and its experts) vetted ITT's CUSO loss estimates and CUSO disclosures, and ITT adopted its recommended changes. Concerning ITT's internal CUSO cash flow models, the results of which the Commission claims were improperly withheld from the public, the evidence shows that neither ITT, PwC, nor the independent financial experts that ITT retained to analyze its CUSO obligations, considered these cash flow models to be reliable.

ITT settled with the Commission and was dismissed from this case following the company's bankruptcy filing. While ITT was in settlement negotiations, Defendants and the Commission reached a settlement in principle to resolve the litigation at a May 2017 settlement conference before the Hon. Mark J. Dinsmore. In August 2017, however, after the parties had finalized the settlement agreement, the SEC Staff informed Defendants and the Court that the SEC Commissioners would not approve the settlement, for unspecified reasons. The litigation is proceeding to trial as a result.

Pitt's Report, Rebuttal Report, and Deposition

Both parties have proffered multiple experts on various issues. Among others, the Commission designated Pitt, a securities lawyer who served as Chairman of the SEC from 2001-2003. On September 1, 2016, Pitt submitted an expert report that purports to opine on various issues relating to ITT's disclosures to investors and PEAKS noteholders; its communications with PwC; and its reliance on the advice of counsel.

Pitt's "Summary of Engagement and Conclusions" opens with a 15-page "Background" section on the history of ITT and the PEAKS and CUSO loan programs. *See* [Filing No. 197-3 (Ex. C, Pitt Report ("Report")) at 6.] Ostensibly a summary of relevant "facts," this section (which ignores a huge swath of record evidence) sets the tone for the improper and prejudicial opinions that follow. The loan programs, Pitt declares, were "saddled . . . with high-capitalized fees and adjustable interest rates." *Id.* at 10. Pitt describes PEAKS and CUSO as special-purpose entities with a reference to "the Enron scandal, where a variety of special purpose entities masked Enron's true financial condition," *id.*, and concludes by alleging that the programs' off-balance sheet classification left investors "unable to monitor" their performance. *Id.* at 12. Turning to ITT's practice of making POBOB, Pitt frames it as a "strategy" that ITT purportedly endeavored to hide from investors, *id.* at 14, declaring, "it cannot be gainsaid that ITT did not reveal the existence of its POBOB program, and certain of its statements effectively denied the existence of such payments." *Id.* at 15. With respect to ITT's practice of netting, Pitt finds an alleged "disparity between the netted disclosure ITT purveyed to the investing public" and its internal projections, and declares this purported disparity "significant," without

explaining how he arrived at this conclusion and without mentioning the fact that PwC was well

aware of and concurred with ITT's netting methodology. *Id.* at 16.[4]

As set forth in Section 3.3 of his report titled "Summary of Opinions," Pitt then provides

at least five purported opinions:

- That "[m]arket participants widely understand, and rely upon the fact" that companies such as ITT are required to make accurate disclosures;

- That ITT "ignored commonly accepted understandings and practices" with respect to its disclosures of information concerning the PEAKS and CUSO programs "that reasonable investors would have considered important";

- That "[p]ublic companies and their advisors uniformly understand" that companies should inform their outside auditors of "all significant developments" affecting the accuracy and reliability of their financial statements;

- That "[m]arket participants understand and rely on the fact" that corporate managers are responsible for ensuring and certifying the accuracy of a company's filings and public statements; and

- That "[p]ublic companies and their advisors uniformly understand that full disclosure is the obligation of the companies (as well as their managers)," and that before a company can justifiably rely on outside experts such as accountants or counsel, it must seek the advice of knowledgeable and independent counsel, identify the specific issues about which they seek an opinion, fully inform counsel of all relevant facts, satisfy themselves that the advice received is rational, and follow the advice as provided.

[Filing No. 197-3 (Report) at 22-23.]  Pitt concludes his "Summary of Opinions" by offering a

blanket statement as to his view of ITT's conduct: "In this matter, ITT did not satisfy any,

much less all, of these necessary preconditions to shifting the obligation to achieve full

disclosure."  *Id.* at 23.

---

[4] As referenced below, Pitt also wrongly assumes, contrary to established caselaw, that all important information must be disclosed to investors. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) ("Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.").

The opinions that follow read more like a prosecutor's closing statement than an expert report.  Section 4.1, purportedly a discussion of "The Philosophy, Practice, and Market's Understanding of Full and Fair Corporate Disclosure," *id.*, declares that "ITT investors were not given complete and accurate information regarding [PEAKS] guarantee payments," that ITT made POBOB "in direct contravention of its public statements," and that ITT's disclosure "concerning its payments on the CUSO program was inaccurate."  *Id.* at 28.

Section 4.2, titled "ITT's Filed Documents and Earnings Calls Misstated and Omitted Information that Should Have Been Disclosed," asserts that PEAKS was "by definition, of the utmost importance to ITT investors," *id.* at 28 n.137, that ITT did not "take [its] disclosure obligations seriously," that it "carr[ied] on with [its] faulty payment strategies" in the face of countervailing evidence, and that it "fail[ed] to make meaningful disclosure" of "material facts" relating to its PEAKS and CUSO obligations.  *Id.* at 30.  In the same section, Pitt characterizes disclosures like ITT's as "invariably problematic" and "widely understood … to be inadequate to satisfy the requirements" of federal securities statutes and regulations, and opines that ITT was "[a]ware that disclosures" relating to PEAKS and CUSO "would be deemed important by analysts and investors."  *Id.* at 36.

Judging by its title, Section 4.3 would appear limited to the opinion that "[c]ompanies and their management widely understand and accept that they must certify the information in their filings is complete, accurate and not materially misleading at the time it is publicly reported."  *Id.* at 37.  Yet Pitt again turns his legal advocacy squarely at Defendants, opining that Defendants "passively and exclusively rel[ied]" on information provided by "their subordinates," asserting that Defendants understood their disclosure obligations "but, in my opinion, failed to live up to them," and concluding that certifications filed by Defendants "were

10

materially inaccurate." *Id.* at 37-39. Likewise, in Section 4.5, concerning the understanding of public companies and senior managers that they are obligated to make accurate and sufficient disclosures, Pitt opines that ITT's "conferral … with counsel was inadequate," *id.* at 41, and that as a general rule "inside counsel is not deemed to be independent, nor expert on federal securities law disclosure issues." *Id.* at 41 n.182. Moreover, Pitt continues, even assuming Defendants received advice from counsel (which the factual record makes clear that they did), "the advice rendered would not have been rational or logical, and the defendants would have known that, given their superior knowledge of the relevant facts." *Id.* at 42 n.185. Pitt concludes his report with the strikingly objectionable opinion that "ITT not only did not live up to the disclosure obligations market participants commonly understand and expect, and that it was required to meet, it did not come close." *Id.* at 43.

