UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:15-cv-00758-JMS-MJD |
| vs. | ) | |
| | ) | |
| ITT EDUCATIONAL SERVICES, INC., KEVIN M. MODANY, and DANIEL M. FITZPATRICK, | ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff United States Securities and Exchange Commission (the "SEC") initiated this litigation against ITT Educational Services, Inc. ("ITT"), Kevin Modany, and Daniel Fitzpatrick in May 2015, alleging that Defendants violated various federal securities laws in connection with two student loan programs created by ITT for ITT students. Specifically, the SEC alleges that when the loan programs exhibited high default rates and ITT's guarantee obligations increased, Defendants engaged in various deceptive acts to conceal the condition of the loan programs and the impact on ITT's financial condition. The SEC and ITT reached a settlement, but claims against Mr. Modany and Mr. Fitzpatrick remain pending. Both the SEC on the one hand, and Mr. Modany and Mr. Fitzpatrick on the other, have filed Motions for Partial Summary Judgment, [Filing No. 225; Filing No. 227], which are now ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear,

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d

903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648.

## II.
### BACKGROUND

The following factual background is set forth pursuant to the standard discussed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

## A. The Defendants

ITT was a for-profit higher education company whose stock was registered with the SEC and quoted on the New York Stock Exchange. [Filing No. 1 at 5; Filing No. 33 at 2.][1] Mr. Modany was ITT's Chief Executive Officer ("CEO") since 2007, and chairman of its Board of Directors since 2008. [Filing No. 1 at 5-6; Filing No. 33 at 3.] Mr. Modany served as ITT's President and Chief Operating Officer ("COO") from 2005 to 2007, and was Chief Financial Officer ("CFO") from 2003 to 2005. [Filing No. 1 at 6; Filing No. 33 at 3.] Mr. Fitzpatrick was ITT's CFO, principal accounting officer, and Executive Vice President since April 2009. [Filing No. 1 at 6-7; Filing No. 33 at 3.] Both Mr. Modany and Mr. Fitzpatrick played a role in ITT's disclosure process, including editing portions of, and reviewing, signing, and certifying ITT's periodic filings. [Filing No. 1 at 6-7; Filing No. 1 at 26; Filing No. 1 at 31; Filing No. 1 at 34; Filing No. 33 at 3-4; Filing No. 33 at 13; Filing No. 33 at 15-17.]

## B. The PEAKS Program

In 2010, ITT formed the Program for Education Access and Knowledge student loan program (the "PEAKS Program"). [Filing No. 1 at 1; Filing No. 1 at 9.] It was structured as a trust (the "PEAKS Trust") that raised funds by issuing senior debt to institutional investors (the "PEAKS Noteholders"). [Filing No. 1 at 9.] The PEAKS Trust received the cash flows generated by payments on the student loans and used those funds to pay the principal and interest of the senior debt, and other fees and expenses. [Filing No. 1 at 9.] A student loan servicer collected payments on the student loans. [Filing No. 1 at 9.]

---

[1] Neither the SEC nor Defendants set forth background information supported by citations to record evidence regarding the parties, the loan programs at issue, or the overall scheme in which the SEC alleges the Defendants engaged, in their Motions for Summary Judgment. The Court, citing to the SEC's Complaint and Defendants' Answer, provides that information by way of background. This background information does not constitute findings of fact.

ITT made certain guarantees related to the PEAKS Program, including all of the principal and interest payments on the PEAKS senior debt, other financial obligations of the PEAKS Trust, and maintaining a "parity ratio" between the PEAKS Trust's assets (the value of the loans made to ITT's students) and liabilities (the senior debt owed to the PEAKS Noteholders). [Filing No. 1 at 9.] If ITT failed to make the required guarantee payments on time, the PEAKS Noteholders could force ITT to immediately pay the entire amount of principal and interest remaining on the senior debt in advance of the 2020 maturity date. [Filing No. 1 at 10.]

### C. The CUSO Program

In 2009, ITT launched the Credit Union Service Organization student loan program (the "CUSO Program"). [Filing No. 1 at 10.] The CUSO Program involved a group of credit unions, acting through a Credit Union Service Organization ("CUSO"), making a total of approximately $141 million in private loans to ITT students. [Filing No. 1 at 10.] Loans made in each year of the CUSO Program were aggregated into one of three annual loan pools. [Filing No. 1 at 10.] ITT and the CUSO entered into a risk sharing agreement whereby if more than 35% of the loans in any of the three annual pools defaulted, ITT guaranteed payment of the principal, interest, and fees on any loans that defaulted over the 35% threshold (the "risk share threshold"). [Filing No. 1 at 10.] Once ITT's guarantee obligation was triggered for one of the CUSO loan pools, ITT could either pay the monthly payments due on defaulted loans over the threshold (a minimum payment), or discharge its total future obligation by immediately paying the outstanding principal plus some additional interest. [Filing No. 1 at 10-11.]

### D. The Allegedly Fraudulent Scheme

From the end of 2011 through the end of the third quarter of 2012, loans through the PEAKS Program and the CUSO Program were defaulting at high rates. [Filing No. 1 at 12.] At

the same time, ITT's financial performance and stock price were declining due to, among other issues, decreasing enrollment at ITT.  [Filing No. 1 at 12.]  In October 2012, ITT received a demand for a PEAKS guarantee payment of more than $8 million due to the parity ratio falling below its required level.  [Filing No. 1 at 14.]  ITT made a payment to the PEAKS Trust for $8 million.  [Filing No. 1 at 14.]  Mr. Modany and Mr. Fitzpatrick then began devising a plan to avoid PEAKS Program guarantee payments.  [Filing No. 1 at 14.]

The alleged scheme involved ITT determining which students were about to default on their loans, and making the minimum payment necessary to avoid default on their behalf, without advising the students that these payments were being made.  [Filing No. 1 at 15.]  These "Payments on Behalf of Borrowers" ("POBOB") were to prevent PEAKS Program loans from defaulting so that ITT could avoid making parity ratio guarantee payments.  [Filing No. 1 at 15.]  At the end of October 2012, ITT made approximately $2.4 million in POBOB payments, which allowed ITT to avoid approximately $30 million in guarantee payments to the PEAKS Trust.  [Filing No. 1 at 15.]  Neither ITT, Mr. Modany, nor Mr. Fitzpatrick disclosed POBOB to investors.  [Filing No. 1 at 16.]

As for the CUSO Program, ITT calculated its liability for CUSO guarantee payments (triggered when loans defaulted over a 35% risk share threshold), and determined to pay the monthly minimum.  [Filing No. 1 at 28.]  Defendants did not disclose to investors in public filings that the method ITT used to calculate liability – which assumed that ITT would immediately discharge its obligation – was inconsistent with the method ITT actually used to pay its CUSO guarantee – which was to make minimum payments of the monthly amounts due on the high-interest loans.  [Filing No. 1 at 29.]  The decision to make only the monthly minimum payments

resulted in increasing the amount that ITT would ultimately have to pay on the CUSO guarantee well beyond the amount of the liability disclosed in public filings. [Filing No. 1 at 28-29.]

### E. The Lawsuit

The SEC initiated this litigation in May 2015, alleging that Mr. Modany and Mr. Fitzpatrick, among other things:[2]

- "Designed ITT's off-balance sheet student loan programs";

- "Devised and implemented the POBOB payment practice, which had the effect of temporarily delaying significant and looming PEAKS guarantee payments";

- "Failed to disclose the POBOB practice to investors";

- "Initially concealed the POBOB practice from the PEAKS Noteholders";

- "Misrepresented to ITT's auditor that the PEAKS Noteholders had consented to the POBOB practice when in fact they were not initially consulted about the practice and, when they did learn of the practice, objected to it";

- "Withheld from ITT's auditor that ITT had received a legal opinion that POBOB payments were likely not permitted under the terms of the PEAKS agreements";

- "Failed to disclose to ITT's auditor that ITT was projecting more than $100 million in CUSO payments if it continued using the minimum monthly payment method";

- "Failed to consolidate the PEAKS program into ITT's financial statements, even when [they] knew that ITT had the right to kick-out the PEAKS servicer";

- "Signed management representation letters to ITT's auditor that contained false or misleading statements and omissions";

- "Made false and misleading statements and omissions on earnings calls that, among other things, failed to disclose the POBOB practice and misled investors by claiming that ITT's net PEAKS liability was equal to the total amount of

---

[2] The SEC and ITT ultimately settled the claims against ITT. [See Filing No. 176; Filing No. 177.] Accordingly, the Court only discusses claims against Mr. Modany and Mr. Fitzpatrick. Specifically, the SEC asserts Claims Nine and Twelve against ITT only, so they are not addressed in this Order. [See Filing No. 1 at 50; Filing No. 1 at 52.]

cash payments ITT would be required to make, when in fact ITT was projecting near-term cash payments that were tens of millions of dollars greater [than] the total net liability"; and

- "Signed or certified numerous of ITT's period[ic] filings containing material misstatements and omissions regarding PEAKS and CUSO."

[Filing No. 1 at 38-40.]

The SEC asserts the following claims against Mr. Modany and Mr. Fitzpatrick: (1) fraud under Section 10(b) of the Exchange Act and Rule 10b-5 (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5); (2) control person liability under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) for ITT's violations of Section 10(b) and Rule 10b-5; (3) aiding and abetting ITT's violations of Section 10(b) and Rule 10b-5; (4) fraud in the offer or sale of securities in violation of Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)); (5) aiding and abetting ITT's violations of Section 17(a); (6) falsified books, records, or accounts under Section 13(b)(5) of the Exchange Act and Rule 13b2-1 (15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1); (7) false certifications under Rule 13a-14 of the Exchange Act (17 C.F.R. § 240.13a-14); (8) deceit of auditors under Rule 13b2-2 of the Exchange Act (17 C.F.R. § 240.13b2-2); (9) aiding and abetting ITT's false SEC filings under Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 (15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13); (10) control person liability for ITT's false SEC filings under Section 20(a) of the Exchange Act; (11) aiding and abetting ITT's violations of Section 13(b)(2) of the Exchange Act (15 U.S.C. § 78m(b)(2)); (12) control person liability under Section 20(a) of the Exchange Act for ITT's violations of Section 13(b)(2); and (13) failure to reimburse under Section 304(a) of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243(a). [Filing No. 1 at 45-55.]

The SEC seeks an injunction permanently enjoining Mr. Modany and Mr. Fitzpatrick from violating any securities laws, an order prohibiting either from acting as an officer or director of

any public company, an order that each disgorge any ill-gotten gains, an order requiring them to pay a civil penalty, and an order requiring them to reimburse ITT for any bonuses, incentive-based and equity-based compensation, and any profits realized from their sale of ITT stock. [Filing No. 1 at 55-56.]

## III.
### DISCUSSION

The Court notes at the outset the somewhat unusual nature of the pending Motions for Summary Judgment. The SEC's motion focuses on certain elements of the claims it asserts[3] and on some defenses it believes Mr. Modany and Mr. Fitzpatrick will rely upon, presumably attempting to narrow its burden of proof for trial. Mr. Modany and Mr. Fitzpatrick's motion addresses some of those elements, but also seeks to exclude certain allegations, likely to whittle away at the scheme the SEC alleges existed. The Court has done its best to align the parties' arguments with the claims, and finds that the most efficient way to address the motions is to set forth the elements of each claim[4] and then discuss each motion for summary judgment as it relates to that claim. While the result involves some repetition, the Court considered it necessary to ensure a complete analysis.

---

[3] Some courts have rejected outright motions for summary judgment that "seek[ ] adjudication of only a single element of a claim," finding that "[t]he use of Rule 56 to resolve an element of a claim is wasteful of judicial resources in situations, such as this one, where there is a dispute on the remaining issues which will necessarily be resolved at trial." *Member Services, Inc. v. Sec. Mut. Life Ins. Co. of New York*, 2010 WL 3907489, *16 (N.D. N.Y. 2010). The Court tends to agree that motions for summary judgment seeking the adjudication of certain elements of a claim are a waste of judicial resources, especially where, as here, other elements of the claims will need to be considered by a jury at trial. It will, however, consider the parties' arguments that relate to only certain elements of the SEC's claims.

[4] The SEC's first claim is brought under § 10(b) and Rule 10b-5, and the Court addresses those provisions separately as the parties raise distinct arguments related to those provisions.

### A. Claim One - Fraud Under Section 10(b) of the Exchange Act

*1. Elements of the Claim*

Section 10(b) of the Exchange Act provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -- …To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  In order to prove a violation of § 10(b) of the Exchange Act, the SEC must show that defendants: "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Bauer*, 723 F.3d 758, 768-69 (7th Cir. 2013) (quotations omitted).

*2. The SEC's Motion for Summary Judgment*

The SEC moves for summary judgment on two elements of its § 10(b) claim – first, that the violation occurred "by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange," and second, that the violation occurred in connection with the purchase or sale of securities.  The SEC also argues that Defendants may not rely on advice of counsel as a defense to the fraud-related claims.  The Court addresses each argument in turn.

     a.   Interstate Commerce

The SEC argues that it has alleged that Mr. Modany and Mr. Fitzpatrick made misstatements or omissions in public filings made with the SEC, failed to consolidate the PEAKS Trust into ITT's financial statements, and made misstatements or omissions in conference calls

with investors.  [Filing No. 226 at 20.]  It asserts that it "is not moving for summary judgment on whether these violations occurred…[, r]ather the [SEC] is moving for judgment that, if these violations occurred, they occurred through the use of interstate commerce."  [Filing No. 226 at 20.]  The SEC argues that these acts were done through the use of interstate commerce because misstatements or omissions made in public filings with the SEC and misstatements or omissions made in telephone calls constitute the use of interstate commerce, and ITT was a publicly traded company using the New York Stock Exchange.  [Filing No. 226 at 21.]

