UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:15-cv-00758-JMS-MJD |
| vs. | ) | |
| | ) | |
| ITT EDUCATIONAL SERVICES, INC., KEVIN M. MODANY, and DANIEL M. FITZPATRICK, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff United States Securities and Exchange Commission (the "SEC") filed this lawsuit against Defendants ITT Educational Services, Inc. ("ITT"),[1] ITT's former Chief Executive Officer Kevin Modany, and ITT's former Chief Financial Officer Daniel Fitzpatrick, alleging that Defendants violated federal securities laws in connection with two student loan programs created by ITT for ITT students. The SEC on the one hand, and Mr. Modany and Mr. Fitzpatrick on the other, have filed numerous motions to exclude expert testimony in advance of the July 9, 2018 trial. Specifically, presently pending and ripe for the Court's consideration are: (1) Defendants' Motion to Exclude the Report, Testimony, and Opinions of Harvey L. Pitt, [Filing No. 197]; (2) the SEC's Motion to Preclude the Testimony of Defendants' Expert David B.H. Martin, [Filing No. 201]; (3) Defendants' Motion to Exclude the Report, Testimony, and Opinions of Kevin Kinser, Ph.D, [Filing No. 199]; (4) the SEC's Motion to Preclude the Testimony of Defendants' Expert Roger Meiners, [Filing No. 203]; (5) Defendants' Motion to Exclude Certain Testimony

---

[1] The SEC and ITT's trustee ultimately settled all claims against ITT, and only claims against Mr. Modany and Mr. Fitzpatrick remain pending. [*See* Filing No. 176; Filing No. 177.]

and Opinions of Anjan V. Thakor, Ph.D, [Filing No. 206]; and (6) Defendants' Motion to Exclude

Certain Testimony and Opinions of R. Larry Johnson, [Filing No. 208].

# I.
## BACKGROUND[2]

ITT was a for-profit higher education company whose stock was registered on the New

York Stock Exchange.  Mr. Modany was ITT's Chief Executive Officer and Mr. Fitzpatrick was

ITT's Chief Financial Officer during the relevant time period.  In 2009, ITT launched the Credit

Union Service Organization student loan program (the "CUSO Program").  The CUSO Program

involved a group of credit unions, acting through a Credit Union Service Organization ("CUSO"),

making a total of approximately $141 million in private loans to ITT students.  ITT and the CUSO

entered into a risk sharing agreement whereby if more than 35% of the loans in any of the three

annual pools defaulted, ITT guaranteed payment of the principal, interest, and fees on any loans

that defaulted over the 35% threshold.  Once ITT's guarantee obligation was triggered for one of

the CUSO loan pools, ITT could either pay the monthly payments due on defaulted loans over the

threshold (a minimum payment), or discharge its total future obligation by immediately paying the

outstanding principal plus some additional interest.

In 2010, ITT formed the Program for Education Access and Knowledge student loan

program (the "PEAKS Program").  The PEAKS Program was structured as a trust (the "PEAKS

Trust") that raised funds by issuing senior debt to institutional investors (the "PEAKS

Noteholders").  The PEAKS Trust received the cash flow generated by payments on the student

loans and used those funds to pay the principal and interest of the senior debt, and other fees and

expenses.  ITT made certain guarantees related to the PEAKS Program, including all of the

---

[2] This background section is taken largely from the Court's Order on the parties' Motions for
Summary Judgment.  [*See* Filing No. 259 at 3-9.]

principal and interest payments on the PEAKS senior debt, other financial obligations of the PEAKS Trust, and maintaining a "parity ratio" between the PEAKS Trust's assets and liabilities. If ITT failed to make the required guarantee payments on time, the PEAKS Noteholders could force ITT to immediately pay the entire amount of principal and interest remaining on the senior debt in advance of the 2020 maturity date.

From the end of 2011 through the end of the third quarter of 2012, loans through the PEAKS Program and the CUSO Program were defaulting at high rates. At the same time, ITT's financial performance and stock price were declining due to decreasing enrollment at ITT, among other issues. In October 2012, ITT received a demand for a PEAKS guarantee payment of more than $8 million due to the parity ratio falling below its required level. ITT made a payment to the PEAKS Trust for $8 million. Mr. Modany and Mr. Fitzpatrick began devising a plan to avoid PEAKS Program guarantee payments.

The alleged scheme involved ITT determining which students were about to default on their loans, and making the minimum payment necessary to avoid default on their behalf, without advising the students that these payments were being made. These "Payments on Behalf of Borrowers" ("POBOB") were to prevent PEAKS Program loans from defaulting so that ITT could avoid making parity ratio guarantee payments. At the end of October 2012, ITT made approximately $2.4 million in POBOB payments, which allowed ITT to avoid approximately $30 million in guarantee payments to the PEAKS Trust. Neither ITT, Mr. Modany, nor Mr. Fitzpatrick disclosed POBOB to investors.

As for the CUSO Program, ITT calculated its liability for CUSO guarantee payments (triggered when loans defaulted over a 35% risk share threshold), and determined to pay the monthly minimum. Defendants did not disclose to investors in public filings that the method ITT

used to calculate liability – which assumed that ITT would immediately discharge its obligation – was inconsistent with the method ITT actually used to pay its CUSO guarantee – which was to make minimum payments of the monthly amounts due on the high-interest loans. The decision to make only the monthly minimum payments resulted in increasing the amount that ITT would ultimately have to pay on the CUSO guarantee well beyond the amount of the liability disclosed in public filings.

The SEC initiated this lawsuit in May 2015, alleging that Mr. Modany and Mr. Fitzpatrick failed to disclose certain information to investors and ITT's auditor, and engaged in other fraudulent behavior. The SEC asserts claims against Mr. Modany and Mr. Fitzpatrick under numerous provisions of the Exchange Act and the Securities Act. On March 23, 2018, the Court granted in part and denied in part the parties' Motions for Summary Judgment, [*see* Filing No. 259], leaving most of the SEC's claims pending for the upcoming July 9, 2018 trial. The parties' various Motions to Exclude are now ripe for the Court's decision.

## II.
### APPLICABLE LAW

Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified…or evidence is admissible." Fed. R. Evid. 104(a). Federal Rule of Evidence 702 provides that expert testimony is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. A trial judge "must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary

assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue…. Many factors will bear on the inquiry…." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).

The Court has a "gatekeeping obligation" under Rule 702, and "must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam*, 877 F.3d at 779.

### III.
### DISCUSSION

The parties submitted over 450 pages in briefs and over 1,500 pages in exhibits related to the six Motions to Exclude, and the Court has done its best to address the motions in a comprehensive yet manageable fashion. Below, the Court provides a brief summary of each expert's report and of the parties' arguments related to the report and anticipated testimony, before discussing the admissibility of the report and associated evidence. The Court notes that, although the parties provided lengthy discussions of the expert reports and testimony in connection with their motions, the issues involved are fairly discrete and simple and the Court discusses the issues

accordingly.[3]

**A. Harvey Pitt**

*1. Summary of Report*

Harvey Pitt, one of the SEC's expert witnesses, is the founder and Chief Executive Officer of Kalorama Partners, LLC, a global business consulting firm which "specializ[es] in providing strategic guidance – to independent board members, public companies and governmental entities – on corporate governance, disclosure, accounting, economic and risk-crisis issues." [Filing No. 197-3 at 1.] Mr. Pitt was the SEC's Chairman from 2001 to 2003, where he "oversaw and directed the myriad functions performed by the SEC, including the establishment and interpretation of SEC regulatory requirements and disclosure policies, the creation of enforcement practices and oversight of SEC enforcement proceedings, and efforts designed to protect the fairness and orderly conduct of our Nation's securities markets." [Filing No. 197-3 at 2.]