On March 16, 2017, Pitt submitted a rebuttal report whose accusatory statements and inflammatory remarks are, if anything, more objectionable than those in the initial report. The rebuttal report refers to "ITT's fraudulent SEC Disclosures," alleging that Defendants had "actual knowledge of their serious omissions from, and misrepresentations contained in, the ITT SEC Disclosures." [Filing No. 197-4 (Ex. D, Pitt Rebuttal Report ("Rebuttal Report")) at 4.] Pitt asserts that "it is a criminal act" to suggest, as he accuses Defendants' expert David Martin of suggesting, that SEC review of a company's filings and disclosures constitutes approval of those disclosures. *Id.* at 6. In a neat bit of question-begging, Pitt also states that ITT's robust disclosure processes and procedures were "irrelevant because ITT's disclosures were materially false and misleading." *Id.* at 8. The "mere involvement of outside counsel and independent auditors," he continues, "has no bearing" on the accuracy or completeness of a company's disclosures. *Id.* Accordingly, in Pitt's estimation, any attempt by Defendants to

discuss the involvement of inside counsel, outside counsel, PwC, or independent analysts in

ITT's disclosure determinations is simply an attempt to "evade their obligation" and "shuck off

to experts … the responsibility for facts that only the company itself is well aware of." *Id.* at

11.

On April 20, 2017, Pitt was deposed and proffered testimony similar to the opinions in

his report and rebuttal report.

## LEGAL STANDARDS

Under Federal Rule of Evidence 702, an expert's opinion is admissible only if: (i) the

expert's "scientific, technical, or other specialized knowledge" will assist the trier of fact in

understanding the evidence or determining a fact in issue, (ii) the opinion is "based on sufficient

facts or data," (iii) the opinion is "the product of reliable principles and methods," and (iv) the

expert "has reliably applied the principles and methods to the facts of the case." FED. R. EVID.

702. An expert's opinion may be based on facts or data that the expert has been made aware of

or personally observed. FED. R. EVID. 703.

As further explicated by the United States Supreme Court, expert testimony is admissible

only if it is based on (i) "scientific, technical, or other specialized knowledge" that (ii) is helpful

to the trier of fact. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-92 (1993); *see

Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (applying *Daubert* standard to

non-scientific expert testimony). Expert opinions must also be reliable. *Daubert*, 509 U.S. at

584, 589.

Under *Daubert* and Federal Rule of Evidence 702, the Seventh Circuit has adopted a

three-step analysis for determining whether expert opinions should be admitted: (i) whether the

expert is qualified, (ii) whether the expert's reasoning or methodology is reliable, and (iii)

whether the testimony assists the trier of fact in understanding the evidence or determining facts

12

at issue.  *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  *See also Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) ("[T]he district court is a 'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert.") (citation omitted).  "Trial judges enjoy wide latitude and discretion when determining whether to admit expert testimony."  *Wintz ex rel. Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997).

Expert reports and testimony that offer legal opinions are improper and inadmissible.  *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible.").  *See also United States v. Sinclair*, 74 F.3d 753, 758 n.1 (7th Cir. 1996) ("Our own cases have determined that Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case.  That is, they cannot testify about legal issues on which the judge will instruct the jury.") (citing cases).

Federal Rule of Evidence 704 states that an expert opinion "is not objectionable just because it embraces an ultimate issue."  FED. R. EVID. 704.  Rule 704, however, does not permit expert opinions that improperly state legal opinions or are merely conclusory.  *See, e.g., Marting v. Crawford & Co.*, No. 00 C 7132, 2004 WL 305724, at *3 (N.D. Ill. Jan. 9, 2004) ("Under Federal Rule of Evidence 704(a), an expert's report will not be rejected merely because it encompasses an ultimate issue to be decided by the trier of fact; however, the report must offer more analysis than just the 'bottom line.'") (*quoting Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997)).

In addition to being helpful to the trier of fact, expert opinions must also be "the product of reliable principles and methods."  FED. R. EVID. 702(c).  To this end, expert opinions must

have "sufficient factual underpinnings." *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 536 (7th Cir. 2000) (internal citation and quotation marks omitted). Experts must consider all relevant data and avoid "cherry-picking" the facts used in their analyses. *See, e.g.*, *Bone Care Int'l LLC v. Pentech Pharm., Inc.*, No. 08-CV-1083, 2010 WL 3928598, at *6 (N.D. Ill. Oct. 1, 2010) (excluding expert opinion based on incomplete analysis); *LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (expert opinion unreliable where it ignored relevant data that undermined his opinion); *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628, 2009 WL 3241401, at *7-8 (S.D.N.Y. Sept. 30, 2009) (expert testimony on relevant market excluded where expert "[did] not consider meaningfully" reasonable substitutes and "quickly dismissed" such substitutes based on "scant evidence"). An expert's opinion may not be based on "subjective belief or unsupported speculation." *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994).

An expert's opinion should also be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Daubert*, 509 U.S. at 595 (internal quotation marks and citation omitted). Moreover, "[t]he opportunity for vigorous cross examination and the presentation of contrary evidence . . . is not a basis for allowing otherwise inadmissible [expert] testimony to be admitted." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 800 (N.D. Ill. 2005).

As the party seeking to offer Mr. Pitt's expert opinion testimony, the SEC bears the burden of proving by a preponderance of the evidence that the testimony is admissible. *Daubert*, 509 U.S. at 592 n.10; *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); FED. R. EVID. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed

by the principles of Rule 104(a).  Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

**ARGUMENT**

**PITT'S REPORT, TESTIMONY, AND OPINIONS**
**SHOULD BE EXCLUDED IN THEIR ENTIRETY UNDER APPLICABLE LAW**

**I.    PITT'S REPORT, TESTIMONY, AND OPINIONS**
**SHOULD BE EXCLUDED BECAUSE THEY ARE**
**IMPROPER, INADMISSIBLE, AND UNHELPFUL TO A JURY**

Pitt's report, rebuttal report, and testimony depend wholly on improper and inadmissible legal opinions that are unhelpful to the factfinder and usurp the role of the judge and jury.  As the Seventh Circuit has recognized many times over—and as Pitt himself should know, given that his opinions have been previously barred for these very reasons—legal opinions and opinions otherwise usurping the jury's role have no place in expert reports or testimony.

**A.    The Court Should Exclude Pitt's Testimony**
**Because Pitt Offers Improper and Inadmissible Legal Opinions**

Pitt's reports and deposition testimony are rife with legal opinions on the ultimate issues in this case.  Foremost among these are Pitt's opinions that information concerning the CUSO and PEAKS student loan programs, including ITT's practice of making POBOB, would have been materially important to investors—a key legal element of various claims brought by the Commission in this case.

Pitt declares in his report that one of his "principal conclusions" is that "ITT ignored commonly accepted understandings and practices regarding its SEC filings and other corporate disclosures with respect to *information . . . that reasonable investors would have considered important* in deciding whether to buy, sell or hold ITT securities."  [Filing No. 197-3 (Report) at 22 (emphasis added).]  Pitt goes on to explain the specific information concerning ITT's student

15

loan programs that he believes investors would have considered important.  For instance, **"the PEAKS program was, by definition, of the utmost importance to ITT investors** . . . . [T]rends associated with ITT's private student loan programs were of the essence of those that **market participants view** as required disclosures under Item 303(a)(1) of Regulation S-K.")  *Id.* at 28 n.137 (emphases added).