Buried in a footnote in Defendants' Statement of Material Facts In Dispute section of their response brief, Defendants state that "[t]he SEC moved for judgment that certain conduct (enumerated in three prongs in its brief [and related to certain public filings and conference calls]) met the interstate commerce elements of §§ 17(a) and 10(b)….  As to §§ 17(a) and 10(b), Defendants do not contest interstate commerce based on the conduct described in these three prongs.  Defendants understand the SEC's first and second prongs to be premised on alleged false or misleading statements in the Form 10-Q for the third quarter…2012, the Forms 10-Q for Q1-Q3 2013, and in the 2012 Form 10-K."  [Filing No. 254 at 6, n. 1.]

Because Defendants concede the interstate commerce element for conduct related to certain filings and to conference calls, the Court **GRANTS** the SEC's Motion for Summary Judgment on that issue related to those filings and conference calls.  The Court notes the SEC's representation in its opening brief that it "reached out to Defendants to ask if they would stipulate" to certain elements including the interstate commerce elements, but that Defendants were "unable to do so." [Filing No. 226 at 8, n. 1.]  As trial approaches in this case, which involves numerous claims each with multiple elements, the Court encourages and expects the parties to reach as many stipulations

as possible to conserve time and judicial resources. [*See* Filing No. 72 at 10 (Court's Practices and Procedures stating "stipulations of fact[ ] are not only encouraged but expected").]

  b.  In Connection With the Purchase or Sale

The SEC argues that "[m]isrepresentations in documents such as public filings and press releases, which are designed to reach investors and to influence their decisions to transact in a publicly-traded security meet the 'in connection with the purchase or sale' requirement" of § 10(b). [Filing No. 226 at 21.] It then points to its allegations in the Complaint, including misstatements or omissions in public filings made with the SEC and in earnings calls, which it asserts were "designed to reach investors and to influence investors' decisions related to ITT securities." [Filing No. 226 at 22.]

Mr. Modany and Mr. Fitzpatrick respond that the SEC cannot demonstrate that the "connection" between the alleged misrepresentations and the purchase or sale of securities was material and, in fact, has not argued that that is the case. [Filing No. 254 at 17.]

In its reply, the SEC argues that Mr. Modany and Mr. Fitzpatrick have "conflate[d] the materiality element [of a § 10(b) claim] (which the SEC has not moved on) with the 'in connection' element on which the SEC has moved." [Filing No. 257 at 7.]

The SEC's request for summary judgment on the issue of whether the allegedly violative acts occurred in connection with the purchase or sale of securities is based solely on the allegations of the Complaint. Indeed, the SEC cites only to the Complaint in support of its argument, and not to any evidence. In other words, the SEC asks the Court to find that if it proves certain facts at trial, then summary judgment is appropriate on the offer or sale of securities element of its § 10(b) claim. This the Court cannot do.

Federal Rule of Civil Procedure 56 provides that "[a] party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the SEC has not provided material facts, supported by citations to the record, which show that the allegedly violative acts occurred in connection with the purchase or sale of securities. Rather, it has merely pointed to its allegations and has argued that if it proves those allegations are true at trial, then those facts would show that the violations occurred in connection with the purchase or sale of securities.

ITT admits some of the allegations on which the SEC relies, but those allegations do not provide the requisite connection between the purchase or sale of a security and the allegedly fraudulent acts. *See U.S. v. Durham*, 766 F.3d 672, 682 (7th Cir. 2014) (the "in connection with the purchase or sale of a security" element of a § 10(b) claim requires that a misrepresentation "coincide" with or "touch" a securities transaction) (citing *S.E.C. v. Zandford*, 535 U.S. 813, 822 (2002) and *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12 (1971)). For example, the SEC relies upon allegations in paragraph 62 of the Complaint that ITT's 2012 Form 10-K contained certain language. [Filing No. 1 at 17.] Defendants admit that paragraph 62 quotes ITT's 2012 Form 10-K. [Filing No. 33 at 9-10.] But Defendants go on to deny allegations in paragraph 63 that the language in the 2012 Form 10-K was misleading, [*see* Filing No. 1 at 17-18; Filing No. 33 at 10], and the SEC does not provide undisputed evidence that those statements were misleading.

For the Court to find that the SEC will have proven this element of its § 10(b) claim if it proves that certain allegations (which link public filings to fraudulent conduct) are true would be

to issue an impermissible advisory opinion. *See Member Services, Inc. v. Sec. Mut. Life Ins. Co. of New York*, 2010 WL 3907489, *17 (N.D. N.Y. 2010) (motion requesting summary judgment "based upon the facts that might be proven at trial" seeks an impermissible advisory opinion) (emphasis omitted); *Socha v. Pollard*, 621 F.3d 667, 670 (7th Cir. 2010) (federal courts may not issue advisory opinions). This issue simply has not been appropriately supported in the SEC's motion, and therefore is not appropriately decided on summary judgment. Obviously, it could be addressed at trial, if appropriate, once the parties have presented their evidence. Depending on the evidence, either party could move for judgment as a matter of law on the purchase or sale element of this claim. *See* Fed. R. Civ. P. 50(a)(1)(B) ("If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may…grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue").

The SEC's efforts to obtain summary judgment on this element of its § 10(b) claim is akin to requesting that the jury be instructed that this element has been conclusively established. But final jury instructions are crafted after the Court has had the benefit of seeing the evidence that the parties have presented to the jury. Without that benefit, it is impossible to know whether, for example, the fraudulent conduct here is linked with the specific public filings the SEC relies upon to satisfy this element of its § 10(b) claim. The SEC's Motion for Summary Judgment as to the purchase or sale element of its § 10(b) claim is **DENIED**.

c.   Reliance on Advice of Counsel

The SEC moves for partial summary judgment on all of its claims alleging violations of the anti-fraud provisions of the federal securities laws on the issue of whether Defendants may rely

on advice of counsel as a defense to those claims. [*See* [Filing No. 226 at 27-31](#).] It argues that its anti-fraud claims are based, in part, on allegations that Defendants failed to disclose to ITT's investors information regarding POBOB, misled investors by only disclosing the "net" amount of payments they projected making to the PEAKS Program rather than the more than $100 million in gross cash payments they anticipated, and failed to disclose information about projected cash flows related to the CUSO Program. [[Filing No. 226 at 28](#).] The SEC argues that the evidence shows that Defendants never sought legal advice regarding any of those disclosures. [[Filing No. 226 at 29-31](#).]

In response, Defendants argue that they will present evidence regarding advice of counsel not as an affirmative defense, but as evidence of their lack of scienter or negligence, and that "Defendants are aware of no case in which a court has granted summary judgment to preclude an individual defendant from offering evidence of counsel's advice to show a lack of scienter." [[Filing No. 254 at 26-27](#).] Defendants contend that, in any event, "[t]he record is replete with evidence of in-house and outside counsel's role in repeatedly reviewing, editing, and advising on the specific disclosure issues raised in the SEC's motion." [[Filing No. 254 at 27](#).] Defendants set forth evidence that they argue indicates that they sought legal advice on the three issues the SEC focuses on – POBOB, disclosures relating to the PEAKS Program guarantee payments, and disclosures related to the CUSO Program. [[Filing No. 254 at 29-38](#).]

In its reply, the SEC argues that it is entitled to summary judgment on any affirmative defense based on advice of counsel because Defendants concede that they are not asserting such an affirmative defense. [[Filing No. 257 at 19-21](#).] It also argues that, to the extent the Court considers advice of counsel as it relates to scienter, there are no genuine disputes of fact that Defendants themselves did not seek out or receive such advice. [[Filing No. 257 at 21-24](#).]

The parties' briefs on this issue present a disconnect that the Court must address up front. The SEC's Motion for Summary Judgment only seeks judgment on Defendants' "affirmative defense" that the SEC's fraud-based claims fail because they relied upon advice of counsel. Defendants argue that they do not assert such an affirmative defense, although they state in Affirmative Defense 17 in their Answer that "Defendants are not liable because they relied upon the work, involvement, advice, judgment, and opinions of numerous professionals and subject-matter experts engaged by the company." [Filing No. 33 at 26.] In their Statement of Claims and Defenses, however, Defendants clarify their position by stating that they "are not liable because they relied upon the work, involvement, advice, judgment, and opinions of numerous professionals and subject-matter experts engaged by the company..., including: ITT's in-house attorneys...; [and] outside attorneys.... With respect to reliance on counsel, a defendant's reliance on the advice of counsel demonstrates a lack of scienter (or even negligence), an element necessary to many of the SEC's claims.... Defendants' reliance on counsel is thus not an affirmative defense upon which the Defendants bear the burden of proof." [Filing No. 210 at 4.] Defendants also concede in their response to the SEC's Motion for Summary Judgment that "contrary to the SEC's apparent belief, Defendants are adducing evidence of advice of counsel not as an affirmative defense but as evidence of their lack of scienter or negligence, which are essential elements of the SEC's claims." [Filing No. 254 at 26 (emphasis omitted).] The Court **DENIES** the SEC's Motion for Summary Judgment since it asks for judgment on an affirmative defense that Defendants have conceded does not exist. That said, the Court also finds that Defendants are bound by their concession and may not rely on advice of counsel as an affirmative defense at trial.[5]

---

[5] The SEC seeks summary judgment on the reliance of counsel issue in connection with all of its fraud-based claims, and the Court **DENIES** the motion on those claims for the same reasons as discussed.

Because the SEC does not move for summary judgment on Defendants' reliance on advice of counsel as a factor to consider in determining scienter, the Court need not address that issue. The Court notes, however, that advice of counsel is a proper consideration in analyzing a defendant's state of mind in connection with securities fraud claims. *See, e.g.*, *Securities and Exchange Commission v. Sethi Petroleum, LLC*, 2017 WL 3386047, *4 (E.D. Tex. 2017) ("Reliance on counsel is not a formal defense, but rather it is simply a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud") (citations and quotations omitted); *Howard v. S.E.C.*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) ("reliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter"); *United States v. Peterson*, 101 F.3d 375, 381 (5th Cir. 1996) (affirming district court's issuance of jury instruction which stated: "To decide whether such reliance [on advice of counsel] was in good faith, you may consider whether the Defendant sought the advice of a competent attorney concerning the material fact allegedly omitted or misrepresented, whether the Defendant gave his attorney all the relevant facts known to him at the time, whether the Defendant received an opinion from his attorney, whether the Defendant believed the opinion was given in good faith and whether the defendant reasonably followed the opinion"). The SEC, however, still has the burden of proof regarding scienter. *Securities and Exchange Commission v. Ferrone*, 163 F.Supp.3d 549, 568 (N.D. Ill. 2016) ("The SEC has the burden to establish scienter for its claims under Section 10(b) and Rule 10b-5") (citing *Aaron v. SEC*, 446 U.S. 680, 691 (1980)).

To the extent the SEC believes that certain evidence regarding Defendants' reliance on advice of counsel should be precluded at trial, it may file a motion in limine in advance of trial or object to such evidence at trial. Because the SEC did not move for summary judgment on whether

Defendants may rely on advice of counsel as a mitigating factor in determining scienter – which, the Court notes, appears to be based on evidence which is largely disputed – the Court will not address this issue further.

### B. Claim One - Scheme Liability Under Exchange Act Rule 10b-5

#### 1. Elements of the Claim

Rule 10b-5, promulgated by the SEC pursuant to § 10(b) of the Exchange Act, makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "Rule 10b-5 prohibits only conduct that § 10(b) already renders unlawful."

*In re Akorn, Inc. Securities Litigation*, 240 F.Supp.3d 802, 813 (N.D. Ill. 2017).

#### 2. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the SEC's Rule 10b-5 claim, arguing that certain allegations in the Complaint do not support the SEC's "scheme liability" theory under Rule 10b-5(a) and (c), and that alleged conduct relating to the PEAKS Noteholders, certain disclosures to the shareholders, and conduct relating to the auditor cannot support its Rule 10b-5(b) claim.[6]

---

[6] Defendants move for summary judgment related to scheme liability allegations in connection with the SEC's claim under § 10(b), but do not specifically address § 10(b) in this part of their brief. The Court's discussion related to Rule 10b-5 applies with equal force to the § 10(b) claim. Additionally, the SEC moves for summary judgment on the interstate commerce element of Rule 10b-5, which the Court **GRANTS** for the reasons discussed above in connection with the SEC's § 10(b) claim.

a. <u>Scheme Liability Allegations Under Rule 10b-5(a) and (c)</u>

Defendants argue that the SEC relies on alleged acts that "do not independently satisfy the elements of fraud," and "then aggregates these independent acts and applies a pejorative 'scheme to defraud' label to these acts."[7] [Filing No. 247-1 at 32.] They assert that "scheme liability cannot be predicated upon false or misleading statements absent the existence of inherently deceptive conduct." [Filing No. 247-1 at 32.] Defendants point to the following alleged activities, and argue that they were not inherently fraudulent: (1) the POBOB practice; (2) Mr. Fitzpatrick's alleged failure to consolidate the PEAKS Trust into ITT's financial statements; and (3) misstatements or omissions in SEC filings or earnings calls, to the auditor, or to certain parties, with respect to POBOB. [Filing No. 247-1 at 35-37.] Defendants contend that "the SEC is improperly utilizing scheme liability to pursue a case that is really about the propriety of ITT's public disclosures, when it has no evidence of deceptive conduct beyond alleged misstatements and omissions. This is an impermissible expansion of scheme liability…." [Filing No. 247-1 at 37.]