Mr. Pitt summarizes his engagement as follows:

I have been retained by the SEC to discuss long-standing understandings and customary practices, on the part of public companies and their advisors, regarding certain issues of particular relevance to this matter, including:

- Purpose and history of the disclosure obligations of public companies;

- Understandings, expectations, and industry practices with respect to issuer disclosures, particularly as they relate to trends and known uncertainties affecting a company's profitability, revenues, liquidity and future business metrics;

- Expectations of public investors regarding corporate disclosures, analyst assessments and corporate earnings calls;

---

[3] The Court is reminded of Mark Twain's famous quote: "I didn't have time to write a short letter, so I wrote a long one instead." http://thinkexist.com/ (last visited April 16, 2018). A similar quotation is also attributed to Blaise Pascal, a French mathematician, logician, physicist, and theologian, who said "I would have written a shorter letter, but I did not have the time." https://en.wikiquote.org/wiki/Blaise_Pascal (last visited April 16, 2018).

- Responsibilities assumed by senior corporate managers for their company's formal and informal disclosures, including their certification of SEC filings and their need to update information that becomes stale, misleading or omits significant facts; and

- Commonly accepted management practices when seeking to rely on the advice of professional advisors.

[Filing No. 197-3 at 21-22.]

Mr. Pitt summarizes his conclusions as follows:

- Market participants widely understand, and rely upon the fact that, public companies, such as ITT, are obligated to ensure that their disclosures – whether in the form of formal SEC filings or other forms of corporate communications – are accurate and not materially misleading;

- ITT ignored commonly accepted understandings and practices regarding its SEC filings and other corporate disclosures with respect to information regarding various of its student loan programs that reasonable investors would have considered important in deciding whether to buy, sell or hold ITT securities;

- Public companies and their advisors uniformly understand that public companies should inform their outside auditors of all significant developments affecting the accuracy and reliability of their financial statements;

- Market participants understand and rely on the fact that senior corporate managers are responsible for ensuring and certifying the accuracy of their company's SEC filings, and ensuring that any other public statements about their company, including regular earnings calls, must be honest, accurate and current; and

- Public companies and their advisors uniformly understand that full disclosure is the obligation of the companies (as well as their managers) themselves, and that, before they can justify relying on the advice of outside experts, they must

  o Seek advice from knowledgeable and independent counsel, expert in the field to which the company's inquiry relates;

  o Identify the specific issue (or issues) about which they seek an opinion;

  o Fully inform counsel of all relevant facts related to the subject matter of the inquiry;

- o Satisfy themselves the advice received is rational and logical; and

- o Follow the advice received as provided.

In this matter, ITT did not satisfy any, much less all, of these necessary preconditions to shifting the obligation to achieve full disclosure.

[Filing No. 197-3 at 22-23.]

### 2. *Defendants' Motion to Exclude*

Defendants argue that Mr. Pitt's report, testimony, and opinions should be excluded because they are improper, inadmissible, and unhelpful to a jury. [Filing No. 198 at 20-34.] Specifically, Defendants assert that Mr. Pitt offers improper and inadmissible legal opinions, including "that information concerning the CUSO and PEAKS student loan programs, including ITT's practice of making POBOB, would have been materially important to investors – a key legal element of various claims brought by the [SEC] in this case." [Filing No. 198 at 20.] Defendants also argue that Mr. Pitt's statement that ITT's POBOB payments were not contractually required is an impermissible legal conclusion. [Filing No. 198 at 27.] Defendants point to another case where Mr. Pitt's testimony was barred because the court found that it contained legal conclusions. [Filing No. 198 at 29-30.] Defendants contend that Mr. Pitt's testimony merely recites the SEC's allegations and invades the jury's province, and that any value in his testimony is outweighed by the risk of confusing the jury. [Filing No. 198 at 30-34.] Defendants also argue that Mr. Pitt's report, testimony, and opinions are unreliable because they rely on factual assertions that omit key information or are contrary to the established record, and his comments demonstrate his bias and unreliability. [Filing No. 198 at 34-40.]

In response, the SEC argues that Defendants do not challenge many of Mr. Pitt's opinions, and that his opinions regarding common practices and understandings relating to corporate governance issues are proper expert testimony and helpful to the jury. [Filing No. 218 at 10-25.]

The SEC contends that Mr. Pitt does not opine on the legal issues, nor on materiality or contract interpretation. [Filing No. 218 at 11-21.] It also asserts that Mr. Pitt's opinions are reliable. [Filing No. 218 at 25-31.]

In their reply, Defendants argue that they challenge Mr. Pitt's report and testimony in their entirety. [Filing No. 240 at 6-9.] They assert that Mr. Pitt improperly offers legal opinions regarding the materiality of ITT's disclosures and whether POBOB was contractually required. [Filing No. 240 at 9-17.] Defendants reiterate their arguments that Mr. Pitt's opinions are prejudicial and unreliable. [Filing No. 240 at 17-24.]

Mr. Pitt's testimony is a mixed bag of statements regarding the standard for what information a company must disclose and what market participants would general rely upon versus whether ITT in fact complied with those standards. For example, Mr. Pitt provides general information regarding public companies, requirements of the Securities Exchange Act, and information companies must provide to investors. [*See* Filing No. 197-3 at 23-27.] Included in that general information, however, are statements relating to what Defendants should have disclosed and did not. [*See, e.g.*, Filing No. 197-3 at 28 ("ITT's disclosure concerning its payments on the CUSO program was inaccurate"); Filing No. 197-3 at 34-35 ("ITT did not adequately enhance its disclosure in its 10-Ks or 10-Qs to describe this material trend in its off-balance sheet arrangements and how that would soon affect ITT's liquidity"); Filing No. 197-3 at 43 ("ITT not only did not live up to the disclosure obligations market participants commonly understand and expect, and that it was required to meet, it did not come close").]

The Court acknowledges that it can be helpful in certain situations for an expert to testify regarding a defendant's legal duties. *See, e.g.*, *Lees v. Carthage College*, 714 F.3d 516, 522 (7th Cir. 2013) ("Where the specifics of a defendant's duty of care involve specialized knowledge,

plaintiffs must introduce expert testimony to establish this element….").  But this situation is unlike those where the standard a jury must apply is not defined by the law, but rather by a custom, practice, or even difficult-to-understand technology – for example, the standard of care a doctor must exercise, or the use of a state of the art device.  Here, Defendants were required to follow a standard defined by the law, and the jury will receive instructions setting forth what that law is. Expert testimony regarding a standard defined by the law would encroach on the Court's role of instructing the jury on that issue.  *S.E.C. v. Tourre*, 950 F.Supp.2d 666, 675 (S.D.N.Y. 2013) ("Expert testimony may not usurp the province of the judge to instruct on the law….").  An expert is not necessary to set forth the standard, and an expert's opinion regarding whether Defendants complied with that standard is not appropriate. *See In re Longtop Financial Technologies Ltd. Securities Litigation,* 32 F.Supp.3d 453, 463-64 (S.D.N.Y. 2014) (expert "may explain what steps he would consider prudent for a CFO to take in response to various analyst reports or red flags. He may also answer hypothetical questions about whether certain investigative responses by a CFO would be sufficient or appropriate in accordance with industry standards.  He may not say whether [defendant] in fact took those steps, or whether [defendant's] responses were 'reasonable' or 'reckless'").