Likewise, under a heading in his report that purports to identify "Information that Should Have Been Disclosed," Pitt states that "ITT itself recognized the importance of": "[d]isclosing its increasing liability resulting from its off-balance sheet PEAKS Trust"; "[t]he significance of the growing debt associated with making only minimum payments on its CUSO guarantee obligations"; "[t]he significance of its adverse liability trends, stretching out beyond 2020, and the disparity between its internal payment projections on the PEAKS and CUSO programs for the full fiscal years 2012 and 2013 and the amounts it disclosed in its public filings"; and assurances to analysts and investors that ITT was "satisfactorily dealing with its payment obligations for the PEAKS and CUSO Loan Programs, and that its payments would max out in 2014 at approximately $30 million."  *Id.* at 28-29.

Pitt admitted that he intends to opine on "[w]hat expectations of investors were," [Filing No. 197-5 at 26 (Ex. E, Pitt Deposition Transcript ("Dep. Tr.") 90:20-21),] reiterating that "[t]he issue that I am opining on is what investors would expect to hear from their CEO and CFO."  *Id.* at 91 (Dep. Tr. at 188:9-11)  This issue—what specific pieces of information about the PEAKS and CUSO programs would have been important to a reasonable investor and thus what specific disclosures investors would have expected ITT to make—is a crucial element of what the jury

must decide, namely, whether ITT's purported omissions and misstatements were material.[5]

And to compound this improper tactic, Pitt bases his opinions upon the flawed legal conclusion

that a company has a duty to disclose all material information to investors. *See Matrixx*, 563

U.S. at 45.

Thus, Pitt's opinions are clearly improper because they are precisely the decisions that

the jury must make based on the Court's legal instructions. Yet Pitt's report is permeated with

these conclusory statements that seek to decide the issues of the case: "ITT was well aware that

a material trend in its liabilities" in both the PEAKS and CUSO programs "would soon trigger

large guarantee obligations by late 2012." [Filing No. 197-3 (Report) at 34.] "Despite this

knowledge, ITT did not adequately enhance its disclosure … to describe this material trend." *Id.*

at 34-35. ITT was "[a]ware that disclosures of large payment obligations due on the PEAKS and

CUSO programs would be deemed important by analysts and investors." *Id.* at 36. Pitt's report

is a veritable minefield of declarations that specific information concerning the PEAKS and

CUSO programs would have been material to noteholders.

Further, what is Pitt's basis for his opinions on materiality? One might presume that he

interviewed ITT investors and conducted some statistical analysis of data. Not so.[6] When asked,

"How do you know what investors think are important?," Pitt replied that he knows because he

has fifty years of experience as an investor, regulator, and advisor, and because "I have, over the

---

[5] *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("The general standard of materiality … is as follows: An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote…. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."); *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (applying the *TSC Industries* materiality standard to claims brought under Exchange Act Sec. 10(b) and Rule 10b-5).

[6] Pitt admitted that he never spoke to ITT's investors. *See* [Filing No. 197-5 at 30 (Dep. Tr. at 94:12-14)] ("I have not, at least knowingly, spoken to anyone who was an ITT investor").

years, been an investor, and I consider myself reasonable."  [Filing No. 197-5 at 28-29 (Dep. Tr.

at 92:18 – 93:15).]  In other words, information is material to investors if Pitt says so.  Such

testimony is improper legal opinion and should be excluded.  *See Panter v. Marshall Field &*

*Co.*, 646 F.2d 271, 293 n.6 (7th Cir. 1981) (affirming exclusion of expert testimony as to

standards of conduct that should apply to board of directors accused of "adopting a secret policy"

to resist acquisition and "failing to disclose" such a policy to shareholders, because such

testimony would "usurp the function of the judge"); *see generally Navarro v. Fuji Heavy Indus.,*

*Ltd.*, 117 F.3d 1027, 1031 (7th Cir.1997) ("[A] conclusion without any support is not one based

on expert knowledge and entitled to the dignity of evidence.").[7]

       Worse yet, Pitt doubles down—opining not only as to what he believes investor

expectations would have been with regard to the PEAKS program, but also that, in ***his own***

***estimation***, Defendants failed to meet those expectations.  *See* [Filing No. 197-3 (Report) at 36]

(Disclosures like ITT's "are widely understood by corporate advisors, corporations and

regulators to be inadequate to satisfy the requirements of either the statutory provisions at issue

here, or the provisions of Regulation S-K Item 303(a).").  *See also* [Filing No. 197-5 at 82 (Dep.

Tr. at 174:5-15)]:

     5  Q  And you would testify that, in this
     6  case, it's your opinion that the CEO and the CFO
     7  here did not live up to the expectation of
     8  investors?

_____

[7] In opining on ITT's disclosures and what investors would expect, Pitt uses a double standard
when he attacks Defendants' expert, Dr. Mark Zmijewski, an economist.  Pitt claims in his
Rebuttal Report that Dr. Zmijewski "may not be the average, ordinary reasonable investor
contemplated by federal securities law."  [Filing No. 197-4 (Rebuttal Report) at 14.]  If an
economics professor such as Dr. Zmijewski does not qualify as an average, ordinary investor,
then surely neither does a former SEC Chairman who touts his five decades of experience and
expertise in federal securities law.  Importantly, Pitt ignores the fact that, unlike his own
opinions, Dr. Zmijewski bases his opinions on a scientific event study that he conducted to
analyze the price reaction of ITT stock.

> 9  MR. HEINKE: Object to the form.
> 10  THE WITNESS:  They didn't meet the
> 11  expectations, no.
> 12  BY MR. MILLER:
> 13  Q  And that's your opinion, right?
> 14  A  That is, based on my experience, my
> 15  opinion.

Pitt further opines in his report that, by failing to disclose information that investors purportedly expected it to disclose, Defendants thereby failed to meet their disclosure obligations under applicable securities laws.  *See* [Filing No. 197-3 (Report) at 38] ("***[Defendants] understood their [disclosure] obligations but, in my opinion, failed to live up to them.***") (emphasis added); [Filing No. 197-4 (Rebuttal Report) at 15] ("As the HLP Initial Report originally indicated, ITT did not live up to the disclosure obligations market participants commonly understand and expect.").

Pitt does not stop there.  He also offers the naked legal conclusion that ITT's disclosures were materially misleading and fraudulent.  *See, e.g.*, [Filing No. 197-3 (Report) at 35] ("these statements [by Defendants] were false"); *id.* at 36 ("even statements that may literally be true can be misleading, as ITT's disclosures demonstrated"); *id.* at 41 ("ITT's disclosures in its 10-Ks for 2012 and 2013, as well as its 10Qs over the same period, were false, misleading and omissive.").  Pitt's Rebuttal Report makes the same legal judgment.  *See* [Filing No. 197-4 (Rebuttal Report) at 2-3] (the "content and accuracy" of ITT's SEC filings and earnings calls was "materially misleading"); *id.* at 4 (Defendants filed "false and misleading certifications of ITT's SEC Disclosures"); *id.* at 8 ("The fact that ITT had a disclosure committee and had disclosure controls and procedures, even if it were true, would be irrelevant because ITT's disclosures were materially false and misleading.").