In response, the SEC argues that it need not show deceptive conduct beyond misstatements, and that this issue has not been addressed by the Seventh Circuit Court of Appeals. [Filing No. 251 at 27.] It contends that, if required, there is substantial evidence of conduct beyond misstatements to support its Rule 10b-5 scheme liability claim, including Defendants lying to auditors and the PEAKS Noteholders about the POBOB practice, and Defendants engaging in deceptive conduct to avoid consolidating the PEAKS Trust into ITT's financial statements. [Filing No. 251 at 28-30.]

---

[7] Defendants assert these same arguments in connection with the SEC's claims brought under § 17(a) of the Exchange Act, which the Court will address below.

In reply, Defendants argue that "the SEC asks this Court to read a prohibition against deceptive statements into Rule[ ] 10b-5(a) and (c)," but that doing so "would render Rule 10b-5(b)…superfluous." [Filing No. 258 at 12.] Defendants reiterate their argument that the majority of courts have held that Rule 10b-5 requires deceptive conduct beyond false or misleading statements. [Filing No. 258 at 14-15.] They also assert that even if deceptive statements could create scheme liability, the nondisclosure of POBOB to the PEAKS noteholders would not support scheme liability because Rule 10b-5 liability cannot extend beyond § 10(b) liability, § 10(b) prohibits only conduct that is manipulative or deceptive, and a nondisclosure of information cannot be deceptive absent a duty to disclose it. [Filing No. 258 at 16-17.]

The Seventh Circuit Court of Appeals has not considered the issue of whether Rule 10b-5(a) and (c) require deceptive conduct beyond mere misstatements or omissions, but the majority of courts that have considered the issue have required deceptive conduct that is distinct from the alleged misrepresentations and omissions. *See, e.g.*, *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, *16-17 (N.D. Cal. 2018)* ("'A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions'") (quoting *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011)); *United States Securities and Exchange Commission v. Wey*, 246 F.Supp.3d 894, 918 (S.D. N.Y. 2017) (finding that plan to move shares into brokerage accounts was "deceptive even without the later misrepresentation," and supported Rule 10b-5(a) and (c) claims; *S.E.C. v. Cole*, 2015 WL 5737275, *8 (S.D. N.Y. 2015) (noting that courts "have repeatedly allowed both 'scheme liability' and deceptive statement claims to go forward 'where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b-5(b), as well that the defendants undertook

a deceptive scheme or course of conduct that went beyond the misrepresentations'") (emphasis omitted) (quoting *In re Alstom SA*, 406 F.Supp.2d 433, 475 (S.D.N.Y. 2005)); *In re CytRx Corporation Securities Litigation*, 2015 WL 5031232, *12 (C.D. Cal. 2015) (SEC properly alleged scheme liability where allegations "also included conduct beyond [misstatements], including the hiring of promoters, planning and editing well-timed article releases with targeted content to artificially inflate the value of company stock and raise revenue, and covering up the Company's involvement").

The Court follows the majority of other courts and finds that the SEC must show more than misstatements or omissions in order to succeed on its Rule 10b-5(a) and (c) scheme liability claims. This approach comports with the plain language of Rule 10b-5. Part (b) prohibits the making of any untrue statement of material fact or omission of material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading. In other words, part (b) prohibits misstatements and omissions. It would render part (b) superfluous if the Court were to read parts (a) and (c) as not requiring anything more than misstatements or omissions. Rather, the Court finds that scheme liability requires something more – deceptive acts along with misstatements or omissions.

Because the Court finds that the SEC must show that Defendants engaged in deceptive acts in addition to misstatements and omissions, it need not consider whether the misstatements discussed by the parties – failure to disclose the POBOB practice to the PEAKS Noteholders, failure to disclose ITT's internal projections of its PEAKS cash obligations, failure to disclose certain information in the Management Discussion and Analysis ("MD&A") section of ITT''s public filings, failure to disclose the POBOB practice in the Form 10-Q for the third quarter of 2012, and failure to disclose ITT's CUSO guarantee liability – are enough to support the Rule 10b-

5 claim. The Court also need not consider the SEC's argument that these misstatements or omissions caused other statements to be false and misleading. [*See, e.g.*, Filing No. 251 at 33-34.] Rather, the Court finds that the SEC has presented enough evidence of deceptive acts, which are separate and apart from misstatements and omissions in ITT's public filings and analyst calls, that Defendants are not entitled to summary judgment on the SEC's Rule 10b-5 claim. This evidence includes deceptive acts related to the information Defendants provided to auditors, including:

- not informing auditors regarding POBOB and that the PEAKS Noteholders had objected to POBOB, [*see, e.g.*, Filing No. 250-4 at 12-13; Filing No. 250-4 at 29-30; Filing No. 250-11 at 3-4; Filing No. 250-12 at 4];

- not informing auditors regarding outside counsel telling Defendants that POBOB likely was prohibited, [Filing No. 250-4 at 32; Filing No. 250-12 at 7]; and

- misleading auditors by not informing them that ITT had determined it could remove the servicer of the PEAKS loans (which was relevant to whether to consolidate PEAKS onto ITT's balance sheet), [Filing No. 250-4 at 35].

This evidence, albeit based on facts that Defendants dispute, is enough to defeat summary judgment on the SEC's Rule 10b-5 claim. *Cole*, 2015 WL 5737275 at *8 (defendants' summary judgment motion based on failure to show deceptive acts in connection with Rule 10b-5 claim denied where "the SEC unmistakably alleges and points to evidence that, although disputed by Defendant, could lead a reasonable fact-finder to conclude that [defendant] engaged in several deceptive acts in addition to the misstatements, including but not limited to backdating and fabricating work papers to deceive the Public Company Accounting Oversight Board, which regularly inspected public accounting firm…, and omitting audit steps"). The Court also notes the difficulty of determining at the summary judgment stage that the SEC is prohibited from presenting certain evidence at trial, particularly where scheme liability is alleged. Without seeing the evidence that the SEC will present, the Court cannot rule in a vacuum and determine that, for

example, evidence of misleading auditors is not enough to support its Rule 10b-5(a) and (c) claims. So, while the SEC must prove more than misstatements or omissions in connection with its Rule 10b-5(a) and (c) claims, it has set forth such evidence here and Defendants' Motion for Summary Judgment as to the SEC's scheme liability allegations is **DENIED**.

      b.  <u>Omissions Under Rule 10b-5(b)</u>

Defendants also move for summary judgment on the SEC's Rule 10b-5(b) claim, arguing that failure to make certain disclosures related to the PEAKS Noteholders, certain disclosures to shareholders, and certain disclosures to the auditor cannot support that claim.

      i.    PEAKS Noteholder Allegations

First, Defendants contend that the SEC's reliance on the failure to disclose POBOB to the PEAKS Noteholders cannot support any fraud claims. [Filing No. 247-1 at 37.] They argue that an omission, absent a duty to disclose, is not misleading, and there was no legal duty to disclose POBOB to the PEAKS Noteholders. [Filing No. 247-1 at 38-39.] Defendants contend that "[t]he SEC has no evidence that there was any relationship (fiduciary or otherwise) between the individual defendants and the noteholders, and as to ITT, has no evidence that ITT had any contractual obligation to provide any information to the noteholders." [Filing No. 247-1 at 39.] Defendants argue that the SEC cannot establish that they were the makers of the statements related to the performance of the PEAKS collateral, and that undisputed facts indicate that they were not. [Filing No. 247-1 at 40-41.]

The SEC argues in response that it is not alleging that Defendants' failure to disclose the POBOB practice is a misstatement or omission in violation of Rule 10b-5(b), but rather that allegations relating to the POBOB practice support its scheme liability claims under Rule 10b-5(a) and (c). [Filing No. 251 at 30-31.] As to the monthly servicing reports that reflected that PEAKS

loans were not defaulting, the SEC asserts that it is not basing its claims on false statements in the monthly servicing reports, but rather those allegations support the SEC's scheme liability claims. [Filing No. 251 at 31-32.]

In their reply, Defendants reiterate their argument that the failure to disclose information cannot be deceptive absent a duty to disclose that information. [Filing No. 258 at 17.]

The SEC has represented that allegations relating to the PEAKS Noteholders do not relate to their Rule 10b-5(b) claim for misstatements or omissions, but rather to their scheme liability claims under Rule 10b-5(a) and (c). At this stage of the litigation, without seeing all of the evidence presented at trial, the Court cannot judge whether the PEAKS Noteholder allegations do or do not support the SEC's scheme liability claims. While it is true that those claims require more than just a misstatement or omission, the evidence presented could support a reasonable jury finding that the PEAKS Noteholder allegations establish the type of deceptive acts required under Rule 10b-5(a) and (c). If during trial it is evident that the PEAKS Noteholder evidence is irrelevant to the scheme liability claims, based on the context in which that evidence is presented and the other evidence that has been admitted, Defendants may object to its admission. At this point, however, the Court will not pluck certain allegations, out of context, from the SEC's scheme liability theory without seeing the whole picture. Defendants' Motion for Summary Judgment as to the PEAKS Noteholder allegations is **DENIED**.

ii.     Disclosures to Shareholders

Defendants argue that the SEC's theory that they failed to make certain disclosures to shareholders is flawed because a company has no duty to disclose to investors all material information. [Filing No. 247-1 at 41.] Defendants urge the Court to "reject the SEC's claims that are based on pure, alleged omissions." [Filing No. 247-1 at 41.] They contend that there is no

evidence to support fraud claims related to the Form 10-Q for the third quarter of 2012 related to POBOB because POBOB did not start until three weeks after the end of that quarter. [Filing No. 247-1 at 42.] Defendants also argue that the SEC's position that ITT should have disclosed its CUSO payment options to investors is meritless because ITT was legally permitted to make either minimum or discharge payments to the CUSO, the SEC has not identified any statements rendered misleading by the lack of disclosure of this information and other information related to the CUSO, and the SEC has no evidence that ITT used the discharge option before the second quarter of 2013. [Filing No. 247-1 at 44.]

In response, the SEC argues that it is not asserting claims for "pure omissions," but that the omissions show that statements Defendants did make were false and misleading. [Filing No. 251 at 33-35.] In addition to POBOB practices, the omissions the SEC focuses on include ITT's PEAKS and CUSO cash obligations, information in connection with ITT's Form 10-Q for the third quarter of 2012, and ITT's CUSO guarantee liability. [Filing No. 251 at 35-38.] As for the POBOB practices, the SEC argues that Defendants claimed in public filings that ITT was making only the guarantee payments it was required to make, and that those payments were relatively small, so the failure to disclose POBOB rendered those statements false and misleading. [Filing No. 251 at 33-34.] The SEC points to additional examples of statements being rendered false and misleading by the failure to disclose POBOB practices, and also argues that Defendants had an affirmative duty to disclose certain information that was omitted from the MD&A section of ITT's public filings. [Filing No. 251 at 35-36.] The SEC also contends that Defendants failed to disclose information in the Form 10-Q for the third quarter of 2012 because they made statements regarding other events after the end of the quarter, which were rendered misleading by failing to disclose POBOB. [Filing No. 251 at 36.] Finally, the SEC argues that Defendants' failure to disclose ITT's

options related to the CUSO guarantee payments, that it was calculating its liability using one payment option while actually using a different payment option, and the impact of using the different options on ITT's obligations and cash rendered statements regarding CUSO guarantee liability misleading. [Filing No. 251 at 38.]

In their reply, Defendants argue that the SEC cannot rely on pure omissions in the MD&A section of SEC filings to support its fraud claims. [Filing No. 258 at 18-19.] They reiterate their argument that POBOB did not begin until after the third quarter of 2012, and "did not specifically relate to an event during Q3 2012." [Filing No. 258 at 19.] As to the CUSO disclosures, Defendants argue that the SEC has not demonstrated why additional disclosures were necessary. [Filing No. 258 at 19.]