The Court finds that Mr. Pitt's report and testimony is not necessary in terms of setting forth what Defendants were legally obligated to disclose, and is improper in terms of opining regarding whether Defendants complied with those legal obligations.  Moreover, to the extent his testimony regarding Defendants' obligations is helpful, it is inextricably intertwined with his conclusions regarding whether Defendants met those obligations.  *See Rivera v. Allstate Ins. Co.*, 2016 WL 1055580, *1 (N.D. Ill. 2016) ("Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions as to legal issues that will determine the outcome of a case….  Much of the

proposed testimony relates legal conclusions and also enforcement issues that need not be reached…. [W]hen facts are accurately presented a jury can make a proper determination without expert testimony. This is such a case. The proposed testimony of [Mr.] Pitt concerning SEC practices is not necessary or helpful and poses problems of sorting out argument and legal conclusions from expert opinions"); *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) ("[T]he line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties").

Accordingly, Defendants' Motion to Exclude the Report, Testimony, and Opinions of Harvey L. Pitt, [Filing No. 197], is **GRANTED**, and the SEC is precluded from presenting Mr. Pitt's testimony or report at trial.

**B. David Martin**

  *1. Summary of Report*

David Martin is one of Defendants' expert witnesses, and is senior counsel at the law firm of Covington Burling LLP. [Filing No. 201-1 at 1.] He has over thirty-three years of private practice experience, most of which has been focused on corporate, corporate governance, corporate finance, and securities law. [Filing No. 201-1 at 1.] Mr. Martin also spent seven years with the SEC, including as the Director of the Division of Corporation Finance, which "is responsible for administering the SEC's disclosure system for public companies, which involves the review of filings made by companies with the SEC." [Filing No. 201-1 at 2.]

In his report, Mr. Martin sets forth various public company disclosure obligations, including discussing the nature of certain SEC reports, general antifraud principles, and disclosure controls and procedures. [Filing No. 201-1 at 3-15.] He then summarizes ITT's filings and

disclosures and its "disclosure controls and procedures." [Filing No. 201-1 at 15-17.] Finally, Mr. Martin concludes that Defendants exercised a reasonable standard of care with disclosure determinations and certifications, CUSO guarantee obligations, PEAKS guarantee obligations, and reliance on legal advice for modified parity payments. [Filing No. 201-1 at 18-28.]

### 2. The SEC's Motion to Preclude

In its Motion to Preclude, the SEC argues that Mr. Martin should not be permitted to tell the jury that Defendants did not knowingly, recklessly, or negligently make materially false disclosures. [Filing No. 202 at 7-11.] It also contends that Mr. Martin should not be permitted to tell the jury that Defendants met or exercised a reasonable standard of care, stating that "the SEC does not dispute that an expert may permissibly 'describ[e] sound professional standards and identify[] departures from them.'…. But that is not what Mr. Martin does here. Mr. Martin does not simply explain industry standards and comment on whether Defendants did or did not deviate from them. Nor does he simply comment on whether Defendants' conduct was reasonable or unreasonable. Rather, he expressly states that, based on the record in this case, Defendants in fact met a certain 'standard of care,' which is just another way of saying – impermissibly – that Defendants were not negligent." [Filing No. 202 at 12 (citation and quotation omitted).]

In response, Defendants argue that Mr. Martin may testify regarding whether Defendants exercised a reasonable standard of care in making disclosure determinations, certifying ITT's SEC reports, and assessing the permissibility of modified parity payments and the issues surrounding disclosures about such payments. [Filing No. 221 at 15-16.] They contend that "an expert may opine on the reasonableness of a party's conduct without opining on whether that party was negligent and without otherwise providing a legal conclusion." [Filing No. 221 at 16.] Defendants assert that Mr. Martin testified several times in his deposition that he was not providing legal

opinions, but was only providing the standard of care and what a reasonable person would be doing under the facts and circumstances of the case. [Filing No. 221 at 17-18.] Defendants also argue that Mr. Martin should be allowed to testify regarding whether the record establishes that Defendants engaged in conduct which knowingly, recklessly, or negligently caused ITT's disclosures regarding its guarantee obligations under the CUSO Program and the PEAKS Program to be materially false or otherwise caused those disclosures to omit material information necessary in order to make those disclosure not misleading. [Filing No. 221 at 21-28.] They argue that "Mr. Martin is not opining on the accuracy of ITT's disclosures nor on the Defendants' state of mind concerning those disclosures. He is opining…on the process…that formed the foundation for Defendants' disclosure determinations." [Filing No. 221 at 23 (emphasis omitted).] Defendants assert that to the extent the Court finds that any of Mr. Martin's opinions are inadmissible legal opinions, it must also find that Mr. Pitt presents inadmissible legal opinions. [Filing No. 221 at 24.]

In its reply, the SEC argues that Mr. Pitt opines regarding whether ITT ignored "commonly accepted understanding and practices regarding its SEC filings and other corporate disclosures," which is permissible, but Mr. Martin opines about "whether the record establishes that Defendants knowingly, recklessly, or negligently made materially false or misleading disclosures," which is not permissible. [Filing No. 234 at 4-5.]

Mr. Martin's report and testimony suffer from many of the same problems as those of Mr. Pitt. First, Mr. Martin sets forth the purpose and contents of various SEC filings, [Filing No. 201-1 at 3-10], which is unnecessary testimony. The background section of his report includes a discussion of legal issues for which the jury will receive instructions, such as the definition of

materiality, and a recitation of some relevant facts, which can be presented through direct testimony from lay witnesses. [*See* Filing No. 201-1 at 10-17.]

The "Opinions" section of Mr. Martin's report also includes factual recitations for which expert testimony is not necessary. [*See, e.g.*, Filing No. 201-1 at 19 ("ITT's draft filings were generally subjected to review, revision and overall scrutiny by many other participants in the process"); Filing No. 201-1 at 23 ("Defendants also relied on outside experts for input into ITT's ultimate accounting judgments"); Filing No. 201-1 at 27 ("The Defendants also sought, obtained and relied on advice from counsel concerning the disclosure of modified parity payments to the noteholders").] Indeed, it is inappropriate "for experts to become a vehicle for factual narrative…. Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. Mere narration thus fails to fulfill *Daubert*'s most basic requirements." *Tourre*, 950 F.Supp.2d at 675 (citations omitted).

The remainder of Mr. Martin's opinions are legal conclusions that invade the province of the jury. *See U.S. v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("Although testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice") (citation omitted). Much like Mr. Pitt, Mr. Martin provides an ultimate conclusion regarding Defendants' liability. While he may have testified in his deposition that he was not providing legal conclusions, he does just that in his report. [*See, e.g.*, Filing No. 201-1 at 20 ("I am of the opinion that the Defendants exercised a reasonable standard of care in making disclosure determinations and certifying ITT's SEC reports"); Filing No. 201-1 at 26 (Defendants "exercised a reasonable standard of care in

assessing the permissibility of modified parity payments and the issues surrounding disclosures about such payments….")]

Like Mr. Pitt, Mr. Martin may not opine regarding whether Defendants ultimately exercised a reasonable standard of care in determining what to disclose to ITT investors. *See In the Matter of Laurie Bebo and John Buono, CPA*, SEC Release No. 893, 112 S.E.C. Docket 3201, 2015 WL 5769700, *53 (October 2, 2015) (finding that Mr. Martin's opinions that company could have "reasonably" reached certain conclusions were "legal conclusions on dispositive matters and are entitled to no weight") (citing *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003)). The SEC's Motion to Preclude the Testimony of Defendants' Expert David B.H. Martin, [Filing No. 201], is **GRANTED**, and Mr. Martin may not testify at trial, nor may his report be presented.