All of these statements are hornbook examples of improper legal opinions.  *See Hershey v. Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 952, 957-58 (N.D. Ill. 2010) (barring opinions of three experts who sought to testify that defendant PIMCO's conduct was "manipulative," which was an issue "material to" establishing the defendant's liability); *Marting*, 2004 WL 305724 at *1-3 (barring proposed testimony in FLSA case that plaintiff employee's duties did not require the exercise of independent judgment, which would have made plaintiff's position exempt under the statute).

Indeed, courts have barred experts who sought to opine on ***nearly identical*** issues of investor expectations and materiality of disclosures.  For example, in *Feinberg v. Katz*, the plaintiff asserted fraud claims based on allegations that the defendants, co-owners of an apparel manufacturer, had failed to notify creditors of financial losses associated with factory closings, and had overstated the company's financial projections in statements issued to creditors.  *See Feinberg v. Katz*, No. 01-Civ.-2739, 2007 WL 4562930, at *1 (S.D.N.Y. Dec. 21, 2007).  The plaintiff proffered expert testimony as to "whether defendants' alleged omissions and misrepresentations were material and whether creditors would have relied on such information" in extending credit to the company.  *Id.*  The court excluded the testimony, singling out as particularly objectionable the expert's opinion that certain "omissions from the financial statements are material" and that "had this information been available, many if not all of the creditors using these financial statements would not have issued credit to the Company."  *Id.* at *9.  Such a highly objectionable opinion, the court observed, "manages in a single sentence to both usurp the trial judge's function of instructing the jury on the law and tell the jury what result to reach on the facts."  *Id.*  The opinion, the court concluded, was a "breathtaking *tour de force* of inadmissibility."  *Id.*

*SEC v. Goldstone* is also instructive.  In that case, the Commission sought to introduce expert testimony from a CPA and retired auditor, Dale Kitchens, that the defendants' 10-K filing "contained material misstatements" that required restatement in order to comply with GAAP and SEC rules.  *SEC v. Goldstone*, No. CIV 12-0257, 2016 WL 3135651, at *8, *41 (D.N.M. May 10, 2016).  In a detailed opinion that singled out several expert opinions as objectionable, the court found a number of Kitchens' opinions (which bear a striking resemblance to Pitt's opinions here) to be inadmissible, including, *inter alia*, (i) that the 10-K contained material misstatements, (ii) that the defendants "deceived" their auditors by "withholding material information," (iii) that the defendants mislead auditors about material issues, and (iv) that the defendants' failure to provide KPMG with certain documents was "materially deceptive" because "any reasonable auditor would have wanted to know about them."  *Id.* at *54.  Underscoring each of these specific rulings was the court's crucial observation that an opinion as to whether a company's disclosures contain material misstatements "inappropriately states a legal conclusion drawn by applying the law to the facts."  *Id.* at *42.  Put plainly, "[t]he parties' experts may not simply declare certain representations material."  *Id.*

In the Delaware Court of Chancery case *In re Cogent, Inc. Shareholder Litigation*, 7 A.3d 487 (Del. Ch. 2010), a derivative suit brought by shareholders of a target corporation, the shareholders alleged that a "Recommendation Statement" approving a planned merger, which was filed by the corporation's directors, was materially misleading because it failed to disclose certain data underlying the transaction analysis and withheld details concerning the board's merger approval process.  *See id.* at 510-12.  The shareholders sought to introduce the testimony of an expert, David Fuller, in support of their position.  Defendants moved to strike Mr. Fuller's testimony "to the extent he purports to opine on materiality and disclosure issues on the ground

that . . . his opinions reflect inadmissible legal conclusions." *Id.* at 517 n.123.  Although the

court's denial of the preliminary injunction mooted the motion to strike, the court nevertheless

observed: "Several of Fuller's opinions purport to identify material nondisclosures or omissions

and to state what must be disclosed.  In that sense, I agree with Defendants that Fuller's opinions

reflect inadmissible legal conclusions and should be stricken." *Id.*

Likewise, when faced with purported expert testimony that advances an opinion that

improperly usurps the role of the finder of fact, this Court has not hesitated to exclude it.  *See*

[Filing No. 197-6 at 13 (Ex. F, *Bull v. Bd. of Trustees of Ball State Univ.*, No. 10-cv-00878-JMS-

TAB, at 13 (S.D. Ind. May 2, 2012) (Magnus-Stinson, J.)] (expert's proposed testimony about

differential treatment "must stop short of opining that the differential treatment is indicative of

discrimination or retaliation, as that is an inference the trier of fact can make for itself; she may

not offer that inference to the jury as her expert opinion").

Pitt's expression of legal opinions is not limited to the issue of materiality.  In his report,

Pitt claims that ITT's payments on behalf of student borrowers (POBOB) were not contractually

required.  *See* [Filing No. 197-3 (Report) at 15] (POBOB consisted of "payments that ITT was

*not* contractually obligated to provide"); *id.* at 28 n.135 (contending that ITT's statement in its

SEC filings that it did not provide financial or other support to PEAKS that it was not

contractually required to provide was a "false" disclosure).  It is axiomatic that contract

interpretation is not the job of an expert witness.  *See Loeb v. Hammond*, 407 F.2d 779, 781 (7th

Cir. 1969) ("The question of interpretation of the contract is for the jury and the question of legal

effect is for the judge.  In neither case do we permit expert testimony.").  Moreover, the only

specific basis for Pitt's opinion that POBOB was voluntary appears to be his interpretation of a

single word—"sometimes"—that appeared in ITT's 10-Q for Q3 2013.  *See* [Filing No. 197-5 at

44 (Dep. Tr. at 136:12-16)] ("[T]he clear meaning to me of saying that 'we sometimes make payments' is an indication that 'we are not obligated to make payments, but we have been making them.'").  The question of whether POBOB were "contractually required" under the terms of the PEAKS loan program agreements is not a question for Pitt or any other expert to resolve.  Even if it were, it would not be resolved through rank speculation as to whether making payments "sometimes" is determinative of whether they are "contractually required."[8]  By way of comparison, in *Landmark Builders, Inc. v. Cottages of Anderson, LP*, an expert sought to testify that a contractor had not achieved "substantial completion" of a building project, a term that was defined in the parties' contract.  *See Landmark Builders, Inc. v. Cottages of Anderson, LP*, No 01-C-1592, 2003 WL 21508118, at *2 (S.D. Ind. May 20, 2003).  The court summarily rejected this testimony and granted the motion to exclude, noting that "[p]ermitting expert witness testimony on how to interpret a contract could potentially invade the province of both the jury and the court."  *Id.*

Having improperly opined that POBOB was not contractually required, Pitt gives the screw another turn and opines that, since ITT's SEC filings stated it did not provide support to the PEAKS Trust other than what was contractually required, ITT's disclosures were false for this reason as well.  *See* [Filing No. 197-3 (Report) at 28 n.135] (ITT asserted in its filings "that it did not explicitly or implicitly provide financial or other support to the PEAKS Trust that it was not contractually obligated to provide—even though that disclosure, in my opinion, was false.").  And finally—having improperly opined that POBOB is not contractually required, and having improperly opined that ITT's disclosures were false as a result—Pitt provides the

---

[8] Indeed, immediately after identifying the statement in ITT's 10-Q for Q3 2013 that evidently formed the basis for his opinion that POBOB was voluntary, Pitt testified that the statement "was, in my view, inaccurate."  [Filing No. 197-5 at 44 (Dep. Tr. at 136:21-22).]