The parties' key dispute is the nature of the impact that disclosures to shareholders related to POBOB, the Form 10-Q for the third quarter of 2012, and CUSO obligations had on other statements. While, as discussed above, the SEC's Rule 10b-5(a) and (c) claims must be based on more than pure omissions, the SEC's claims are based on numerous statements that it claims rendered others misleading. Statements can form the basis of a Rule 10b-5(a) or (c) claim when they are separate from the statements relied upon for the Rule 10b-5(b) claim. *S.E.C. v. Kovzan*, *2013 WL 5651401, \*8 (D. Kan. 2013)* (misrepresentations could form basis for Rule 10b-5(a) and (c) scheme liability claims where same misrepresentations were not part of Rule 10b-5(b) claim). Moreover, Defendants again ask the Court to pick allegations out of context, and determine that they cannot support the SEC's claims. Even if the facts themselves are not disputed, their implications are, and it is improper for the Court to determine at the summary judgment stage how these facts fit into the bigger picture without seeing all of the evidence. As with the PEAKS Noteholder allegations, Defendants can move to exclude evidence as irrelevant during trial. The

Court **DENIES** Defendants' Motion for Summary Judgment as to failure to disclose certain information to shareholders.

iii.    Auditor Statements

Defendants argue that the SEC's allegations regarding false or misleading statements or omissions to ITT's auditors cannot support its Rule 10b-5 claims because "[t]he SEC has no evidence to support that the allegedly false or misleading statements made to [the auditors] were 'in connection with the purchase or sale of any security.'" [Filing No. 247-1 at 45.] Specifically, Defendants assert that the SEC cannot show that the auditor "was a victim who took, tried to take, who divested itself of, who tried to divest itself of, or who maintained an ownership interest in a security in connection with the alleged misconduct." [Filing No. 247-1 at 46.] Defendants also argue that the auditor made hundreds of requests for information from ITT each quarter, that the SEC has not presented any evidence that ITT did not satisfy these requests in a timely manner, and that there was no duty to disclose information that was not provided. [Filing No. 247-1 at 47-48.]

In its response, the SEC argues that its claims under Rule 10b-5(a) and (c) are for scheme liability, and that the cases Defendants rely upon arise under Rule 10b-5(b). [Filing No. 251 at 38-39.] The SEC also contends that Defendants did have an affirmative duty to disclose information to auditors, that Defendants rely on inapposite case law, and that the statements to the auditors were deceptive acts in furtherance of a fraudulent scheme. [Filing No. 251 at 42.] The SEC discusses specific information that it contends Defendants had an affirmative duty to disclose to the auditor. [Filing No. 251 at 44-48.]

In their reply, Defendants argue that "omissions to auditors do not constitute 'deceptive acts' and, therefore, cannot support scheme liability." [Filing No. 258 at 20.]

The parties' briefs on this issue again reveal a disconnect. Defendants argue that their statements or omissions to the auditor cannot support the SEC's Rule 10b-5(b) claim, and the SEC argues that it relies on misstatements and omissions to the auditor only in connection with its Rule 10b-5(a) and (c) claims. Courts have held that concealing information from auditors can constitute deceptive acts for purposes of claims brought under Rule 10b-5(a) and (c). *See, e.g.*, *Securities and Exchange Commission v. Penn*, 225 F.Supp.3d 225, 236 (S.D. N.Y. 2016) (granting summary judgment to SEC based, in part, on finding that defendant routed money in a way which "served no legitimate purpose and was an obvious attempt to shield [theft] from the Fund's auditors…."); *U.S. S.E.C. v. Kearns*, 691 F.Supp.2d 601, 618 (D. N.J. 2010) (finding allegations that defendants affirmatively misled auditors by "assuring them that there were no allegations of fraud, that there were no billing irregularities, and that the auditors had received all relevant information" were sufficient to allege inherently deceptive conduct for scheme liability claim).[8]

As for Defendants' argument that ITT provided the auditor with all of the information that was requested, and had no duty to provide additional information, the Court again finds that whether the omissions the SEC bases its Rule 10b-5(a) and (c) claims on constituted deceptive acts is a question for the jury, once it has been presented with all of the evidence. *See Kovzan*, 2013 WL 5651401 at *8 (rejecting defendant's argument that allegedly deceptive acts were not "inherently deceptive," because "such questions are for the jury at trial"). The Court **DENIES** Defendants' Motion for Summary Judgment as it relates to auditor statements.

---

[8] The cases Defendants rely upon for their argument that omissions to an auditor cannot form the basis for Rule 10-b(a) and (c) claims because the auditor itself is not purchasing securities – *Chadbourne & Parke LLP v. Troice*, 134 S.Ct. 1058 (2014), and *S.E.C. v. Retail Pro, Inc.*, 673 F.Supp.2d 1108 (S.D. Cal. 2009) – simply do not stand for that proposition. Neither case involved scheme liability allegations where misstatements or omissions to an auditor were separate deceptive acts, and not pure misstatements or omissions under Rule 10b-5(b).

### C. Claim Two - Control Person Liability Under Section 20(a) of the Exchange Act

#### 1. Elements of the Claim

15 U.S.C. § 78t(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable…, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

#### 2. The SEC's Motion for Summary Judgment

In its Motion for Summary Judgment, the SEC argues that Mr. Modany and Mr. Fitzpatrick are liable as control persons for violations of § 10(b) and Rule 10b-5 because they are control persons under § 20(a). [Filing No. 226 at 24-26.] The SEC argues that Mr. Modany was the CEO and chairman of the board of ITT, so he "would have possessed the ultimate management authority of the corporation on a daily basis," and "had, at least, the power to indirectly influence the specific corporate policies which resulted in ITT's violations…." [Filing No. 226 at 25.] It argues further that Mr. Fitzpatrick was ITT's CFO and principal accounting officer, that it is reasonable to infer that he had control over ITT's financial reporting, and that he "had, at least, the power to indirectly influence the specific corporate policies which resulted in ITT's violations…." [Filing No. 226 at 25.] The SEC also notes that Mr. Modany and Mr. Fitzpatrick signed and certified the relevant public filings, and that this is sufficient to demonstrate that they are control persons. [Filing No. 226 at 26.]

In their response, Defendants argue that the record does not support an inference that Mr. Modany and Mr. Fitzpatrick were control persons. [Filing No. 254 at 22.] They note that the record indicates that ITT's Board of Directors controlled ITT's business affairs, including "adopting and monitoring ITT's corporate policies, reviewing and approving ITT's strategic plans,

and overseeing ITT's financial statements and reporting." [Filing No. 254 at 22.] Defendants argue that neither Mr. Modany nor Mr. Fitzpatrick exercised control over ITT's Board of Directors, so there is a genuine issue of material fact as to whether they actually exercised control over ITT's affairs. [Filing No. 254 at 22.] Defendants assert that neither Mr. Modany nor Mr. Fitzpatrick had the power or authority to control the relevant SEC filings, and that those filings were "subject to review and approval by ITT's Audit Committee and Board of Directors." [Filing No. 254 at 23.]

The SEC argues in its reply that Mr. Modany and Mr. Fitzpatrick need only have participated in the operations of the company in general to be considered control persons, and that the undisputed facts show that they did actually participate in the operations of ITT. [Filing No. 257 at 14-15.] It contends that "as CEO and Chairman of the Board of ITT, Modany would have possessed the ultimate management authority of the corporation on a daily basis, which would have necessitated that he actually participated in the operations of ITT," and "as CFO, Fitzpatrick would have actually participated in the operations of ITT." [Filing No. 257 at 15.] The SEC asserts that the fact that the Board could exercise all powers of the corporation does not mean that the CEO and CFO could not have participated in the operations of the company in general. [Filing No. 257 at 15.] The SEC also argues that "[i]t is ironic, at best, that Defendants attempt to seek the benefit of their 'capacity as corporate officers' to avail themselves of advice lawyers purportedly offered to the company while simultaneously denying that they 'actually exercised control over ITT's affairs.'" [Filing No. 257 at 15.]

In order to establish control person liability, two requirements must be met: "First, the 'control person' needs to have actually exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability – even if not exercised – to control the specific transaction or activity that is alleged to give rise to liability."

*Donohoe v. Consolidated Operating & Production Corp.*, 30 F.3d 907, 911 (7th Cir. 1994) (emphasis omitted). The Seventh Circuit has "long recognized that some indirect means of discipline or influence, although short of actual direction, is sufficient to hold a 'control person' liable." *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996) (citing *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992)).

The SEC relies upon the following facts that Defendants have not disputed:

- Mr. Modany was ITT's CEO and Chairman of the Board of Directors during the relevant time period;

- Mr. Fitzpatrick was ITT's CFO and principal accounting officer during the relevant time period;

- Mr. Fitzpatrick was ITT's CFO and Executive Vice President since April 2009;

- Mr. Modany and Mr. Fitzpatrick signed and certified ITT's periodic filings;

- Mr. Modany and Mr. Fitzpatrick were part of ITT's disclosure process, and played a role in editing portions of and reviewing ITT's periodic filings;

- Mr. Modany signed and certified ITT's 2012 Form 10-K, and certified ITT's Forms 10-Q for the first and second quarters of 2013;

- Mr. Fitzpatrick signed and certified ITT's 2012 Form 10-K and Forms 10-Q for the first and second quarters of 2013;

- Mr. Modany certified ITT's Form 10-Q for the third quarter of 2013; and

- Mr. Fitzpatrick signed and certified ITT's Form 10-Q for the third quarter of 2013.

[Filing No. 226 at 11-12; Filing No. 226 at 25-26.] The SEC also points to Defendants' Answer, in which they admit that Mr. Modany and Mr. Fitzpatrick played a role in editing portions of and reviewing ITT's periodic filings, signed ITT's filings on its behalf, certified those filings, and participated in an earnings call. [Filing No. 257 at 16.]

While it does not appear that courts within the Seventh Circuit have considered whether an officer signing a public filing is enough to support control person liability, numerous other courts have held that signing statements makes the officer a control person for liability related to those statements. *See, e.g.*, *In re Metropolitan Securities Litigation*, 532 F.Supp.2d 1260, 1296-97 (E.D. Wash. 2007) ("[P]ersuasive authority indicates that audit committee members, including outside directors, who sign SEC filings qualify as control persons"); *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 487 (S.D.N.Y. 2005) ("[If an] officer or director has signed financial statements containing materially false or misleading statements, court have held that control as to the financial statements is sufficiently pled"). The Court follows this line of cases, and **GRANTS IN PART** the SEC's Motion for Summary Judgment as to Mr. Modany and Mr. Fitzpatrick being control persons for claims related to representations in public filings which they signed.

As to control person liability for violative acts not related to the public filings that Mr. Modany and Mr. Fitzpatrick signed, the Court finds that a genuine dispute of fact exists regarding whether they are considered control persons under § 20(a). The SEC sets forth facts indicating that Mr. Modany and Mr. Fitzpatrick were "part of ITT's disclosure process and played a role in editing portions of and reviewing ITT's periodic filings." [Filing No. 226 at 11.] It is not clear, however, from these facts – which Defendants do not dispute – exactly what role each individual played. The SEC has not presented undisputed facts showing that Mr. Modany and Mr. Fitzpatrick "actually exercised general control over the operations of the wrongdoer, and second,… had the power or ability – even if not exercised – to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe*, 30 F.3d at 911; *see also Glickenhaus & Co. v. Household Inter., Inc.*, 787 F.3d 408, 426-27 (7th Cir. 2015) (whether CEO was a control person for purposes of statements made in press releases was "an inherently fact-bound inquiry");

*Cabletron Systems, Inc.*, 311 F.3d 11, 41 (1st Cir. 2002) ("Control is a question of fact that will not ordinarily be resolved summarily at the pleading stage…. The issue raises a number of complexities that should not be resolved on such an underdeveloped record") (quotations and citations omitted). Rather, the SEC relies on Mr. Modany's and Mr. Fitzpatrick's positions at ITT, and on inferences from those positions. [*See, e.g.*, Filing No. 226 at 25 (SEC arguing that it is "reasonable to infer" that Mr. Fitzpatrick, "as CFO…had at least indirect control over ITT's financial reporting") (citation and quotation omitted).] These inferences are not enough to warrant summary judgment on the issue of whether Mr. Modany and Mr. Fitzpatrick were control persons for violative acts outside of public filings that they signed. And indeed, at the summary judgment phase, the SEC is not permitted to rely on inferences, all of which must be drawn in favor of the non-movants. Accordingly, the Court **DENIES IN PART** the SEC's Motion for Summary Judgment related to Mr. Modany and Mr. Fitzpatrick being control persons for representations in public filings which they did not sign or other violative acts as genuine issues of fact exist regarding whether Mr. Modany and Mr. Fitzpatrick had general control over ITT's operations and the power or ability to control the specific violative acts.[9]

### 3. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the SEC's § 20(a) claim by advancing the same arguments that they assert in connection with the SEC's § 10(b) and Rule 10b-5 claims – that there is no liability under § 10(b) or Rule 10b-5 based on the SEC's scheme liability theory, based on failure to disclose certain information to shareholders, and based on misstatements to the

---

[9] The SEC also seeks summary judgment on the "use of interstate commerce" and "in connection with the purchase or sale of a security" arguments in connection with its § 20(a) claim, since it must establish those elements for control person liability related to its § 10(b) claim. As discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** the SEC's Motion for Summary Judgment as to those elements of its § 10(b) claim.

auditor.  The Court **DENIES** Defendants' Motion for Summary Judgment on those arguments to the same extent discussed above.