### C. Kevin Kinser

#### 1. *Summary of Report*

Kevin Kinser, the SEC's expert witness, is a professor and head of the Department of Educational Policy Studies at Pennsylvania State University. [Filing No. 199-2 at 1.] He is also a Senior Scientist in the Center for the Study of Higher Education. [Filing No. 199-2 at 1.] His research focuses on "for-profit higher education in the United States and private higher education globally." [Filing No. 199-2 at 1.]

Mr. Kinser states in his report that he was asked by the SEC to: "1) explain issues related to the organizational structure of higher education in the United States, especially as it relates to distinguishing the for-profit sector from the public and private nonprofit sectors; 2) explain the business model and regulatory regime for for-profit colleges, and focus particularly on the large, publicly traded for-profit education corporations that are most similar to ITT…; and 3) explain the

market trends and pressures from 2007 to 2014 that affected ITT and other publicly traded for-profit institutions, along with regulatory changes that occurred that influenced the market." [Filing No. 199-2 at 1.] Mr. Kinser provides information in his report regarding certain terminology (e.g., "public higher education," "nonprofit higher education," and "for-profit higher education"); compares for-profit, nonprofit, and public institutions; discusses the business model and regulatory regime for for-profit colleges; discusses market and regulatory pressures from 2007 to 2014; and then discusses ITT's response to those pressures. [Filing No. 199-2 at 1-19.]

2. *Defendants' Motion to Exclude*

In their Motion to Exclude, Defendants argue that Mr. Kinser's report, testimony, and opinions should be excluded in their entirety because they will not assist the jury in deciding relevant issues and they are unduly prejudicial. [Filing No. 200 at 11-20.] Specifically, Defendants contend that Mr. Kinser's "background and frequently abstract discussion of higher education and for-profit colleges has no bearing on the [SEC's] claims and thus cannot assist the jury in deciding this case." [Filing No. 200 at 13.] Defendants argue that Mr. Kinser's testimony relates to easily understood lay issues, such as comparing for-profit colleges to businesses in general. [Filing No. 200 at 15-16.] Defendants assert that Mr. Kinser's report, testimony, and opinions are speculative and would be unduly prejudicial, including his citation to and characterization of a congressional case study "that implied that ITT did not provide a quality education, overcharged its students, 'used questionable tactics to comply with the 90/10' Rule, and made an unreasonable amount of profit." [Filing No. 200 at 16-17.] Defendants object to portions of Mr. Kinser's testimony and opinions as hearsay, and also argue that his report, testimony, and opinions are unreliable because they omit key information. [Filing No. 200 at 19-22.]

In response, the SEC argues that Mr. Kinser's opinions and testimony are relevant and helpful to the jury because they will "help the jury understand evidence and a host of complex issues referenced throughout trial, including ITT's business model as a for-profit education institution, the regulatory regime applicable to for-profit colleges, and market forces that impacted the for-profit sector following the financial crisis." [Filing No. 219 at 9.] The SEC argues that Mr. Kinser's testimony is tied directly to the allegations in the Complaint – for example, Mr. Kinser's testimony regarding a federal regulation requiring ITT to obtain at least 10% of its revenue from non-Title IV sources (the "90/10 regulation") relates to the allegation that ITT's business was heavily dependent on revenue it received from federal student loan programs. [Filing No. 219 at 10.] The SEC contends that the background information Dr. Kinser provides is relevant and will be helpful to the jury because "[l]ay jurors are unlikely to be familiar with the unique business model, regulations, and other issues applicable to ITT and the for-profit education industry." [Filing No. 219 at 12.] The SEC argues further that Dr. Kinser's opinions and testimony are not speculative or unfairly prejudicial, are not based on impermissible hearsay, and are reliable. [Filing No. 219 at 16-21.]

In their reply, Defendants reiterate their argument that Mr. Kinser's opinions and testimony would not assist the jury because they are not tied to the SEC's allegations. [Filing No. 242 at 6-10.] They contend that legal authority does not support Mr. Kinser being allowed to provide background information on higher education, the for-profit education industry, or the 90/10 regulation. [Filing No. 242 at 10-13.] Defendants again argue that Mr. Kinser offers improper hearsay, and note that courts consider congressional hearing testimony and reports unreliable except in narrow circumstances, and that experts cannot merely repeat information they have read or heard. [Filing No. 242 at 14-15.]

The Court finds that Mr. Kinser's testimony is, in various respects, irrelevant, prejudicial, and would not be helpful to the jury. Specifically, expert testimony is not needed regarding the general business model of for-profit higher education institutions relying on student enrollment to maintain revenue and earning revenue through tuition. This is something a layperson would understand, making expert testimony unnecessary. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (expert "must testify to something more than what is obvious to the layperson") (citation and quotation omitted); *Sullivan v. Alcatel-Lucent USA Inc.,* 2014 WL 3558690, *6 (N.D. Ill. 2014) ("Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony") (citation and quotation omitted). Further, the 90/10 regulation is a law, and information regarding that law can be submitted to the jury through testimony from lay witnesses or through stipulation. [*See* Filing No. 200 at 5 (Defendants stating that they would "readily stipulate" to the fact that "Title IV of the Higher Education Act requires that ITT obtain at least 10% of its funding from non-federal sources").] Once information regarding the 90/10 regulation is provided, it would be obvious to a layperson how establishment of the PEAKS Program and the CUSO Program helped ITT meet its obligations under the 90/10 regulation. Finally, testimony regarding congressional case studies about ITT and government reports about problems in for-profit higher education institutions is unfairly prejudicial and not relevant to whether Defendants violated securities laws in this case.

Accordingly, the Court **GRANTS** Defendants' Motion to Exclude the Report, Testimony, and Opinions of Kevin Kinser, Ph.D. [Filing No. 199.] The SEC may not present testimony from Mr. Kinser, or his report, at trial.

### D.  Roger Meiners

#### 1.  *Summary of Report*

Roger Meiners is an expert proffered by Defendants, and is the Chairman of the Economics Department at the University of Texas at Arlington where he has been on faculty since 1993. [Filing No. 203-1 at 3.]  Defendants engaged Mr. Meiners to "discuss the economic basis for the development of the for-profit section of the education industry, [and] its changing role in and impact upon the industry."  [Filing No. 203-1 at 3.]

Mr. Meiners discusses the following topics in his Report: (1) "The Role for For-Profit Schools in Higher Education"; (2) "General Principles from Economic Theory"; (3) "Examples of Large Industries Subjected to External Forces"; (4) "The Higher Education Industry"; (5) "The Obama Administration's Assault on the For-Profit Segment"; and (6) "Educational Investments and Outcomes."  [Filing No. 203-1 at 5-33.]

#### 2.  *The SEC's Motion to Preclude*

In its Motion to Preclude, the SEC first argues that Mr. Meiners is not qualified to offer expert testimony because, while he is an economist, he does not have any education, employment background, or experience in the for-profit education industry.  [Filing No. 204 at 6.]  The SEC also contends that Mr. Meiners' testimony regarding students receiving a "positive return" from for-profit college education is unreliable and irrelevant.  [Filing No. 204 at 7-12.]  It asserts that this testimony has no nexus to the case, which is about securities fraud and not the value to students of degrees from for-profit educational institutions.  [Filing No. 204 at 8.]  The SEC argues that Mr. Meiners based his opinions on articles rather than on some sort of methodology, principle, or data that he uses to arrive at his opinions.  [Filing No. 204 at 8-11.]  It contends that Mr. Meiners' testimony on the Obama Administration's "assault on the for-profit segment" is unfounded,

irrelevant, and unduly prejudicial. [Filing No. 204 at 12-15.] Finally, the SEC argues that Mr. Meiners' testimony regarding the role of for-profit schools in higher education and educational investments and outcomes should be excluded. [Filing No. 204 at 15-17.]