23

additional legal opinion that Defendants' certifications in their SEC filings were thereby materially false as well.  *See id.* at 39 ("Accordingly, in my opinion the certifications filed by ITT's CEO and CFO were materially inaccurate.").

Despite all of the foregoing, Pitt testified during his deposition that, somehow, he was not providing any legal opinions.  [Filing No. 197-5 at 47 (Dep. Tr. at 139:4-7)] (**Q**  And you just mentioned the fact that you're not here to provide legal opinions on these issues, right?  **A**  On any issues, yes.").  Pitt then stated, a few minutes later, that he was "not opining on materiality." *Id.* at 54 (Dep. Tr. 146:15).  These statements are both incredible and plainly wrong.  The opinions cited and discussed *supra* are ample testament that Pitts' opinions are legal advocacy thinly disguised as expert analysis.  Indeed, Pitt even uses the innocuously titled "Background" section of his report to make targeted value judgments.  For example, he refers facetiously to ITT's practice of making POBOB as its "largesse," characterizes POBOB as a "strategy" that "enabled it to avoid paying tens of millions of dollars in guarantee obligation payments" (while ignoring the fact that ITT did make guarantee payments during the time it made POBOB), and states that ITT's SEC filings "effectively denied the existence" of POBOB.  [Filing No. 197-3 (Report) at 13-15.]

Notably, Pitt's testimony has been barred before for similar reasons.  In *Kensinger v. Allstate*, an adverse employment termination action brought in the Northern District of Illinois, Pitt sought to testify as to "the attitude of the SEC enforcement staff" concerning the qualified document disclosure privilege, as well as "what investors would want to learn from a 10-K report."  *Kensinger v. Allstate*, No 10 C 1733, 2016 U.S. Dist. LEXIS 34416, at *3 (N.D. Ill. Mar. 17, 2016).  The court granted plaintiffs' motion to bar Pitt's testimony, observing:

> Much of the proposed testimony relates legal conclusions and also enforcement issues that need not be reached….  The proposed testimony of Pitt concerning

> SEC practices is not necessary or helpful and poses problems of sorting out argument and legal conclusions from expert opinions.  The jury can decide whether or not the qualified privilege was abused based on the facts to be presented without being told about SEC practices or what an investor would want to know.  IT IS THEREFORE ORDERED that plaintiffs' motion to bar the testimony of Harvey Pitt is granted.

*Kensinger* at *3.  *See also* [Filing No. 197-7 (Ex. G, Deposition Exhibit 841, *Kensinger v. Allstate Ins. Co.*)]; [Filing No. 197-5 at 10-11 (Dep. Tr. at 49:11 – 50:1)] (reading relevant portion of *Kensinger* opinion into the record).  Pitt's report and testimony in the instant case suggest that Pitt has not taken the court's order in *Kensinger* to heart, as his report and testimony here concerns one of the exact same opinions—namely, "what investors would want to learn from a 10-K report"—that was excluded as improper in *Kensinger*.

Because Pitt's report, rebuttal report, and testimony are comprised of and rely on improper legal opinions, this court should exclude Pitt as an expert witness and bar his reports and testimony in their entirety.  *See Good Shepherd Manor*, 323 F.3d at 564; *Sinclair*, 74 F.3d at 758 n.1.

### B.     This Court Should Exclude Pitt's Testimony Because Pitt Merely Recites the Commission's Allegations and Invades the Jury's Province

Pitt's statements about the purported inaccuracy and misleading nature of ITT's disclosures are also inadmissible because they are merely restatements of the allegations in the Commission's complaint that require no expertise or technical knowledge and they invade the jury's province.  *See Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) (Easterbrook, J.) (rejecting portion of expert report and testimony that amounted to "legal analysis in the guise of banking expertise. . . . An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.") (internal punctuation and citations omitted).

*See also id.* (cautioning that it is "vital" that "judges not be deceived by the assertions of experts who offer credentials rather than analysis").

In several places in his report and rebuttal report, Pitt dresses up the Commission's contentions in this case as his own conclusions. The Commission alleges, for instance, that Defendants' disclosures in its filings concerning "contractually required" payments were "false" because the PEAKS agreements "did not require ITT to make POBOB payments." [Filing No. 1 at 19 (SEC Compl. ¶ 66).] Pitt likewise concludes that these disclosures were "false" because POBOB were "payments that ITT was *not* contractually obligated to provide." [Filing No. 197-3 (Report) at 15, 28 n.135.] The Commission also alleges that ITT's statement in its 2012 10-K that it was entitled to repayments made under the PEAKS guarantee was false because "unlike parity ratio guarantee payments, POBOB was not recoverable." [Filing No. 1 at 19 (SEC Compl. ¶ 67).] Per Pitt, ITT's disclosures in its 2012 10-K as to repayment were false because "its POBOB payments were not recoverable." [Filing No. 197-3 (Report) at 39.] And of course, Pitt's improper legal opinions that certain disclosures would have been material to investors, and that those disclosures were therefore materially false and misleading, originate directly from the Commission's Complaint. *Compare* [Filing No. 197-3 (Report) at 28 n.137)] ("the PEAKS program was, by definition, of the utmost importance to ITT investors") *with* [Filing No. 1 at 20-21 (SEC Compl. ¶ 71)] ("Investors would have wanted to know of the existence and impact of POBOB") *and id.* at 34 (SEC Compl. ¶ 122) ("facts about the total near-term cash payments related to PEAKS would have been material to investors"). *Also compare* [Filing No. 197-4 (Rebuttal Report) at 8] ("ITT's disclosures were materially false and misleading") *with* [Filing No. 1 at 20-21, 26-27 (SEC Compl. ¶¶ 71, 93)] ("The Defendants' misstatements and omissions were material"), *id.* at 50 (SEC Compl. ¶ 184) (Defendants "each made or caused to be made

26

materially false or misleading statements"), *and id.* at 50-52 (SEC Compl. ¶¶ 187, 190, 194)

("ITT … filed materially false and misleading reports with the SEC").