### D.  Claim Three – Aiding and Abetting ITT's Violations of § 10(b) and Rule 10b-5

#### 1.  *Elements of the Claim*

To establish liability for aiding and abetting violations of § 10(b) and Rule 10b-5, the SEC must establish: "(1) a primary violation of Section 10(b); (2) that [Defendants] had actual knowledge of that primary violation; and (3) that [Defendants] substantially assisted in that primary violation."  *S.E.C. v. Cook*, 2015 WL 5022152, *25 (S.D. Ind. 2015) (citing 15 U.S.C. § § 77o(b), 78t(e)).

#### 2.  *The SEC's Motion for Summary Judgment*

The SEC sets forth the same arguments it asserts in connection with its § 10(b) and Rule 10b-5 claims – that it is entitled to summary judgment on the "use of interstate commerce" and "in connection with the purchase or sale of a security" elements of those claims.  For the reasons discussed above in Part III.A., the Court **GRANTS IN PART** and **DENIES IN PART** summary judgment on these elements as they relate to the SEC's aiding and abetting claim.

#### 3.  *Defendants' Motion for Summary Judgment*

Defendants also seek summary judgment on the SEC's aiding and abetting claim for the same reasons they seek summary judgment on the 10(b) and Rule 10b-5 claims, which the Court has addressed above in Part III.B.  For the same reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment as it relates to the SEC's aiding and abetting claim.

**E. Claim Four – Fraud in the Offer or Sale of Securities Under § 17(a) of the Securities Act**

   *1. Elements of the Claim*

Section 17(a) of the Securities Act provides:

It shall be unlawful for any person in the offer or sale of any securities…by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

   (1) to employ any device, scheme, or artifice to defraud, or

   (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  The elements of a § 17(a)(1) claim are essentially the same as those for a § 10(b) claim, but "[t]he principal difference is that § 10(b) and Rule 10b-5 apply to acts committed in connection with a purchase or sale of securities while § 17(a) applies to acts committed in connection with an offer or sale of securities."  *S.E.C. v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995) (emphasis omitted).  As with its § 10(b) claim, under § 17(a)(1) the SEC must show that defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) [in the offer or sale] of securities."  *Bauer*, 723 F.3d at 768-69 (quotations and citations omitted).  The elements of a § 17(a)(2) or (3) claim are the same as those for a § 17(a)(1) claim, but only require a showing of negligence instead of scienter.  *Id.* at 768 n.2; *Aaron*, 446 U.S. at 696-97.

2. *The SEC's Motion for Summary Judgment*

a. "In the Offer or Sale" of Securities

In its Motion for Summary Judgment, the SEC argues that it is entitled to summary judgment that the allegedly violative acts that are the subject of its § 17(a) claim occurred "in the offer or sale" of securities.[10] [Filing No. 226 at 22.] It contends that violations occurring outside the context of a specific securities offering are still made "in the offer or sale" of securities. [Filing No. 226 at 22.] The SEC points to its scheme liability allegations, including "that the defendants engaged in a fraudulent scheme and made material misstatements and omissions in periodic filings with the Commission and other statements to the public," and that "defendants made material misstatements and omissions that were incorporated in ITT's securities registration statements filed with the SEC…." [Filing No. 226 at 23.]

In response, and also in their Motion for Summary Judgment,[11] Defendants argue that the SEC cannot meet the "in the offer or sale" requirement of § 17(a). [*See* Filing No. 247-1 at 25-26; Filing No. 254 at 18-21.] Defendants contend that the SEC has stretched the holdings of the cases it relies upon and that "fraud is only actionable under § 17(a) when a defendant participated in a related offer or sale of securities…." [Filing No. 254 at 18.] They assert that the SEC's view of § 17(a) liability "divorces a defendant's alleged fraud from any offer or sale," and that under that view the "offer or sale" requirement would be met if investors sold ITT stock during the relevant period even if they did not know of ITT's filings or sold stock for reasons unrelated to the fraud.

---

[10] The SEC also moves for summary judgment on the interstate commerce element of § 17(a), which the Court **GRANTS** for the reasons discussed above in connection with the § 10(b) claim.

[11] The parties raise the same arguments in support of their own Motions for Summary Judgment, and in response to each other's motions, on this issue. Accordingly, the Court only re-caps the arguments made in connection with the SEC's Motion for Summary Judgment as it relates to the "in the offer or sale" requirement of § 17(a), to avoid repetition.

[Filing No. 254 at 20.] They also argue that the SEC's view is "inconsistent with § 17(a)(2)'s requirement that a defendant 'in the offer or sale of securities…obtain money or property…' as a defendant cannot obtain money from a sale by an unrelated investor." [Filing No. 254 at 20.] Finally, Defendants argue that statements in two of ITT's Forms S-8 filed in May 2006 and May 2013 do not meet the "in the offer or sale" requirement because the purpose of the Forms S-8 are to register ITT stock that ITT's employees can acquire upon exercising stock options awarded under ITT's "Equity Compensation Plan." [Filing No. 254 at 20-21.]

In its reply, the SEC points to case law which it argues shows that the "in the offer or sale" requirement is broad and includes misstatements or omissions outside the context of a specific securities offering. [Filing No. 257 at 9.] It also argues that Defendants need not have participated in a related offer or sale of securities in order to establish liability under § 17(a) but, in any event, Mr. Modany and Mr. Fitzpatrick clearly participated in the offerings because they were the CEO and CFO and signed the false and misleading filings. [Filing No. 257 at 10.] The SEC asserts that courts have found that misstatements and omissions in Forms S-8 meet the "in the offer or sale" requirement of § 17(a), and that cases Defendants rely upon for their arguments are inapposite. [Filing No. 257 at 11-13.]

Much like the SEC's request for summary judgment on the "in connection with the purchase or sale" requirement of § 10(b), the SEC bases its request for summary judgment on the "in the offer or sale" requirement of § 17(a) on allegations, not on undisputed facts. Again, the Court may only grant summary judgment "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The SEC cites to only two undisputed facts supported by record evidence: (1) that "ITT filed registration statements on Forms S-8 on May 9, 2006 and May 8, 2013"; and (2) that "ITT's Form

S-8 registration statements incorporated certain prior filings and all subsequently filed periodic reports until all of the registered securities are sold or deregistered." [Filing No. 226 at 13.] These undisputed facts do not prove that Defendants engaged in violative acts "in the offer or sale of any securities" because they do not link those filings to fraudulent conduct. *See Durham*, 766 F.3d at 682 (the "in connection with the purchase or sale of a security" element of a § 10(b) claim requires that a misrepresentation "coincide" with or "touch" a securities transaction). The Court would be issuing an impermissible advisory opinion if it were to grant summary judgment that if the SEC proves that Defendants engaged in violative acts, that those acts were "in the offer or sale of any securities" for purposes of § 17(a). *See Member Services, Inc.*, 2010 WL 3907489 at *17 (summary judgment motion denied where "the motion seeks adjudication of [an element of a claim] based upon the facts that might be proven at trial") (emphasis omitted). Accordingly, the Court **DENIES** the SEC's Motion for Summary Judgment on the issue of whether Defendants engaged in violative acts "in the offer or sale of any securities."

### 3. *Defendants' Motion for Summary Judgment*

#### a. <u>"In the Offer or Sale" of Securities</u>

Defendants' Motion for Summary Judgment on the "in the offer or sale" requirement of § 17(a) is based on its argument that the SEC relies only upon its allegations and that there is a "dearth of evidence" relating to this element. [Filing No. 247-1 at 25-26.]

In response, the SEC points to its allegations in the Complaint that there were misstatements and omissions in public filings including the Forms S-8, and argues that those misstatements or omissions meet the "offer or sale" requirement of § 17(a). [Filing No. 251 at 20-21.]

In their reply, Defendants argue that the only evidence the SEC has presented is the two Forms S-8s, and that the forms are insufficient to show that violations occurred in the offer or sale of securities because "an offer or sale of ITT stock only occurred if an ITT employee exercised an option during the relevant period," and "[t]he SEC lacks evidence of option exercises." [Filing No. 258 at 5-6.]

A Form S-8 "is a filing with the SEC, used by publicly-traded companies to register securities that will be offered to its employees via benefits or incentive plans." *Acuity Brands, Inc. v. Bickley*, 2017 WL 1426800, *14, n. 15 (E.D. Ky. 2017). Forms S-8 must "provide essential facts and be filed to disclose important information, in an effort to inform investors and prohibit fraud in the sale of securities." *Id.* Here, while the Court agrees with Defendants that the SEC has not presented evidence that any ITT employees actually exercised an option based on the Forms S-8, it need not do so to satisfy the "in the offer or sale" requirement of § 17(a). "Offer" is defined by the Securities Act to mean "every attempt or offer to dispose of…a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3). The fact that S-8s were issued is enough to defeat summary judgment on this element of the SEC's claim. *See S.E.C. v. Stanard*, 2009 WL 196023, *27 (S.D. N.Y. 2009) (false statements contained in Form S-8 were "in the offer or sale" of a security for purposes of § 17(a)).[12] Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment on the "in the offer or sale" requirement of the SEC's § 17(a).

---

[12] The SEC's and Defendants' Motions for Summary Judgment on the "in the offer or sale" requirement of § 17(a) illustrate the difficulty in finding that certain elements of claims are met on summary judgment. At trial, the SEC will still need to tie misrepresentations or omissions to the Forms S-8, and it has not yet done so through the evidence it has presented on summary judgment. That being said, because the Forms S-8 can constitute offers or sales of securities, the Court finds that summary judgment is not appropriate for either side, and that the jury will need to determine whether the offers made in connection with the Forms S-8 are linked to the allegedly fraudulent conduct.

b.    "Obtain Money or Property by Means of" False or Misleading Statements

Defendants argue that they are entitled to summary judgment on the SEC's § 17(a)(2) claims because "the undisputed facts establish that Defendants did not obtain money or property because of the alleged false or misleading statements." [Filing No. 247-1 at 28.] They contend that ITT was prohibited from compensating employees, including executive officers, "on any financial performance-based metric," so Defendants' compensation could not have been tied to the financial performance of ITT under applicable education regulations. [Filing No. 247-1 at 28.]

In response, the SEC argues that a defendant need not personally obtain money to satisfy this element when the defendant's employer obtains money or property by means of fraud. [Filing No. 251 at 22-23.] The SEC also notes that Defendants received salaries and other compensation while ITT employees, and that "there is evidence that these amounts were affected by their fraud." [Filing No. 251 at 23.] The SEC points to language in ITT's proxy statements that "the company was 'guided' by certain objectives in setting Defendants' compensation, including 'focus,' which was intended to allow Defendants to 'continue to focus on [ITT's] financial and operating results, their individual performance and their job responsibilities.'" [Filing No. 251 at 23 (quoting Filing No. 250-1 at 5).] It also asserts that ITT reviewed Defendants' personal short-term and long-term performance along with the performance of ITT in determining whether to continue Defendants' employment. [Filing No. 251 at 23.] The SEC argues that Defendants need not have received a bonus or other compensation tied directly to the fraud, and that "a jury is entitled to assess whether Defendants received, directly or indirectly, money or property by means of the fraud…." [Filing No. 251 at 24.]

In their reply, Defendants contend that the SEC is essentially arguing that Defendants obtained money or property because ITT obtained money or property, and that this argument has

been rejected by other courts.  [Filing No. 258 at 9.]  They assert that the SEC's argument that Defendants received compensation that was affected by the alleged fraud is only supported by the SEC's conjecture, and not by any facts.  [Filing No. 258 at 10.]  They argue that the sentence the SEC focuses on from ITT's 2014 proxy statement is taken out of context and "does not support the SEC's speculation that Defendants' compensation was in any way based on ITT's financial metrics, or ITT's financial and operating results."  [Filing No. 258 at 10.]  Defendants also argue that "[t]he SEC has not adduced any evidence that Defendants' alleged violations had any bearing whatsoever on the Board's evaluation of Defendants' continued employment at ITT."  [Filing No. 258 at 11.]

The Seventh Circuit Court of Appeals has not indicated whether a defendant must personally receive money or property in order to be liable under § 17(a)(2).  While some district courts have found it sufficient that a defendant obtain money or property on behalf of his employer, *see, e.g.*, *U.S. S.E.C. v. Stoker*, 865 F.Supp.2d 457, 463 (S.D.N.Y. 2012) (finding that it is sufficient under § 17(a)(2) that defendant obtained money or property for his employer while acting as its agent), the Court sides with the majority of courts and finds that the language of § 17(a)(2) indicates that the Defendants must themselves obtain money or property, and that it is not enough if ITT obtains money or property from Defendants' actions.  *See United States Securities and Exchange Commission v. Ustian,* 229 F.Supp.3d 739, 775 (N.D. Ill. 2017) ("There is no rule that a defendant cannot be liable if he obtains money in 'a highly roundabout manner.'  But there still must be money obtained by the defendant, not just lost by the investor or gained by the defendant's employer") (citations omitted); *Securities and Exchange Commission v. Bardman*, 216 F.Supp.3d 1041, 1056 (N.D. Cal. 2016) (finding that, in connection with § 17(a)(2) claim, "requiring the defendant's receipt of money or property [is] consistent with the statutory language and thus more

persuasive") (citation and quotation omitted); *U.S. S.E.C. v. Syron*, 934 F.Supp.2d 609, 637-39 (S.D.N.Y. 2013) (disagreeing with *Stoker* and holding that defendant must personally receive money or property from the alleged fraud).