In their response, Defendants argue that if the Court precludes Mr. Kinser's report, testimony, and opinions, then it should also exclude Mr. Meiners' since "[Mr.] Meiners's opinions have been proffered solely to rebut irrelevant issues raised by [Mr.] Kinser." [Filing No. 223 at 9.] Defendants then argue that Mr. Meiners' testimony is "as relevant as [Mr.] Kinser's testimony," that he has the requisite expertise, that his testimony is reliable, and that his testimony regarding federal government regulation and market incentives is "fair game." [Filing No. 223 at 10-21.]

The SEC reiterates many of their arguments on reply. [Filing No. 235.]

The Court need not address the arguments raised by the SEC, as Defendants have conceded that they offer Mr. Meiners' testimony solely to rebut Mr. Kinser's testimony. [*See* Filing No. 223 at 9.] Since the Court, as discussed above, has granted Defendants' Motion to Exclude Mr. Kinser's testimony, it also excludes Mr. Meiners' testimony based on Defendants' concession. The Court also notes that Mr. Meiners' testimony, like Mr. Kinser's testimony, covers information for which expert testimony is not necessary and is not tied to the circumstances presented by this case, and portions of it would be prejudicial. The Court **GRANTS** the SEC's Motion to Preclude the Testimony of Defendants' Expert Roger Meiners. [Filing No. 203].

### E. Anjan Thakor

#### 1. *Summary of Report*

Anjan Thakor is a Professor of Finance at the Olin Business School at Washington University in St. Louis. [Filing No. 206-1 at 3.] Prior to that, he was the Edward J. Frey Professor

of Banking and Finance at the University of Michigan Business School from 1996 to 2003. [Filing No. 206-1 at 3.] Mr. Thakor was retained by the SEC to "review the facts related to the market trends in the for-profit education market during the relevant time period, analyze the materiality of ITT's failure to disclose, including the buy-and-hold returns on ITT's stock, and examine its conduct with respect to its private student loan programs." [Filing No. 206-1 at 5.] Mr. Thakor states in his Report that he has analyzed:

> (i) [POBOB] made compared to the guarantee payments avoided during 2012-2014; (ii) disclosed PEAKS liability compared to internal calculations of PEAKS cash obligations; (iii) POBOB as a percentage of funds received by the PEAKS Trust (2012-2014); (iv) the percentage of loans on which ITT made POBOB that remained delinquent 180 days later; (v) the PEAKS parity ratio calculated by the ITT internal model provided to the ITT auditor compared to the PEAKS parity ratio known to ITT (2011-2012); (vi) the buy-and-hold returns of ITT's stock compared to its peer groups and the overall stock market during the relevant periods; and (vii) the potential gain from delaying guarantee payments that were due to the PEAKS loan program.

[Filing No. 206-1 at 5.] Mr. Thakor also "compared the CUSO liability reported by ITT to projections produced by ITT's cash flow analyses." [Filing No. 206-1 at 5.]

Mr. Thakor summarizes his conclusions as follows:

> (1) ITT and the entire for-profit college sector were in a downturn and facing reduced cash generation, deteriorating financial performance, and declining stock prices, (2) private student loans were defaulting at high rates, and (3) ITT was liable for guarantee payments to its PEAKS and CUSO private student loan programs. My analysis shows that the PEAKS program was in a vulnerable condition during the investigation period from October 2012 to October 2014, and ITT was faced with substantial cash obligations under the PEAKS Guarantee. Similarly, the CUSO program was also in a vulnerable financial condition during the same period, as ITT faced the prospect of substantial projected guarantee payments. The POBOB practice had a material impact on ITT's liquidity as it temporarily relieved ITT of guarantee payments, but this was achieved at the cost of accumulating potentially larger future losses. Three facts point to the relevance and materiality of the financial health of ITT's student loan programs: (i) ITT's stock price dropped on the relevant disclosure dates, (ii) its holding-period returns were below those of its peer groups and the overall market, and (iii) there were significant corrections in ITT's net income after the consolidation of the PEAKS Trust. It is my opinion

that the performance of these programs would have been material to ITT's investors.

[Filing No. 206-1 at 13 (emphasis omitted).]

### 2. *Defendants' Motion to Exclude*

Defendants move to exclude certain testimony and opinions of Mr. Thakor.  [Filing No. 206.]  They argue that Dr. Thakor is not qualified to opine on the timeliness and sufficiency of ITT's disclosures and his opinion is unreliable and usurps the role of the jury.  [Filing No. 207 at 9-11.]  They contend that Dr. Thakor's opinion that ITT filed "to disclose in a timely manner the true performance of the PEAKS and CUSO programs, as well as the existence and impact of the POBOB practice" should be excluded because Dr. Thakor is not a certified public accountant, has never worked as an accountant, and has never served as a Chief Executive Officer or Chief Financial Officer or worked in any other capacity for a United States public company.  [Filing No. 207 at 9.]  Defendants argue that Dr. Thakor's opinion applies no reliable methodologies or principles in assessing the timeliness or sufficiency of ITT's disclosures, and also usurps the role of the jury because it tells them to conclude that ITT had a duty to disclose the information at issue, and failed to disclose it.  [Filing No. 207 at 10-11.]  Defendants criticize the methodology Dr. Thakor uses to assess the materiality of ITT's disclosures on four dates based on the return of ITT's stock during the two months surrounding each disclosure date.  [Filing No. 207 at 11.]  Defendants argue that the methodology does not employ scientific methods or principles, does not take into account external market factors on ITT's stock prices, and does not control for information in ITT's disclosures that is unrelated to the SEC's allegations.  [Filing No. 207 at 12-13.]  Defendants seek to exclude Dr. Thakor's testimony regarding his buy-and-hold returns analysis because it is unreliable and unhelpful, his testimony regarding what investors would have wanted to know because it usurps the role of the jury, his analysis of ITT's cash flow analyses

relating to the CUSO Program because it is unreliable and unhelpful, and his opinion regarding the effect of POBOB because it exceeds his expertise and is speculative. [Filing No. 207 at 14-28.]

In its response, the SEC argues that Dr. Thakor is not opining on whether ITT's disclosures were timely or sufficient, but rather on the importance of information about the financial health of the PEAKS and CUSO Programs to the market and investors. [Filing No. 216 at 8.] It asserts that Dr. Thakor's statement about ITT's failure to timely disclose certain information is "simply a statement of fact that underlies his opinion that the undisclosed information was important to the market and investors." [Filing No. 216 at 10.] The SEC next contends that Dr. Thakor's analysis of stock market behavior and buy-and-hold returns are relevant and reliable. [Filing No. 216 at 12.] It notes that the movement of ITT's stock price following the announcement of previously-undisclosed information is relevant to the jury's determination of the materiality of that information, and that Defendants have retained their own economic expert to perform a study that purports to evaluate ITT's stock price movement following one specific disclosure. [Filing No. 216 at 12.] The SEC asserts that "event studies are a widely used methodology for measuring the effect of an event…on a company's stock price," but that certain circumstances present in this case made an event study inappropriate so Dr. Thakor performed other analyses. [Filing No. 216 at 13-14.] The SEC argues that Dr. Thakor's testimony regarding the importance of information to investors and the market does not usurp the role of the jury because he "is using a common term to explain his opinions as an economist that certain information was important to the market and investors." [Filing No. 216 at 22.] The SEC defends Dr. Thakor's methodology in analyzing the difference between ITT's publicly-reported CUSO liability and internal cash projections, and also his analysis of the effect of POBOB. [Filing No. 216 at 23-27.]