Pitt also improperly opines on the "adequacy" of ITT's conferral with its inside and

outside counsel, which is a core issue for the jury at trial: "Based on my review of the record thus

far, and based on my experience, the conferral of Messrs. Modany and Fitzpatrick and ITT with

counsel was inadequate." *See* [Filing No. 197-3 (Report) at 41.]  Additionally, Pitt testified that

the Individual Defendants' reliance on counsel constitutes a "delegation of their responsibility"

that is "contrary to the expectations of investors and market participants." *See* [Filing No. 197-5

at 113 (Dep. Tr. at 240:15-19)] ("I think that what they are raising as their defenses would

constitute a delegation of their responsibility to others, including outsiders, contrary to the

expectations of investors and market participants."). *See also id.* at 55-56 (Dep. Tr. 147:14 –

148:21) (opining that it was "completely irrelevant" whether Defendants received legal advice in

advance of the October 25, 2012 earnings call, and that legal advice is "not relevant" to the issue

of what investors expect).  Further, he acknowledged during deposition that this "delegation"

conclusion was based on the factual assumptions in his report, which as described herein, were

flawed. *See id.* at 113-14 (Dep. Tr. 240:10 – 241:2).

Courts have recognized in similar cases that opinions such as Pitt's are inadmissible legal

advocacy.  In *Marting v. Crawford*, an employment class action, the plaintiff retained an expert

who testified, based on his review of the record, as to the scope of the plaintiff's job

responsibilities.  In excluding the expert's proposed testimony, the court observed, the expert

"merely parrots [plaintiff's] assertions that she is a non-exempt employee under the FLSA [*sic*]

without providing significant analysis." *Marting*, 2004 WL 305724 at *3.  The court further

noted that the expert's testimony "will not assist the trier of fact in the resolution of this case,"

27

since the scope and nature of the plaintiff's work were facts to be established by fact witnesses, not experts, concluding that "[a]n expert should offer more than opinions or legal conclusions on issues that will determine the outcome of the case." *Id.* at *3-*4. Likewise, Pitt's assertions that ITT's conferral with counsel was "inadequate," or somehow constituted a delegation of responsibility, are nothing but conclusory statements that invade the jury's province. *See Phillips v. Wilkerson*, No. 1:15-cv-00151-JMS-MPB, 2016 WL 5394404, at *3 (S.D. Ind. Sept. 27, 2016) (Magnus-Stinson, J.) (granting motion to strike where expert "simply assert[ed] a bottom line conclusion" that police officer "used an appropriate level of force") (internal quotation marks omitted). Pitt's accusative, conclusory opinions in this case, like the opinions that this Court struck in *Phillips*, are "bottom line conclusions" that add nothing to the judicial process.

**C.      Any Value in Pitt's Testimony Is Far
          Outweighed By the Risk of Confusing the Jury**

To the extent Pitt's statements have any value for the jury—and we respectfully submit that they have none—any value is far outweighed by the risk that a jury would listen to the opinions of a former SEC Chairman and, no matter how improper those opinions might be, take them as proof of Defendants' liability. *See Norwest Bank, N.A. v. Kmart Corp.*, No. 3:94-CV-78RM, 1997 WL 33479072, at *3 (N.D. Ind. Jan. 29, 1997) ("[W]e recognize that in a close case the danger of unfair prejudice may be heightened by the 'aura of special reliability' that often surrounds expert testimony, and that jurors may tend to give such testimony undue weight.") (internal quotation marks and citations omitted). For example, Pitt's opinion that ITT failed to make disclosures of the kind that investors would expect could be taken by a jury to mean that ITT had violated federal securities laws. Similarly, Pitt's opinion that ITT failed to consult adequately with counsel could be interpreted to mean that Defendants could not have reasonably

relied on counsel's advice.  Courts in the Seventh Circuit have excluded expert testimony for just these reasons, and so should the Court here.  *See Hershey*, 697 F. Supp. 2d at 950 (excluding expert testimony in part because "the potential exists that the jury, though fully capable of reaching a conclusion on its own, will give undue deference" to the expert's conclusion); *see also Phillips*, 2016 WL 5394404 at *2 (granting motion to strike purported expert report and testimony where moving party argued that "the risk of prejudice and confusion to the jury would far outweigh any probative value").

For all the aforementioned reasons, this court should therefore exclude Pitt's legal opinions as improper, inadmissible, and unhelpful to the factfinder.

## II.  PITT'S REPORT, TESTIMONY, AND OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE UNRELIABLE

In addition to being excludable for the reasons set forth above, Pitt's reports and testimony are also unreliable.  They are based on an incomplete set of facts, and they ignore and disregard key facts in the record that Pitt no doubt realizes are detrimental to his arguments.  Far from being expert opinions, Pitt's reports and testimony are undeniable evidence that his true role in this case is not as an expert, but as a fierce hired advocate for the Commission's trial team.

### A.  Pitt's Report, Testimony, and Opinions Should Be Excluded Because They Rely on Factual Assertions That Omit Key Information or Are Contrary to the Established Record

To be reliable, and therefore to assist the trier of fact, expert reports and testimony must have "sufficient factual underpinnings." *Bourelle*, 220 F.3d at 536 (internal citation and quotation marks omitted).  In numerous ways, Pitt's opinions fail that basic standard.

While Pitt purports to opine on the completeness of ITT's disclosures, his selective treatment of testimony on this issue is manifest, repeatedly ignoring unfavorable testimony and

29

evidence.  To this end, while asserting that there is "scant evidence" of Defendants' reliance on

counsel, [Filing No. 197-3 (Report) at 41], he ignores voluminous evidence of the same.  In his

deposition, Pitt did not recall having reviewed, and did not rely upon in forming his opinion, the

deposition testimony of ITT's key in-house attorney, Christine Long[9], who obtained a legal

opinion regarding the permissibility of POBOB from the Schiff Hardin law firm and who (along

with ITT's inside counsel Clark Elwood) advised Defendants and ITT as to the proper disclosure

treatment of POBOB as "guarantee and other payments."  *See* [Filing No. 197-5 at 97 (Dep. Tr.

at 194:10-20).]   In fact, on the fundamental issue of the permissibility of POBOB, nowhere does

Pitt's report even cite the key advice from Schiff Hardin.  *See id.* at 72-73 (Dep. Tr. 164:7 –

165:1).  Pitt also ignored the testimony of Brian Lane of the Gibson, Dunn & Crutcher law firm,

outside counsel who advised on POBOB disclosures in Q3 2013.  *See id.* at 94-95 (Dep. Tr.

191:22 – 192:10).

 As to the 10A investigation[10] performed by Cravath, Swaine & Moore ("Cravath"),

which focused specifically on Defendants' alleged withholding of information from auditors, Pitt

failed to analyze the investigation documents to determine whether they affected his opinion that

Defendants withheld information improperly from the auditors.  *See* [Filing No. 197-5 at 123

---

[9] Although Ms. Long's deposition is listed along with other materials in an Appendix to Pitt's
report, he testified that he did not recall having reviewed it, and that he "certainly" did not
believe he "relied on it in terms of the opinions [he] expressed."  [Filing No. 197-5 at 97 (Dep.
Tr. at 194:10-20).]