The only evidence the SEC has presented in support of its argument that Mr. Modany and Mr. Fitzpatrick personally obtained money or property is the following:

- "ITT was 'guided' by certain objectives in determining compensation. These objectives included 'focus,' which is defined as compensation that 'allow[s] [executives] to continue to focus on [ITT's] financial and operating results, their individual performance and their job responsibilities.'" [Filing No. 251 at 8 (citing Filing No. 250-1 at 5 (2014 Annual Meeting Notice and Proxy Statement at 21)).]

- "ITT reviewed Defendants' short-term and long-term performance, as well as the performance of ITT, in evaluating Defendants' continued employment." [Filing No. 251 at 8 (citing Filing No. 250-1 at 5 (2014 Annual Meeting Notice and Proxy Statement at 21)).]

The SEC does not present the context within which these statements appear. They are in ITT's 2014 Annual Meeting Notice and Proxy Statement (the "Proxy Statement") in a page that explains that ITT's Compensation Committee was required to make changes to its executive compensation program "as a result of the Incentive Compensation Prohibition affecting our industry that severely limit the types of, and bases for awarding, compensation to employees of postsecondary education institutions, like us." [Filing No. 250-1 at 5.] The Proxy Statement then clarifies that ITT believes that the Incentive Compensation Prohibition can be interpreted to cover all employees, including executive officers, and to prohibit "the payment of compensation based on any performance-related metric, including common performance metrics such as earnings, earnings per share and total shareholder return since such metrics are driven by student enrollment and amounts received from financial aid." [Filing No. 250-1 at 5.] It states "[t]he Compensation Committee determined that, while it would prefer to continue to base executive compensation on performance-related

metrics, the risk of violating the Incentive Compensation Prohibition prevented, and will prevent, the Committee from basing compensation amounts or adjustments on individual or company performance after the July 1, 2011 effective date of the Incentive Compensation Prohibition." [Filing No. 250-1 at 5.]

The two statements the SEC points to – first, that the Compensation Committee will continue to be guided by "focus," which is defined as executives focusing on ITT's financial and operating results, their individual performance, and their job responsibilities and, second, that the Compensation Committee will review the short- and long-term performance of officers and the company in evaluating the continued employment of executive officers – simply do not lead to the reasonable conclusion that Mr. Modany and Mr. Fitzpatrick obtained property or money based on ITT's performance. When read in context, the reasonable inference is actually that executive compensation used to be based on company performance metrics such as earnings and shareholder return, but no longer can be due to the Incentive Compensation Prohibition.

The SEC also points to the undisputed facts that Mr. Modany and Mr. Fitzpatrick were part of ITT's disclosure process, edited and reviewed ITT's periodic filings, and signed and certified ITT's filings. [Filing No. 251 at 24 (referring to Filing No. 251 at 8).] But these facts do not show that they obtained money or property themselves as a result of the alleged fraud. The SEC has not presented evidence showing that Mr. Modany and Mr. Fitzpatrick received money or property themselves, which it must in order to survive summary judgment. *See Johnson,* 325 F.3d at 901 ("summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events") (quotation and citation omitted). Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment

on the SEC's claim for primary liability for Mr. Modany and Mr. Fitzpatrick under § 17(a)(2) of the Securities Act.

c. Scope of § 17(a)(3)

Defendants also move for summary judgment on the SEC's § 17(a)(3) claim, arguing that it does not proscribe false or misleading statements because that category of misconduct is covered by § 17(a)(2). [Filing No. 247-1 at 31.] They contend that interpreting § 17(a)(3) to apply to false or misleading statements would result in § 17(a)(2) and § 17(a)(3) covering the same conduct, and would render § 17(a)(2)'s "money or property" requirement meaningless. [Filing No. 247-1 at 31-32.]

The SEC argues in its response that § 17(a)(3) encompasses misstatements, stating that "while Section 17(a)(3) may cover more misconduct than misstatements and omissions covered in Section 17(a)(2), it does not excise those misstatements from its reach." [Filing No. 251 at 26 (emphasis omitted).] It also contends that, in any event, it does not only rely on misstatements, but also other conduct. [Filing No. 251 at 27.]

In their reply, Defendants reiterate their argument that finding that § 17(a)(3) covers misstatements would render § 17(a)(2) superfluous. [Filing No. 258 at 11-12.]

The Court agrees with Defendants that in order to maintain a claim under § 17(a)(3), the SEC must show that Defendants engaged in more than misstatements or omissions. It must show that they engaged in deceptive acts separate from those misstatements or omissions. *See, e.g.*, *S.E.C. v. Farmer*, 2015 WL 5838867, *15 (S.D. Tex. 2015) (Section 17(a)(3) claim survived summary judgment where SEC presented evidence of deceptive acts separate from misstatements or omissions); *S.E.C. v. Morgan Keegan & Co., Inc.*, 2013 WL 10944536, *54 n.36 (N.D. Ga. 2013) ("To establish liability for a violation of Section 17(a)(3), the SEC must also prove that the

defendant undertook a deceptive scheme or course of conduct that goes beyond the negligent misrepresentations that constitute violations of Section 17(a)(2)"); *Stoker*, 865 F.Supp.2d at 467 (denying motion to dismiss § 17(a)(3) claim and stating "a defendant may be liable under both Section 17(a)(2) and Section 17(a)(3) based on allegations stemming from the same set of facts as long as the SEC alleges that the defendants 'undertook a deceptive scheme or course of conduct that went beyond the misrepresentations'") (quoting *In re Alstom SA, Sec. Litig.*, 406 F.Supp.2d 433, 475 (S.D.N.Y. 2005)).

The Court does not read the cases Defendants rely upon to stand for the proposition that misstatements or omissions cannot form part of the basis for a § 17(a)(3) claim. For example, while the court in *U.S. S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015), stated that § 17(a)(3) does not "even address misstatements," *id.* at 796, it did not find that a § 17(a)(3) claim cannot be based on misstatements combined with other deceptive acts, as other courts have held. Further, in *U.S. v. Naftalin*, 441 U.S. 768 (1979), the United States Supreme Court stated that "[e]ach succeeding prohibition [of § 17(a)] is meant to cover additional kinds of illegalities – not to narrow the reach of the prior sections." *Id.* at 774. Allowing a § 17(a)(3) claim to be based on misstatement when they are accompanied by separate deceptive acts, much like a Rule 10b-5(a) or (c) claim, does not "narrow the reach" of § 17(a)(2) and covers an additional kind of illegality – scheme liability. In short, the SEC's § 17(a)(3) claim may be based in part on misstatements and omissions, but must also be supported by deceptive acts.

As discussed above in connection with the SEC's Rule 10b-5(a) and (c) claims, the SEC here has set forth facts related to the information Defendants provided to auditors, including not informing auditors regarding POBOB and that the PEAKS Noteholders had objected to POBOB, [*see, e.g.*, Filing No. 250-4 at 12-13; Filing No. 250-4 at 29-30; Filing No. 250-11 at 3-4; Filing

No. 250-12 at 4]; not informing auditors regarding outside counsel telling Defendants that POBOB likely was prohibited, [*see, e.g.*, Filing No. 250-4 at 32; Filing No. 250-12 at 7]; and misleading auditors by not informing them that ITT had determined it could remove the servicer of the PEAKS loans (which was relevant to the issue of whether to consolidate PEAKS onto ITT's balance sheet), [*see, e.g.*, Filing No. 250-4 at 35]. While these facts are disputed by Defendants, they are enough to survive summary judgment on the SEC's § 17(a)(3) claim. Defendants' Motion for Summary Judgment on the SEC's § 17(a)(3) claim is **DENIED**.

d. Scheme Liability

Defendants also seek summary judgment on the SEC's § 17(a) claims related to scheme liability, conduct related to the PEAKS Noteholders, disclosures to shareholders, and conduct related to the auditors, and set forth the same arguments that they asserted in connection with the 10(b) and Rule 10b-5 claims. The Court has addressed those arguments above and, for the same reasons, **DENIES** Defendants' Motion for Summary Judgment as it relates to those arguments.

**F. Claim Five – Aiding and Abetting ITT's Violation of § 17(a)**

*1. Elements of the Claim*

"In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation.'" *Securities and Exchange Commission v. Riel*, --- F.Supp.3d ----, 2017 WL 4326064, *15 (N.D.N.Y. 2017) (quoting *S.E.C. v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012)).

2. *Defendants' Motion for Summary Judgment*

In their Motion for Summary Judgment, Defendants argue that the SEC's aiding and abetting claim against Mr. Modany and Mr. Fitzpatrick under § 17(a)(2) fails as a matter of law because there is no evidence that ITT obtained any money or property as a result of the alleged false or misleading statements. [Filing No. 247-1 at 29.] In other words, Defendants argue that the SEC cannot establish a primary violation of § 17(a)(2) on the part of ITT. Defendants contend that the only securities offerings related to this claim are the two Form S-8 registration statements filed by ITT for its employee equity compensation plan, and that "the SEC has no evidence that ITT received any 'money or property' from its employees with respect to the equity compensation, let alone as a result of the alleged false and misleading statements." [Filing No. 247-1 at 29.] Defendants also contend that the SEC has not presented any evidence that the continued service of its employees was as a result of the alleged misrepresentations in the Forms S-8. [Filing No. 247-1 at 30.]

The SEC responds that, through the Forms S-8, ITT registered shares of its common stock that were used to compensate its employees, and that it used this stock rather than money as compensation so "did not have to expend as much money to pay for the services." [Filing No. 251 at 22.] The SEC also asserts that ITT's failure to disclose information about the financial health of the PEAKS and CUSO Programs inflated ITT's stock, "meaning that ITT would have been required to issue more shares (or pay compensation in some other way) but for the false statements in ITT's public filings." [Filing No. 251 at 22.]

In their reply, Defendants argue that the SEC surmises that ITT would have paid more money to employees but for its use of equity-based compensation, and that it would have had to issue more shares but for the false statements in ITT's public filings, but only cites to the report

and deposition testimony of Dr. Anjan Thakor, which do not support those theories. [Filing No. 258 at 7.] Defendants label the SEC's conclusion that ITT obtained employees' services by means of false statements in the Forms S-8 as "pure conjecture and not based on admissible evidence." [Filing No. 258 at 7.] Defendants also contend that the Court should reject the SEC's argument that ITT obtained money in the form of inflated stock prices, resulting in lower stock grants, because the SEC raised the argument for the first time in this litigation in its response brief. [Filing No. 258 at 8.]

The SEC's aiding and abetting claim under § 17(a)(2) is based solely on the theory that some employees may have accepted stock under the equity compensation plan that was inflated due to Defendants' violations of securities laws, so ITT had to issue less stock and pay those employees less, and that those employees remained as employees due to the equity compensation plan. The Court finds that a reasonable jury could infer that offering stock options which had an inflated value resulted in ITT receiving money because the stock options were part of the employees' compensation. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment on that claim.[13]

---

[13] Defendants also move for summary judgment on the SEC's aiding and abetting claim under § 17(a) based on the same arguments they assert in connection with the SEC's claim for primary liability under § 17(a) – that the SEC cannot satisfy the "in the offer or sale" requirement of § 17(a) and because § 17(a)(3) does not cover violations arising from false or misleading statements – and based on the arguments they assert in connection with the SEC's § 10(b) and Rule 10b-5 claims – that the scheme liability claims are inadequate, and that conduct relating to the PEAKS Noteholders, disclosures to shareholders, and the auditor are inadequate. Defendants' Motion for Summary Judgment on those arguments as they relate to aiding and abetting violations of § 17(a) is **DENIED** for the same reasons discussed above in connection with the SEC's other claims.

### G. Claim Eight[14] – Deceit of Auditors Under Rule 13b2-2 of the Exchange Act

#### 1. Elements of the Claim

Rule 13b2-2 provides that:

(a) No director or officer of an issuer shall, directly or indirectly:

    (1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

    (2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

        (i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

        (ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart of otherwise.

17 C.F.R. § 240.13b2-2.

#### 2. Defendants' Motion for Summary Judgment

Defendants argue that they are entitled to summary judgment on the SEC's Rule 13b2-2 claim because it is based on information that the SEC claims Defendants did not disclose to the auditor but which, in fact, was already known to the auditor. [Filing No. 247-1 at 48-53.] Specifically, Defendants argue that ITT provided the auditor with a model to project the future cash flows of the PEAKS Trust created by Deutsche Bank (the "DB Model"), and with monthly servicing reports ("MSRs") which reflected actual information about the performance of the PEAKS Trust, and that the auditor knew of the disparity between the DB Model and the PEAKS parity ratio based on this information. [Filing No. 247-1 at 49 ("By disclosing both its internal model and the MSR to [the auditor], ITT did in fact disclose the disparity between the model's

---

[14] Neither the SEC nor Defendants move for summary judgment with respect to Claims Six or Seven.

parity ratio and the actual parity ratio reflected in the MSR").] Defendants assert that "the SEC's claim is essentially that ITT failed to highlight for [the auditor] an obvious difference between two numbers in documents that were analyzed by [the auditor]." [Filing No. 247-1 at 49.] Defendants also argue that the auditor knew purportedly undisclosed information regarding ITT's CUSO payment options, including that ITT was making the minimum payments and was not discharging each loan at the time they defaulted, and that ITT was making minimum monthly payments based on the express language of the auditor's 2012 year-end workpapers, and also that the auditor knew of cash flow models prepared by Mark Huber, ITT's Director of Student Financing, because the auditor reviewed them with Mr. Huber on a quarterly basis. [Filing No. 247-1 at 51-52.] Defendants argue further that the SEC's allegations related to an updated CUSO cash flow model prepared by Mr. Huber in mid-October 2013 do not support the Rule 13b2-2 claim because ITT did not consider the model to be reliable so "[a]n allegation premised on a claimed lack of providing [the auditor with] an analysis deemed unreliable by ITT is nonsensical and untenable." [Filing No. 247-1 at 52.] Defendants also claim that there is no evidence to support the contention that Mr. Fitzpatrick represented to the auditor that CUSO cash flow models did not exist. [Filing No. 247-1 at 53.]