Defendants reply that Dr. Thakor does, in fact, opine on the timeliness and sufficiency of ITT's disclosures, and that testimony should be excluded. [Filing No. 236 at 6-11.] They again criticize the methodology Dr. Thakor uses, and argue that testimony regarding materiality should be excluded and that Dr. Thakor's analyses of ITT's purported cash flow projections and of the effect of POBOB are unreliable. [Filing No. 236 at 11-21.]

Defendants seek to exclude six main categories of testimony: (1) testimony regarding the timeliness and sufficiency of ITT's disclosures; (2) testimony regarding the behavior of the stock market around the dates ITT disclosed information; (3) testimony regarding the buy-and-hold returns analysis; (4) testimony regarding what investors would have wanted to know and the materiality of information to ITT's investors; (5) Dr. Thakor's analysis of ITT's cash flow analyses relating to the CUSO Program; and (6) Dr. Thakor's opinion regarding the effect of POBOB. The Court addresses each are in turn.

### a. Timeliness and Sufficiency of ITT's Disclosures

Defendants argue that Dr. Thakor should not be allowed to testify that ITT failed to disclose in a timely manner the true performance of the PEAKS and CUSO programs and POBOB. But the objectionable language that Defendants cite to from Dr. Thakor's Report is actually contained in a longer sentence that reads, in its entirety: "ITT's failure to disclose in a timely manner the true performance of the PEAKS and CUSO programs, as well as the existence and impact of the POBOB practice, resulted in investors being denied access to payoff-relevant information in a timely manner." [Filing No. 206-1 at 84.] In other words, Dr. Thakor assumes that ITT failed to disclose the true performance of the PEAKS and CUSO programs and POBOB in a timely manner, and is opining regarding the effect of that failure to timely disclose.

Whether ITT did or did not disclose the true performance of the PEAKS and CUSO Programs and POBOB during the time period Dr. Thakor focuses on is factual. If the SEC establishes that that information was not disclosed during that time period, then Dr. Thakor can testify regarding whether the non-disclosure "resulted in investors being denied access to payoff-relevant information in a timely manner." Defendants may challenge Dr. Thakor's opinions during cross examination. Defendants' motion as it relates to Dr. Thakor's testimony regarding the effect of ITT's failure to disclose in a timely manner the true performance of the PEAKS and CUSO Programs is **DENIED**.

b. Stock Market Behavior

Defendants argue that Dr. Thakor is simply comparing stock prices, and that he does not perform any analysis to determine how events affecting the overall market or other factors impacted ITT's stock price. At the outset, the Court finds that the performance of ITT stock following specific disclosures is relevant to the jury's consideration of whether the eventually-disclosed information was material. *See, e.g.*, *Bilzerian*, 926 F.2d at 1298 ("stock movement is a factor the jury may consider relevant" in determining whether information was material). Presumably Defendants agree, as they have retained their own expert to testify that the eventual disclosures were not significant factors in the performance of ITT's stock. [*See* Filing No. 206-2 (Dr. Thakor's Rebuttal Report addressing the conclusions of Defendants' expert witness, Professor Mark Zmijewski).]

As to Dr. Thakor's methodology, the Court finds that Dr. Thakor adequately explained why he did not think an event study was appropriate, and also explained how he arrived at his conclusions. For example, Dr. Thakor provides a chart summarizing the disclosure event and examples of confounding information – or information unrelated to the disclosures that could have

affected ITT's stock price – and then explains that "[t]he presence of confounding information on so many event dates is exactly why I determined that an event study would not be appropriate. Because there is not an event that involves only information related to the allegations and there is no reliable way to strip out the effects of confounding events within short-horizon windows, an event study cannot be used to draw causal inferences that information disclosure related to the allegations generated the observed abnormal return or conclude that the mentioned abnormal return was not distorted by the confounding events."  [Filing No. 206-2 at 7.]  Dr. Thakor also provides a lengthy explanation of how he arrived at his conclusions.  [*See* Filing No. 206-1 at 68-75.]  To the extent Defendants wish to challenge Dr. Thakor's methodology, they will have the chance to present Mr. Zmijewski as a witness, who will presumably explain why he disagrees with Dr. Thakor's methodology.  The jury can then decide what weight to give each expert's testimony.  The Court **DENIES** Defendants' motion as it relates to Dr. Thakor's analysis of stock market behavior.

c.   Buy-and-Hold Returns Analysis

Defendants describe buy-and-hold returns methodology and Dr. Thakor's analysis as follows:

> As a general matter, a buy-and-hold returns methodology involves measuring the return an investor would obtain from buying and holding a company's stock for a specified period of time.  Dr. Thakor's analysis involved comparing the buy-and-hold returns of ITT's stock to a 'peer group' of for-profit education companies, a portfolio of companies from the educational services industry, and the S&P 500 index during the periods from September 28, 2012 to September 30, 2013, January 31, 2014, and October 31, 2014.

[Filing No. 207 at 14.]

Defendants baldly assert that "[t]he use of a buy-and-hold returns model to assess the materiality of a public company's disclosures has not been subjected to peer review and is not

generally accepted within the scientific community." [Filing No. 207 at 14.] They do not cite any authority for their proposition, yet criticize the SEC for not citing any academic literature that would support Dr. Thakor's approach. [Filing No. 207 at 14.] Defendants argue that the buy-and-hold returns analysis cannot identify a specific disclosure as impacting a company's stock price, but Dr. Thakor himself acknowledges this, stating that "the effect of confounding effects cannot be cleanly stripped out" of his analysis. [Filing No. 206-2 at 13.] He explains that his buy-and-hold returns analysis is not intended to measure the effect of a specific disclosure on the stock price on a certain date, but rather is to "show that over the time period that you're conducting the buy and hold analysis for, that the lack of disclosure had a material impact on the stock price." [Filing No. 215-1 at 21.]

Defendants also argue that Dr. Thakor does not account for company-specific factors that could have affected ITT's stock performance. Defendants are free to argue at trial that Dr. Thakor's buy-and-hold returns analysis should not be relied upon, but the Court does not find it so flawed that it should be excluded. As Dr. Thakor explains, a longer term buy-and-hold returns analysis may be more appropriate than a short-term event study. [*See* Filing No. 206-2 at 13-15.] The jury can decide at trial – after considering Dr. Thakor's buy-and-hold returns model and Mr. Zmijewski's testimony – which should be given greater weight. *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F.Supp.3d 404, 433 (S.D. N.Y. 2015) (finding that event study was "one piece of evidence in a total mix of evidence…that a jury may consider when determining the materiality of non-public information"). Defendants' Motion to Exclude as it applies to Dr. Thakor's buy-and-hold analysis is **DENIED**.

d. Materiality

Defendants seek to exclude Dr. Thakor's testimony regarding what investors would have wanted to know and the materiality of that information, arguing that his opinion "goes to the ultimate issue of whether Defendants engaged in securities fraud under the securities laws." [Filing No. 207 at 19-20.] The Court disagrees. Dr. Thakor's opinions differ significantly from the opinions of Mr. Pitt and Mr. Kinser that the Court has excluded. Mr. Pitt and Mr. Kinser both sought to provide opinions regarding whether Defendants provided adequate disclosures in their SEC filings. Dr. Thakor's opinion relates to whether information that Defendants did not disclose (which is a factual question) would have been the type of information investors would have wanted to know – whether that information was material.