[10] Section 10A requires a "registered public accounting firm" (such as PwC) that is concerned
that any "illegal act" (including a violation of securities regulations) "may have occurred" take
steps to "determine whether it is likely that" such a violation has in fact occurred.  The definition
of an "illegal act" means an "act or omission that violates any law, or any rule or regulation
having the force of law."  Section 10A(f).  In February 2014, PwC raised certain questions to
ITT's Audit Committee pursuant to PwC's responsibilities under Section l0A of the Exchange
Act.  In response, ITT's Audit Committee, in consultation with PwC, retained Cravath to conduct
an investigation concerning whether ITT management withheld certain information from PwC or
omitted information from SEC filings.

(Dep. Tr. at 258:3-6).]  This is a critical omission.  The investigation conducted by Cravath, and

relied upon by PwC as part of its audit, specifically concluded, *inter alia*, that:  ITT management

had not intentionally withheld from PwC information previously provided by Cravath to ITT

management concerning the permissibility of POBOB; ITT management had not made

intentional omissions from its public filings and reports; ITT management and PwC had openly

discussed noteholders' objections to POBOB during Disclosure Committee meetings (which

PwC attended); and ITT management believed that making POBOB was, effectively,

contractually required.  As Pitt conceded at deposition, he did not review the 10A investigation

conclusions.  *See id.* at 122-23 (Dep. Tr. 257:14 - 258:6).[11]

Other examples abound and tie directly to key issues in the case:

- Obligations to PEAKS Noteholders: While Pitt apparently believes that Defendants had a duty to disclose POBOB to the PEAKS noteholders, he had no idea whether ITT had any reporting obligations to the noteholders under the relevant agreements.  *See id.* at (Dep. Tr. 153:19 – 154:7).  Pitt also testified that it was irrelevant to him whether or not the Trustee, Deutsche Bank Trust Company, had determined that the identity of the PEAKS noteholders was confidential and would not be shared with ITT.  *See id.* at 157:2-9.

- CUSO Disclosures: As to the CUSO loan program, although Pitt claims the company made inadequate disclosures of potential CUSO losses, he failed to recall reviewing the testimony of Mark Huber, who testified extensively regarding the CUSO projections.  *See id.* at 158:11 – 159:3.

- CUSO Minimum Payments: Pitt claims that ITT hid from investors its practice of making minimum monthly payments under the CUSO program.  *See* [Filing No. 197-3 (Report) at 28.]  Yet PwC knew of the monthly minimum payment option, a fact which Pitt deemed "completely irrelevant" when it was raised during his deposition.  *See* [Filing No. 197-5 at 104 (Dep. Tr. at 226:9-16).]

- PEAKS and CUSO Consolidation: Despite his report's lengthy "Background" section, implying his detailed knowledge of the factual record, [Filing No. 197-3 (Report) at 6-

---

[11] Pitt attempted to downplay the significance of the Cravath 10A investigation during his deposition by arguing that "I'm independent, and Cravath was not."  *Id.* at 127 (Dep. Tr. 262:16-17).  He then immediately conceded that Cravath was asked to conduct the investigation *by PwC*. *Id.* at 127 (Dep. Tr. 262:18-20) ("**Q**  Okay.  But PwC asked Cravath to conduct the 10A.  **A**  That they did.").

21,] Pitt disclaimed knowledge as to whether PwC's own published guidance stated, consistent with ITT's position, that a protective right (such as a servicer kickout right) should not affect the consolidation analysis until the right is actually exercised, and he deemed such guidance irrelevant to his opinions. *See* [Filing No. 197-5 at 37 (Dep. Tr. at 125:3-14).]

- Disclosure Committee: Pitt testified that it was "irrelevant" for his opinions whether ITT had an active disclosure committee and robust disclosure controls and procedures. *See* [Filing No. 197-4 (Rebuttal Report) at 8; Filing No. 197-5 at 111 (Dep. Tr. at 238:3-16).]

- Reliance on PwC: Pitt testified that it was "completely irrelevant" for his opinions that PwC did not suggest that there was any problem with ITT's disclosures concerning the PEAKS contingent liability or the methodology ITT used in calculating it. *See id.* at 51-52 (Dep. Tr. 143:5 – 144:7).

- PEAKS Recovery/Netting: In calculating the PEAKS contingent liability, ITT "netted" expected payments against expected future recoveries. Although Pitt faults Defendants for inadequate public disclosures of the netting of PEAKS future recoveries against losses, Pitt was unaware that PwC knew ITT was netting its payments and raised no objection to ITT's accounting or related disclosures during PwC's numerous reviews of ITT's filings. *See id.* at 114 (Dep. Tr. 241:16-22).

The Seventh Circuit has previously affirmed the exclusion of opinions proffered by a purported expert, such as Pitt, who "cherry-picked the facts he considered," "did not adequately explain why he ignored certain facts and data, while accepting others," and "ignored other portions" of certain testimony and data that did not support his opinions. *See Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (unpublished) (affirming grant of motion *in limine* barring purported aviation expert). *See also Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) (excluding testimony of expert in part because of the "insufficiency of the data supporting [the expert's] testimony," and where expert "uniformly treated all evidence that undermined his underlying conclusion: unwarranted dismissal of the evidence or outright blindness to contrary evidence"). For all of these reasons, Pitt's testimony is unreliable and should be excluded.

**B.**        <u>Pitt's Characterizations and Unduly Prejudicial</u>
             <u>Comments Demonstrate His Bias and Unreliability</u>

In addition to the points above that demonstrate the lack of reliability of Pitt's analysis, other aspects of his report and deposition make clear that his anticipated testimony is unduly prejudicial and biased, further undermining its reliability.

Although Pitt professes to have no "dog in this fight," [Filing No. 197-5 at 19 (Dep. Tr. at 68:13-14),] his reports and testimony belie that claim. Pitt has made it his policy ***never*** to undertake an engagement requiring him to be a governmental adversary, since he finds it "unseemly" to argue that the Commission "should not be allowed to pursue a cause of action against individuals." *Id.* at 11-12 (Dep. Tr. 50:22 – 51:2); *id.* at 11 (Dep. Tr. 50:10-17) ("**Q** Right. I believe your website actually mentions we do not undertake engagements requiring us to be governmental adversaries, correct? **A** That is correct. **Q** And that policy extends to your expert work as well, true? **A** It does."). In other words, when Pitt is engaged to opine in cases like this one, it is always in support of the Commission. More importantly, Pitt has made abundantly clear in his reports and deposition testimony in this case that he is an advocate for the Commission's litigation position and that his expert "opinion" is no more than argument in fancy trim. Among the numerous prejudicial comments Pitt can be expected to reprise for the jury if permitted to testify at trial are the following:[12]

- Pitt admits that he ignored transcripts relating to counsel's review of disclosures, but he repeatedly refers pejoratively and "euphemistically" to Defendants' reliance on counsel as a "no-one-raised-their-hand" defense. *Id.* at 79 (Dep. Tr. 171:19-21); 121 (Dep. Tr. 256:15-17).