In its response, the SEC argues that whether the auditor knew of a discrepancy between the parity ratio and the DB Model is a disputed issue of fact. [Filing No. 251 at 48-49.] It contends that the document Defendants point to as disclosing the discrepancy "was not used by the auditors to determine that information or to substitute for information actually known by management." [Filing No. 251 at 49.] As for CUSO cash flow estimates, the SEC argues that ITT had created a CUSO cash flow estimate by October 2013, but when the auditor asked for a cash flow estimate in November 2013, it was told that the estimate did not exist, and ITT did not provide the estimate

when asked again in January or February 2014. [Filing No. 251 at 49.] The SEC argues that Defendants' contention that the cash flow estimate was unreliable is insufficient because Mr. Fitzpatrick still should have corrected the misleading impression that there was no estimate, Defendants have not provided any information that anyone believed the estimate was unreliable at the time it was prepared, and the estimate was "not as unreliable as Defendants pretend." [Filing No. 251 at 50-51.]

Defendants argue in their reply that the SEC has not raised any genuine disputes of fact regarding the discrepancy between the parity ratio and the DB Model. [Filing No. 258 at 21.] They also contend that the SEC's theory during the litigation has been that Mr. Fitzpatrick falsely represented to the auditor that ITT did not have internal projections related to the CUSO payments, but now it asserts that ITT's controller made the statements, and that Mr. Fitzpatrick did not correct them. [Filing No. 258 at 22.] They contend that, in any event, the SEC has not produced any evidence that Mr. Fitzpatrick made, or caused to be made, a materially false or misleading statement to the auditor regarding the CUSO cash flow estimate. [Filing No. 258 at 22-23.] Defendants argue that "the SEC is attempting to impose a new standard of liability under Rule 13b2-2, which would require officers and directors to read the minds of the auditor." [Filing No. 258 at 24.]

### a. Discrepancy Between DB Model and PEAKS Trust Parity Ratio

The Court first considers the SEC's argument that Defendants did not bring the discrepancy between the DB Model and the PEAKS Trust parity ratio to the attention of the auditor. On the one hand, Defendants set forth evidence that:

- ITT provided the auditor with a copy of the MSR on a quarterly basis for the auditor's 2011 year-end audit and its quarterly reviews for at least the first three quarters of 2012. [Filing No. 247-1 at 16-17 (citing Filing No. 229-7 at 7; Filing No. 229-17; Filing No. 229-18; Filing No. 229-19; Filing No. 229-20).]

51

- The auditor reviewed the MSR on a quarterly basis to monitor ITT's compliance with the PEAKS covenants including the parity ratio. [Filing No. 247-1 at 17 (citing Filing No. 230-1 at 3; Filing No. 231-12 at 6).]

- The auditor was aware that the parity ratio was declining in the first, second, and third quarters of 2012. [Filing No. 247-1 at 17 (citing Filing No. 229-7 at 5).]

- The auditor understood that the DB Model did not use actual loan level data, so the DB Model's output would diverge from the actual parity ratio reflected in the MSR. [Filing No. 247-1 at 17 (citing Filing No. 229-7 at 5; Filing No. 230-1 at 6).]

- Mr. Fitzpatrick, Mr. Modany, and ITT's then-controller signed management representation letters confirming that, to the best of their knowledge and belief, representations made to the auditor on a quarterly basis related to the review of ITT's financial statements. [Filing No. 247-1 at 17-18 (citing Filing No. 230-3 at 1; Filing No. 230-4 at 1; Filing No. 230-5 at 1; Filing No. 230-6 at 1; Filing No. 230-7 at 1).]

- ITT provided the auditor with the DB Model each quarter, including the second and third quarters of 2012. [Filing No. 247-1 at 18 (citing Filing No. 229-10; Filing No. 230-9; Filing No. 230-10; Filing No. 230-11; Filing No. 230-12).]

On the other hand, the SEC presents evidence that:

- ITT management never brought the divergence in the parity ratio of the PEAKS Trust and the DB Model to the attention of the auditor. [Filing No. 251 at 15 (citing Filing No. 250-31 at 4).]

- Even if a single page of a MSR was provided to the auditor, this does not mean that ITT's management fully and transparently disclosed to the auditor the divergence in the parity ratio of the PEAKS Trust and the DB Model. [Filing No. 251 at 15 (citing Filing No. 250-4 at 19).]

- The MSR was not included in the documents given to the auditor to determine if there was a divergence in the DB Model and the MSR, and it was not used for that purpose. It was not the auditor's practice to compare the MSRs with the DB Model due to their different uses. [Filing No. 251 at 15-16 (citing Filing No. 250-4 at 19; Filing No. 250-31 at 4).]

In short, Defendants present evidence indicating that they provided information to the auditor which would have allowed the auditor to discern that there was a discrepancy between the

PEAKS Trust parity ratio and the DB Model, and the SEC presents evidence that the auditor did not use the information provided for that purpose, so would not have known about the discrepancy. The Court finds that there are genuine issues of disputed fact, and that a jury could reasonably find that Defendants made false or misleading statements, or omitted to state material facts, to the auditor regarding the PEAKS Trust parity ration and the DB Model. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment on the SEC's Rule 13b2-2 claim as it relates to the PEAKS Trust parity ratio and the DB Model.

b. CUSO Payments

As for the SEC's Rule 13b2-2 claim in connection with Defendants' disclosures to the auditor relating to CUSO payments, the SEC has clarified in its response brief that it is only claiming that Defendants misrepresented to the auditor that an October 2013 cash flow estimate for the CUSO Loans did not exist when it did, and that it failed to provide the auditor with the estimate. [*See* Filing No. 251 at 49-50 (arguing that Defendants have misstated the SEC's claim, and clarifying its scope).] The Court will not grant summary judgment for Defendants on the other two theories of liability that Defendants discuss and which the SEC has abandoned (that Defendants did not inform the auditor that it was making minimum monthly payments to CUSO on defaulted loans rather than discharging all defaulted loans, and regarding Mr. Huber's CUSO cash flow estimates other than the October 2013 estimate) because, according to the SEC, those claims do not exist. The SEC is precluded, however, from raising those theories at trial in connection with its Rule 13b2-2 claim.

The Court will focus only on the SEC's claim that Defendants knew ITT had a cash flow estimate for the CUSO payments, that it misrepresented to the auditor that the October 2013

estimate did not exist, and that it did not provide the estimate. Defendants provide the following evidence:

- Each quarter, the auditor made hundreds of requests for information from ITT, and ITT provided the requested information. [Filing No. 247-1 at 17 (citing Filing No. 230-2 at 3-5).]

- In mid-October 2013, Mr. Huber created a CUSO cash flow estimate that differed from his prior cash flow estimates made available to the auditor because it estimated the amounts that might be owed under each payment option under the CUSO Risk Share Agreement. [Filing No. 247-1 at 22 (citing Filing No. 232-5).]

- The October CUSO cash flow estimate was "not deemed reliable at that time." [Filing No. 247-1 at 22 (citing Filing No. 230-2 at 7; Filing No. 232-4 at 7-8).]

The SEC presents the following evidence to support its claims:

- In November 2013, the auditor met with Mr. Fitzpatrick and "talked very specifically about the need to develop cash flow estimates or models of the different CUSO guarantee options." [Filing No. 251 at 17 (citing Filing No. 250-4 at 24; Filing No. 250-4 at 28).]

- The auditor was told that developing such a cash flow model would be very difficult. [Filing No. 251 at 17 (citing Filing No. 250-4 at 24-25).]

- The auditor was not told that by October 9, 2013, ITT had created a CUSO cash flow estimate that differed from prior cash flow estimates made available to the auditor because it estimated the amounts that might be owed under each payment option under the CUSO. [Filing No. 251 at 17 (citing Filing No. 250-4 at 25; Filing No. 250-4 at 28; Filing No. 250-33).]

- In January or February 2014, ITT provided the auditor with its initial calculations of ITT's CUSO liability for 2013 year end, which used the same model that ITT had used in prior quarters but did not meet the auditor's request that a cash flow model estimating the different CUSO guarantee options be developed. The auditor again requested such an estimate. [Filing No. 251 at 17 (citing Filing No. 250-4 at 25).]

- The auditor first learned of the October 2013 cash flow model through a 2014 earnings release. [Filing No. 251 at 17-18 (citing Filing No. 250-4 at 26-28; Filing No. 250-34 at 11).]

It does not appear that the parties dispute two key facts: (1) that Mr. Huber created the CUSO cash flow estimate in October 2013; and (2) that the estimate was not provided to the auditor. Instead, Defendants appear to concede that the estimate was not provided, but argue that that was because it was deemed unreliable. The evidence Defendants present to show that the October 2013 estimate was unreliable, however, does not necessarily support that conclusion. For example, Defendants cite to deposition testimony from Angela Knowlton, who was ITT's controller. She testified that Mr. Huber's work sometimes had discrepancies in it, and that sometimes she could trust that work and other times she could not. [Filing No. 230-2 at 7.] She stated that the 2013 estimate was "something [she] wouldn't just take at face value," but her subsequent testimony indicates that she knew very little about the estimate, how Mr. Huber came up with the estimate, and what his conclusions meant. [Filing No. 230-2 at 7-8 (Ms. Knowlton testifying that she did not know how Mr. Huber came up with certain numbers, what assumptions he used to create the estimate, and whether Mr. Huber took into account the timing of when students would default).] This testimony does not necessarily lead to the conclusion that the 2013 estimate was unreliable. Instead, Ms. Knowlton testified that sometimes Mr. Huber's work was reliable, sometimes it was not, and she knew very little about how he arrived at the numbers in the 2013 estimate.

Additionally, Defendants point to testimony from Mr. Fitzpatrick that the 2013 estimate was "rudimentary," "not valid," and "not something that was reliable." [Filing No. 232-4 at 7-8.] But these statements alone do not necessarily show that the 2013 estimate was, in fact, so unreliable that it should not have been provided to the auditor. Moreover, the SEC presents evidence – which Defendants do not dispute in their reply brief – that the 2013 estimate in fact ended up being fairly accurate. [Compare Filing No. 250-34 at 9 (2014 earnings release in which ITT reported that it

estimated a CUSO guarantee liability of $83.6 million) with [Filing No. 250-33](#) (October 9, 2013 email from Mr. Fitzpatrick to Mr. Modany attaching the 2013 estimate which reflected a cash flow payoff forecast summary of $83 million); Compare [Filing No. 250-32 at 5](#) (ITT's 2013 10-K, in which ITT reported a total CUSO guarantee liability of $116.9 million) with [Filing No. 250-33](#) (October 9, 2013 email from Mr. Fitzpatrick to Mr. Modany attaching the 2013 estimate which reflected an estimate of total CUSO guarantee liability for monthly minimum payments for that time frame of $117.2 million).]

In short, there is a genuine dispute of fact regarding whether Mr. Huber's 2013 estimate was unreliable. Because Defendants seek summary judgment on the SEC's Rule 13b2-2 claim related to the 2013 estimate, the Court need not consider at this time whether Defendants would have been required to disclose the 2013 estimate in any event, even if it were unreliable. The SEC has presented sufficient evidence showing that the 2013 estimate existed, Defendants did not disclose the estimate, and the estimate was in fact reliable. Defendants' Motion for Summary Judgment on the SEC's Rule 13b2-2 claim as it relates to Mr. Huber's October 2013 CUSO payment estimate is **DENIED**.[15]

---

[15] Defendants also move for summary judgment on Claim Eight based on one of the same arguments they assert in connection with their § 10(b), Rule 10b-5, and § 17(a) claims – that they did not have an affirmative duty to disclose information to the auditor. [*See* [Filing No. 243 at 47-48](#).] Defendants' Motion for Summary Judgment on that argument as it relates to Rule 13b2-2 is **DENIED**, as a genuine issue of fact exists regarding whether Defendants' misstatements or omissions to the auditor – as part of a larger scheme, and not whether Defendants had a duty to disclose each individual omission in a vacuum – were materially false or misleading.