Courts routinely allow expert testimony regarding whether undisclosed information, or information that was later disclosed, was material. *See, e.g.*, *Securities and Exchange Commission v. Ferrone*, 163 F.Supp.3d 549, 565 (N.D. Ill. 2016) (SEC could present expert testimony regarding materiality of allegedly false and misleading statements because "[t]he jury…cannot determine whether the statements were false and misleading unless it knows the actual facts [surrounding the statements and]… the total mix of information related to those topics"); *U.S. v. Martoma*, 993 F.Supp.2d 452, 457 (S.D. N.Y. 2014) ("Expert testimony concerning materiality is often introduced in cases involving allegations that a company misrepresented or wrongfully withheld information from investors"). To the extent that Defendants object to the use of the word "material" as a legal term of art, the Court notes that the SEC has stated that it "would not object to Dr. Thakor using a word other than 'material' to describe his opinions." [Filing No. 216 at 23.] The parties should discuss what word might accomplish this purpose, and attempt to agree on its

use during Dr. Thakor's testimony. Defendants' Motion to Exclude as it relates to Dr. Thakor's testimony regarding materiality is **DENIED**.

e. <u>Cash Flow Analysis Relating to the CUSO Program</u>

Defendants argue that Dr. Thakor is not qualified to opine regarding ITT's contingent liability for the CUSO Program because he lacks accounting experience, and assert that his methodology is flawed. Dr. Thakor's testimony regarding ITT's contingent liability for the CUSO Program essentially involves comparing two sets of numbers – the cash flow analyses ITT conducted in connection with the calculation of its projected payments related to the CUSO Program from December 2012 to October 2013, and the CUSO liability reported by ITT in its public filings. Dr. Thakor states that "it appears that the contingent liabilities that ITT reported in its public filings were significantly lower than what it calculated internally as projected cash outflows related to the CUSO private student loan program," but does not opine regarding whether ITT's calculation of its contingent liability complied with accounting standards and does not attempt to model the performance of student loans and student loan portfolios. [Filing No. 206-1 at 63.] Because the testimony Dr. Thakor plans to give relates only to comparing the two sets of numbers, and not to opining regarding how those numbers were calculated, he is qualified to give his testimony.

Further, as to Defendants' argument that there are differences between how contingent liabilities and internal cash flow analyses are calculated, the Court does not find that this would render Dr. Thakor's testimony regarding the differences between those numbers unreliable. Again, Defendants can present evidence regarding the differing analyses through Mr. Zmijewski, and the jury can decide whether comparing the two sets of numbers is significant. Defendants' Motion to

Exclude as it relates to Dr. Thakor's testimony regarding the difference between ITT's publicly-reported CUSO liability and internal cash projects is **DENIED**.

### f. Analysis of POBOB

Finally, Defendants argue that Dr. Thakor's opinion regarding the effect of POBOB exceeds his expertise and is speculative. The Court finds Dr. Thakor's explanation of his model to be thorough and well-reasoned, and tied to his experience as an economist. Defendants assert that Dr. Thakor's opinion based on his model is "speculative," but the use of a model always involves some speculation. An expert must "explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). Here, Dr. Thakor has done just that. He explains how his model works, and the scenarios that he considered before discussing his conclusions. [Filing No. 206-1 at 44-50.] The Court rejects Defendants' arguments and **DENIES** their Motion to Exclude Dr. Thakor's analysis of POBOB.

The Court **DENIES** Defendants' Motion to Exclude Certain Testimony and Opinions of Anjan V. Thakor, Ph.D, [Filing No. 206], in its entirety, and the SEC may present Dr. Thakor as an expert witness at trial.

## F. R. Larry Johnson

### 1. *Summary of Report*

R. Larry Johnson, the SEC's expert witness, is a Certified Public Accountant ("CPA") and is the Chairman and Chief Executive Officer of Veris, a consulting firm. [Filing No. 208-1 at 4.] Mr. Johnson has been a CPA since 1969, and has "substantial experience providing a wide range

of auditing and consulting services." [Filing No. 208-1 at 4.] He summarizes his engagement by the SEC as follows:

> I have been engaged by the [SEC] to evaluate whether and to what extent the financial statements of [ITT] as of and for the periods ended March 31, 2013, June 30, 2013, and September 30, 2013 were prepared in accordance with generally accepted accounting principles ["GAAP"], insofar as it relates to the non-consolidation of the PEAKS Trust…in those financial statements, and to evaluate the conduct of ITT, Kevin M. Modany and Daniel M. Fitzpatrick…in relation to the preparation of those financial statements. Further, I have evaluated the conduct of Mr. Modany and Mr. Fitzpatrick as it relates to their communications with ITT's independent auditors….

[Filing No. 208-1 at 3.]

After providing background information on ITT and the PEAKS and CUSO Programs, Mr. Johnson discusses certain accounting and auditing literature and various GAAP principles. [Filing No. 208-1 at 6-35.] Mr. Johnson then sets forth the purpose of an audit according to the Public Company Accounting Oversight Board ("PCAOB"), and the audits performed by ITT's auditor. [Filing No. 208-1 at 35-38.] Finally, he sets forth and discusses his conclusions that, according to GAAP principles, ITT did not properly consolidate the PEAKS Program in 2013, contingent liabilities were not properly disclosed, material weaknesses in ITT's internal control over financial reporting directly contributed to the material misstatements, and Defendants failed to comply with their responsibilities related to ITT's financial statements. [Filing No. 208-1 at 36-85.]

### 2. *Defendants' Motion to Exclude*

Defendants seek to exclude Mr. Johnson's testimony on Defendants' state of mind and intent, arguing that it usurps the role of the jury and is unreliable and prejudicial. [Filing No. 209 at 9-12.] They also argue that Mr. Johnson's opinion that Defendants made false representations in management representation letters to ITT's auditor invades the jury's province and is a legal conclusion. [Filing No. 209 at 12-14.] Defendants assert that Mr. Johnson's testimony that ITT's

31

disclosures were misleading is unreliable and usurps the role of the jury, that his testimony regarding the impact of POBOB is irrelevant and unreliable, that his testimony regarding contingent liability under the CUSO Program and regarding Defendants' failure to provide internal cash flow projections to ITT's auditor is unreliable, that his testimony regarding Defendants' withholding of legal information from the auditor will not help the jury, that he is not qualified to opine on consolidation of the PEAKS Trust in ITT's financial statements and his testimony will not aid the jury and will be prejudicial, and that testimony on certain extraneous matters should be excluded. [Filing No. 209 at 15-29.]

In response, the SEC focuses on the four main opinions that Mr. Johnson gives – that ITT did not properly consolidate the PEAKS Program in 2013, that contingent liabilities were improperly disclosed, that material weaknesses in ITT's internal control over financial reporting directly contributed to the material misstatements, and that Defendants failed to comply with their responsibilities related to ITT's financial statements. [Filing No. 214.] As to the first opinion, the SEC argues that Mr. Johnson is qualified to offer it, that his opinion is sufficiently reliable, and that his testimony would assist the jury. [Filing No. 214 at 11-17.] The SEC also argues that Mr. Johnson's second opinion regarding improper disclosure of contingent liabilities is reliable and that Defendants take Mr. Johnson's statements out of context. [Filing No. 214 at 17-21.] Regarding Mr. Johnson's third opinion – that weaknesses in ITT's internal control over financial reporting directly contributed to the material misstatements – the SEC states that it does not appear Defendants are challenging this opinion. [Filing No. 214 at 22.] The SEC also argues that Mr. Johnson's fourth opinion, that Defendants failed to comply with their responsibilities related to ITT's financial statements, is reliable, that Mr. Johnson is qualified to offer it, that he does not testify regarding scienter, and that his testimony will be helpful to the jury and not prejudicial.