- According to Pitt, it was "at a minimum irrelevant" and possibly "actually worthless" that ITT counsel Clark Elwood had testified that the phrase "guarantee and other payments" was drafted specifically to include POBOB. *Id.* at 89-90 (Dep. Tr. 186:19 – 187:17).

---

[12] Also notable during Pitt's deposition was his refusal to answer questions he deemed irrelevant and his penchant for providing lengthy, non-responsive answers.

- Pitt opines that inside counsel is *per se* not independent. [Filing No. 197-3 (Report) at 41 n.182.]

- "Even if it were assumed, for the purpose of argument, that [Defendants] did receive advice from some counsel, the advice rendered would not have been rational or logical, and the defendants would have known that, given their superior knowledge of the relevant facts." *Id.* at 42 n.185.

- Pitt links this case with the well-known Enron accounting scandal, in a transparent attempt to unfairly prejudice Defendants by creating guilt by association. *Id.* at 35 n.161.

- Pitt baselessly characterizes statements made in Defendants' disclosure expert's report as amounting to a "criminal act." [Filing No. 197-4 (Rebuttal Report) at 6.]

- Pitt acts as judge and jury in finding that Defendants "understood their obligations but, in my opinion, failed to live up to them." [Filing No. 197-3 (Report) at 38.]

- Similarly, Pitt concludes that "ITT not only did not live up to the disclosure obligations market participants commonly understand and expect, and that it was required to meet, it did not come close." *Id.* at 43.

These are the words of an advocate in expert's clothing. The Commission's staff is amply equipped to make the government's arguments to the jury without an assist from another lawyer adorned as an expert. In *Welch v. Eli Lilly & Co.*, this Court struck the opinions and report of a purported expert, Dr. Lance Seberhagen, who attempted to provide an adverse impact analysis in support of an employment class action. *See Welch v. Eli Lilly & Co*, No. 1:06-cv-0641-RLY-JMS, 2009 WL 700199, at *7 (S.D. Ind. Mar. 16, 2009) (Magnus-Stinson, M. J.). In addition to finding several flaws in Dr. Seberhagen's methodology and analysis, *see id.* at *6, this Court observed that he "served more as a hired mouthpiece than as an independent expert seeking to assist the Court," and that as a result his report was "not worthy of credit." *Id.* at *10.

Pitt performs a similar role here, essentially acting as the hired mouthpiece for the Commission's allegations. *See Giuffre v. Jefferson*, No. 14 C 3692, 2017 WL 951239 at *2 (N.D. Ill. Mar. 10, 2017) ("Expert testimony cannot be offered merely for the purpose of

bolstering the credibility of a party's version of the facts. . . . [S]uch testimony usurps the jury's role by 'wrap[ping] the lay witness in the expert's prestige and authority'.") (quoting *Nunez v. BNSF Ry. Co.*, 730 F.3d 681, 684 (7th Cir. 2013)); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541, 546 (S.D.N.Y. 2004) ("experts should not be permitted to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence," for example through "factual narratives and interpretations of conduct or views as to the motivation of parties") (internal quotation marks and footnotes omitted).  Thus, for all the reasons described above, Pitt's reports, testimony, and opinions are unreliable and should be excluded.

## **CONCLUSION**

Pitt's report, rebuttal report, and deposition testimony are improper and inadmissible from beginning to end.  His reports and testimony rely throughout on legal opinions that investors would have expected specific disclosures concerning the PEAKS and CUSO student loan programs, that Defendants failed to meet those expectations, and that Defendants submitted SEC filings and signed certifications containing material misstatements and omissions of fact. Pitt's opinions would be inadmissible in their entirety for this reason alone.  Yet they are also profoundly unreliable, built on a set of groundless factual assumptions that downplay, omit, or simply disregard the documents and testimony that speak to the most crucial issues of fact in this case.  Pitt's improper, conclusory, and unduly prejudicial opinions are, to borrow the words of this Court, "not worthy of credit."  *Welch* at *10.

Accordingly, and for the foregoing reasons, Defendants respectfully move the Court to exclude in their entirety the report, rebuttal report, and testimony of Harvey L. Pitt.

Dated:  October 10, 2017                    Respectfully submitted,

                                            *s/ David I. Miller*
                                            David I. Miller (*pro hac vice*)
                                            Matthew R. Ladd (*pro hac vice*)
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            101 Park Ave.
                                            New York, NY 10178
                                            Telephone:  (212) 309-6000
                                            Fax:  (212) 309-6001
                                            *david.miller@morganlewis.com*
                                            *matthew.ladd@morganlewis.com*

                                            Eric W. Sitarchuk (*pro hac vice*)
                                            Ryan P. McCarthy (*pro hac vice*)
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            1701 Market St.
                                            Philadelphia, PA 19103
                                            Telephone:  (215) 963-5000
                                            Fax:  (215) 963-5001
                                            *eric.sitarchuk@morganlewis.com*
                                            *ryan.mccarthy@morganlewis.com*

                                            Steve Korotash (*pro hac vice*)
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            171 Main St., Suite 3200
                                            Dallas, TX 75201-7347
                                            Telephone: (214) 466-4000
                                            Fax: (214) 466-4001
                                            *steve.korotash@morganlewis.com*

                                            Philip A. Whistler (#1205-49)
                                            Thomas E. Mixdorf (#16812-49)
                                            ICE MILLER, LLP
                                            One American Square, Suite 2900
                                            Indianapolis, IN  46282-0200
                                            Telephone: (317) 236-5832
                                            Fax: (317) 592-4708
                                            *Philip.Whistler@icemiller.com*
                                            *Thomas.Mixdorf@icemiller.com*

                                            *Attorneys for Defendant Kevin M. Modany*

                                            *s/ Michael Ungar (by consent)*
                                            Fredric D. Firestone (*pro hac vice*)
                                            Michael A. Ungar (*pro hac vice*)

36

James M. Commons (*pro hac vice*)
Alison L. Nadel (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
500 North Capitol St., N.W.
Washington, DC  20001
Telephone:  (202) 756-8000
Fax:  (202) 756-8087
*rfirestone@mwe.com*
*mungar@mwe.com*
*jcommons@mwe.com*
*anadel@mwe.com*

Alan S. Brown (#3536-49)
Bryan S. Strawbridge (#29076-49)
FROST BROWN TODD LLC
201 N. Illinois St.
Suite 1900
Indianapolis, IN 46204-4236
Telephone: (317) 237-3841
Fax: (317) 237-3900
*abrown@fbtlaw.com*
*bstrawbridge@fbtlaw.com*

*Attorneys for Defendant Daniel M. Fitzpatrick*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the foregoing document to be served upon all counsel of record by operation of the Court's Electronic Notification system this 10th day of October, 2017.

<em>s/ David I. Miller</em>_____