### H. Claim Ten – Aiding and Abetting False SEC Filings Under § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13

#### 1. Elements of the Claim

Section 13(a) and Rules 13a-1 and 13a-13 "require issuers of registered securities to file with the SEC annual reports on Form 10-K and quarterly reports on Form 10-Q." *Securities and Exchange Commission v. Life Partners Holdings, Incorporated*, 854 F.3d 765, 778 (5th Cir. 2017) (citing 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.13a-1, 240.13a-13). Rule 13a-11 requires issuers to timely file current Forms 8-K. 17 C.F.R. § 240.13a-11. Under Rule 12b-20, an issuer is required to "disclose any material information as may be necessary to ensure that the reports are not misleading." *Life Partners Holdings*, 854 F.3d at 778 (citing 17 C.F.R. § 240.12b-20). To show that Mr. Modany and Mr. Fitzpatrick aided and abetted ITT's violations of § 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13,the SEC must prove: "(1) a primary violation of the securities laws; (2) that the aider and abettor had knowledge of this violation and of his…role in furthering it; and (3) that the aider and abettor knowingly provided substantial assistance in the commission of the primary violation." *Life Partners Holdings*, 854 F.3d at 778 (citing *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 621 (5th Cir. 1993)).

#### 2. Defendants' Motion for Summary Judgment

Defendants assert many of the same arguments in connection with the SEC's § 13(a)-related claims that they set forth in connection with the § 10(b) and Rule 10b-5 claims. Specifically, they argue that a purported failure to disclose information to ITT shareholders is insufficient to support the SEC's claims because they had no duty to disclose all material information, including the POBOB practice, ITT's projected PEAKS cash obligations, and ITT's projected CUSO guarantee payments. [Filing No. 247-1 at 41-42.] Defendants argue that the SEC has no evidence that the Form 10-Q for the third quarter of 2012 contained any false or misleading

statements based on the POBOB practice because that practice did not start until after that quarter. [Filing No. 247-1 at 42-43.] Defendants also contend that the SEC's theory that there was a lack of disclosure of ITT's CUSO payment options cannot support the SEC's § 13(a)-related claims. [Filing No. 247-1 at 44-45.]

The SEC responds that Defendants' omission of certain information from the public filings rendered statements in the public filings misleading in violation of § 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13. [Filing No. 251 at 33-38.]

In their reply, Defendants reiterate their arguments that they were not required to disclose the information the SEC focuses on, and that their disclosures were sufficient. [Filing No. 258 at 18-19.]

As with the SEC's § 10(b), Rule 10b-5, and § 17(a) claims, the Court finds that genuine issues of fact exist regarding the SEC's § 13(a)-related claims. The SEC's case on that claim is based on scheme liability, and the Court will not choose certain factual allegations, out of context, and find that they cannot possibly support this scheme liability. In connection with the § 13(a)-related claims, while the SEC will need to prove that the public filings at issue contained false or misleading statements, it may rely upon facts outside of those filings which might render the filing misleading. In other words, while failure to disclose the POBOB practice may not have itself been misleading, it may have rendered affirmative statements in public filings misleading. What is in dispute is the effect that the failure to disclose the POBOB practice (and other information outlined by the SEC) had on the statements in ITT's public filings. Without seeing the entire picture, the Court cannot determine that the failure to disclose certain information to shareholders did not render information in public filings misleading, and finds that this is a determination the jury must

make.  The Court **DENIES** Defendants' Motion for Summary Judgment on the SEC's aiding and

abetting violations of § 13(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13 in Claim Ten.

I.  **Claim Eleven – Control Person Liability for ITT's Violations of § 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 – and Claim Fourteen – Control Person Liability for ITT's Violations of § 13(b)(2)**

   *1.  Elements of the Claims*

As discussed above in connection with Claim Two, 15 U.S.C. § 78t(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable…, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

   *2.  The SEC's Motion for Summary Judgment*

The SEC argues that it is entitled to summary judgment on the issue of whether Mr.

Modany and Mr. Fitzpatrick were control persons in connection with all of its control person

liability claims.  [Filing No. 226 at 24-26.]  The Court discussed this issue above in Part III.C. in

connection with Claim Two – for person liability for ITT's violations of § 10(b) and Rule

10b-5.  The result is the same for the SEC's control person liability claim in connection with its §

13(a)-related claims and its § 13(b)(2) claim.[16]  The Court **GRANTS IN PART** the SEC's Motion

for Summary Judgment as to Mr. Modany and Mr. Fitzpatrick being control persons for claims

related to representations in public filings which they signed, but **DENIES IN PART** the motion

to the extent the § 13(a)-related claims and the § 13(b)(2) claim related to public filings they did

---

[16] Neither the SEC nor Defendants assert summary judgment arguments that relate specifically to Claim Thirteen, against Mr. Modany and Mr. Fitzpatrick for aiding and abetting ITT's violations of § 13(b)(2) for false books and records.

not sign or other violative acts, as genuine issues of fact exist regarding whether they had general control over ITT's operations and the power or ability to control the specific violative acts.[17]

### J. Claim Fifteen – Failure to Reimburse Under § 304(a) of the Sarbanes-Oxley Act

#### 1. Elements of the Claim

15 U.S.C. § 7243(a) provides that:

> If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities law, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for –
>
> (1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
>
> (2) any profits realized from the sale of securities of the issuer during that 12-month period.

"The issuer's misconduct itself, outside of the preparation of its financial statements, is not what establishes a claim. Rather, the…claim is based on the materially noncompliant form or forms that caused or resulted in the restatement." *Bardman*, 231 F.Supp.3d at 449.

#### 2. The SEC's Motion for Summary Judgment

The SEC argues that it is entitled to summary judgment on the legal issue that § 304 of the Sarbanes-Oxley Act ("SOX") does not require it to prove that Defendants acted intentionally. [Filing No. 226 at 26-27.] The SEC argues that the misconduct at issue here is ITT issuing financial reports, and notes that the legislative history supports the notion that § 304 was meant to

---

[17] It is not clear whether Defendants move for summary judgment on the SEC's control person liability claim for the § 13(a)-related violations based on the same arguments they assert in connection with Claim Ten for aiding and abetting liability under § 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13. To the extent that they do, their Motion for Summary Judgment on Claim Eleven is **DENIED** for the same reasons discussed in connection with Claim Ten.

address "mismanagement or accounting misstatement[s] rather than requiring intentional wrongdoing by the company." [Filing No. 226 at 26-27.]

In their response, Defendants argue that "misconduct" as it is used in § 304 means intentional wrongdoing, and points to cases and legislative history which they argue support this position. [Filing No. 254 at 23-25.]

In its reply, the SEC argues that knowing and intentional conduct are different, and that knowing or reckless conduct is sufficient to establish a § 304 violation. [Filing No. 257 at 18.] The SEC contends that the legislative history for the Senate bill, which was adopted, indicates that § 304 was developed to address concerns about management benefitting from unsound financial statements. [Filing No. 257 at 18.]

The Court notes at the outset the unusual nature of the SEC's summary judgment request. The SEC does not mention any facts of this case in connection with its request, instead asking for a declaration of what the law is. The Court is not convinced that summary judgment was the proper avenue for making this request, as summary judgment generally asks a court to determine the application of the law to undisputed facts. However, because trial is on the horizon, and since this is a legal issue that the Court will need to decide eventually, it does so now. *See Siltronic Corporation v. Employers Insurance Company of Wausau*, 2018 WL 405664, *2 (D. Or. 2018) ("[Plaintiff] has filed a motion for partial summary judgment asking this court to interpret a term in [defendant's] policy, which is a question of law. Arguably, it might have been more appropriate if, instead of presenting this issue in a motion for summary judgment, [plaintiff] had presented it in a motion in limine or some other request for pretrial ruling on a question of law. However, the vehicle [plaintiff] has used to present this question to the court is not important in this instance. Trial is but a few short months away, and this is a legal issue that must be decided").

The proper focus when analyzing a § 304 claim under SOX is misconduct by the issuer – here, ITT – and "not the personal misconduct of the CEO or CFO." *U.S. Securities & Exchange Commission v. Jensen*, 835 F.3d 1100, 1114 (9th Cir. 2016).  As the Ninth Circuit has noted, "most district courts to have examined it have concluded that SOX 304 does not require CEOs or CFOs to have personally engaged in misconduct before they are required to disgorge profits under that statute."  *Id.* at 1115; *see also S.E.C. v. Jenkins*, 718 F.Supp.2d 1070, 1075 (D. Ariz. 2010) ("A CEO need not be personally aware of financial misconduct to have received additional compensation during the period of that misconduct, and to have unfairly benefitted therefrom").  Misconduct "must also be sufficiently serious to result in material noncompliance with a financial reporting requirement under the securities laws…." *Jenkins*, 718 F.Supp.2d at 1075.  Additionally, "CEOs and CFOs may be subject to disgorgement not only when they commit 'misconduct,' but also when any agent of the issuer (acting within the course and scope of his agency) commits 'misconduct' on behalf of the issuer." *Jensen*, 835 F.3d at 1124.

While a CEO or CFO need not have engaged in misconduct to be required to disgorge amounts under § 304, the question remains whether, when misconduct is based on the actions of a CEO, CFO, or some other employee, those actions must have been intentional.  Few courts have addressed the issue.  In *Jensen*, Judge Bea wrote in a concurring opinion that "[i]n my view, 'misconduct' requires an intentional violation of a law or standard (such as GAAP) on the part of the issuer, which can be shown by evidence that any employee of the issuer (not only the CEO or CFO), acting within the course and scope of that employee's agency, intentionally violated a law or corporate standard." 835 F.3d at 1122.

Judge Bea noted that this interpretation is consistent with other provisions of SOX:

SOX 302…imposes a management obligation on CEOs and CFOs to maintain internal controls that will be effective in ensuring that other agents of the issuer are

– for purposes of the present case – recording income in a manner that produces accurate and complete financial statements in accord with GAAP…. In turn, SOX 304 encourages vigorous compliance with SOX 302 by making CEOs and CFOs subject to disgorgement if their internal controls fail to prevent (or to detect prior to the publication of a false or misleading financial report) intentional wrongdoing by any authorized agent of the issuer. When the internal controls fail to detect such wrongful behavior, a CEO or CFO (and thus, by extension, the issuer itself) has committed "mismanagement" – i.e., the first definition of "misconduct."

*Id.* at 1122-23.

The Court also considers the legislative history of § 304. Senate Report 107-205 provides:

Recent events have raised concern about management benefitting from unsound financial statements, many of which ultimately result in corporate restatements. The President has recommended that "CEOs or other officers should not be allowed to profit from erroneous financial statements," and that "CEO bonuses and other incentive-based forms of compensation [sh]ould be disgorged in cases of accounting restatement and misconduct."

Title III includes provisions designed to prevent CEOs or CFOs from making large profits by selling company stock, or receiving company bonuses, while management is misleading the public and regulators about the poor health of the company. The bill requires that in the case of accounting restatements that result from material non-compliance with SEC financial reporting requirements, CEOs and CFOs must disgorge bonuses and other incentive-based compensation and profits on stock sales, if the non-compliance results from misconduct….

S. Rep. 107-205, 2002 WL 1443523, *26 (2002).

The legislative history does not provide helpful insight regarding the meaning of "misconduct," but the Court finds instructive a finding by the Fifth Circuit in *Life Partners* that the defendant had "knowingly" used unreliable data so disgorgement was required under § 304. The Court finds that the SEC must prove material noncompliance of the issuer, as a result of

knowing wrongdoing, with financial reporting requirement under the securities law.[18] "Knowingly" means "that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident." *Seventh Circuit Criminal Pattern Jury Instruction* 4.06. The SEC's Motion for Summary Judgment related to its SOX § 304 claim is **DENIED**.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the SEC's Motion for Summary Judgment, [225], and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment, [227], as discussed above. Specifically, the Court **GRANTS** summary judgment on the following claims or issues:

- That violative acts in connection with statements in the Form 10-Q for the third quarter 2012, the Forms 10-Q for Q1-Q3 2013, and the 2012 Form 10-K, and during conference calls occurred through the use of interstate commerce;

- That Mr. Modany and Mr. Fitzpatrick are considered control persons for claims related to representations in public filings which they signed; and

- That the SEC's claim for primary liability for Mr. Modany and Mr. Fitzpatrick under § 17(a)(2) of the Securities Act fails as a matter of law.

---

[18] The SEC relies upon *Life Partners* to argue that "the company's motivation in issuing the restatement is irrelevant," and "[b]ecause the company's motivation is irrelevant, the statute cannot require intentional conduct." [Filing No. 226 at 27.] But the Fifth Circuit in *Life Partners* stated that a company's "actual motivation in issuing the restatement is…of no moment" because the proper focus is on "the requirement of a restatement," which "must be 'due to the material noncompliance of the issuer, as a result of misconduct,' with financial reporting requirements." 854 F.3d at 788 (quoting 15 U.S.C. § 7243(a)) (emphasis omitted). In other words, *Life Partners* stands for the proposition that the misconduct must be related to the material noncompliance of the issuer in connection with the initial statement, and not related to the issuing of a restatement. This is not contrary to the Court's finding that liability under SOX § 304 requires some knowing wrongdoing in the initial public filing's noncompliance. Indeed, the Fifth Circuit found that defendant's "knowing use of materially underestimated [life expectancy estimates] rendered its financial statements noncompliant and thus also required a restatement." *Life Partners*, 854 F.3d at 788.

All other claims and issues remain pending for trial. No partial final judgment shall enter at this time. The parties are encouraged and expected to work toward stipulating to as many facts and legal issues as possible in advance of the July 9, 2018 trial.

Date: 3/23/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**