[Filing No. 214 at 22-27.]  Finally, the SEC argues that information in Mr. Johnson's report regarding ASC 810[4] and consolidation discusses a document prepared by ITT's auditor, and that accounting for the PEAKS and CUSO Programs is relevant and "a core issue in this case," so Mr. Johnson should be allowed to explain the relevant accounting principles, literature related to that accounting, and the rationale for that accounting.  [Filing No. 214 at 27-28.]

In their reply, Defendants again argue that Mr. Johnson's testimony regarding Defendants' state of mind and intent should be excluded.  [Filing No. 238 at 7-11.]  They reiterate their arguments that Mr. Johnson should not be allowed to testify that Defendants made false representations to ITT's auditor, that ITT's disclosures were misleading, or regarding the impact of POBOB on the issue of consolidation, the contingent liability under the CUSO Program, Defendants' failure to provide internal cash flow projections, Defendants' withholding of legal information from the auditor, or extraneous matters.  [Filing No. 238 at 12-23.]

The Court will not pick apart Mr. Johnson's report line-by-line, but finds generally that Mr. Johnson may testify regarding GAAP standards and whether Defendants met those standards. *In re REMEC Inc. Securities Litigation*, 702 F.Supp.2d 1202, 1227-28 (S.D. Cal. 2010) (allowing dueling experts to testify regarding whether defendant's valuation of goodwill violated GAAP, and stating that jury had to make ultimate determination whether a violation had taken place); *U.S. v. Hatfield*, 2010 WL 1948236, *2 (E.D. N.Y. 2010) ("jurors are not required to 'accept the accountants' evaluation' about 'whether a given fact was material.'…. So [the expert's] proposed testimony neither goes to any ultimate issue nor usurps the jury's role.  But it is still relevant.  This

---

[4] Mr. Johnson describes ASC 810, Accounting Standards Codification Topic 810, as "establish[ing] the criteria and guidelines for accounting for the consolidation of variable interest entities…. Consolidation of financial statements is intended to reflect the assets, liabilities, and results of operations of an entity and its subsidiaries in a single set of financial statements." [Filing No. 208-1 at 25.]

is because compliance with applicable accounting standards 'may negate the government's claim of an intent to deceive'") (quoting *U.S. v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007)).  Mr. Johnson has significant experience as a CPA, and is qualified to provide this testimony.

As for Defendants' nine specific arguments, the Court finds as follows:

- First, Mr. Johnson may not testify regarding scienter.  The SEC states that Mr. Johnson will not testify about scienter, and the Court agrees that Mr. Johnson may not do so.  He may testify regarding whether Defendants complied with GAAP and financial reporting responsibilities, but not what their state of mind was in doing so.

- Second, Mr. Johnson may testify regarding the information Defendants provided to ITT's auditor and whether that information was accurate in light of applicable accounting standards.  Again, though, he may not testify regarding their state of mind when providing this information.  The information Defendants provided and whether it was accurate is not prejudicial testimony, and is important information for the jury to consider.

- Third, as for whether Mr. Johnson can testify that ITT's disclosures were misleading, he may testify regarding whether the disclosures complied with accounting principles.  He may not testify regarding whether the disclosures complied with federal securities laws – the jury will make that determination.

- Fourth and fifth, the Court finds it appropriate for Mr. Johnson to testify regarding the impact of POBOB on consolidation and contingent liability under the CUSO Program.  As a CPA, Mr. Johnson is qualified to render the opinions that ITT did not properly consolidate the PEAKS Program in 2013,[5] and that ITT's disclosure of its contingent obligation under the PEAKS and CUSO programs violated GAAP.  He may not testify that the disclosures were "misleading" or regarding Defendants' motivation or state of mind.[6]

---

[5] Defendants argue that the SEC has not alleged that ITT's filings prior to 2013 were false or misleading because ITT did not consolidate the PEAKS Trust during those periods.  [Filing No. 209 at 17.]  But the SEC alleges generally that Defendants' failure to consolidate the PEAKS Program was part of its fraudulent scheme.  [*See* Filing No. 1 at 3; Filing No. 1 at 11-12.] Accordingly, Mr. Johnson's testimony regarding whether ITT properly consolidated the PEAKS Program is relevant.

[6] For example, Mr. Johnson may not testify – as stated in his Report – that "[t]he 'coincidental' change in ITT's position regarding the permissibility of the POBOB demonstrates the length to which ITT, Mr. Modany, and Mr. Fitzpatrick were willing to go to continue to keep the PEAKS Trust off balance sheet, and, as a result, precluded the deteriorating results of the PEAKS Trust from being reported in ITT's financial statements.  Mr. Modany's request to receive a legal opinion

- Sixth and seventh, Mr. Johnson may testify regarding whether Defendants complied with various auditing standards when providing ITT's auditor with internal cash flow projections or legal information. He may not testify regarding Defendants' state of mind related to their interactions with auditors.

- Eighth, Mr. Johnson may opine regarding consolidation of the PEAKS Trust in ITT's financial statements. Mr. Johnson is a CPA, and is qualified to discuss the treatment of the PEAKS Trust according to GAAP standards. To the extent that Defendants find Mr. Johnson's analysis lacking, they can cross examine him at trial and the jury can decide what weight to place on his testimony.

- Finally, Mr. Johnson may not testify regarding extraneous matters that do not relate directly to this litigation, including that "[s]ignificant financial failure and scandals have resulted from the abuse and misstatement of off-balance sheet items. The potential for such abuse is well documented"; or "high profile failures" of other entities such as Enron, Tower Financial, Bear Stearns, and Lehman Bros. as "examples of the potential severity of the misuse of off-balance sheet entities." [*See* Filing No. 208-1 at 27-28.]

In sum, Defendants' Motion to Exclude Certain Testimony and Opinions of R. Larry Johnson is **GRANTED IN PART** and **DENIED IN PART** as set forth above.

## IV.
### CONCLUSION

For the foregoing reasons, the Court:

- **GRANTS** Defendants' Motion to Exclude the Report, Testimony, and Opinions of Harvey L. Pitt, [197];

- **GRANTS** the SEC's Motion to Preclude the Testimony of Defendants' Expert David B.H. Martin, [201];

- **GRANTS** Defendants' Motion to Exclude the Report, Testimony, and Opinions of Kevin Kinser, Ph.D, [199];

- **GRANTS** the SEC's Motion to Preclude the Testimony of Defendants' Expert Roger Meiners, [203];

---

that the POBOB were not permitted, despite previously and consistently asserting the contrary when it appeared more beneficial to ITT's reported results, is particularly instructive." [Filing No. 208-1 at 49.]

- **DENIES** Defendants' Motion to Exclude Certain Testimony and Opinions of Anjan V. Thakor, Ph.D, [206]; and

- **GRANTS IN PART** and **DENIES IN PART** as set forth above Defendants' Motion to Exclude Certain Testimony and Opinions of R. Larry Johnson, [208].

Date: 4/19/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**